1

2

3

4

5

6

7

8 UNITED STATES DISTRICT COURT

9 FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11 KEENAN WILKINS, aka NERRAH
BROWN,
12
Plaintiff,
13

14 v.

15 DR. CHRISTINE S. BARBER, et al.,

16 Defendants.

No.  2:19-cv-1338 WBS KJN P


FINDINGS AND RECOMMENDATIONS

17       Plaintiff is a state prisoner, proceeding without counsel.  Plaintiff seeks relief pursuant to

18 42 U.S.C. § 1983.  Plaintiff's renewed motions for preliminary injunction are before the court.

19 (ECF Nos. 75, 86.)  As discussed below, the undersigned recommends that plaintiff's motions be

20 denied.

21 I.  Plaintiff's Second Amended Complaint

22       Plaintiff suffers from myriad serious medical conditions including a disc herniation,

23 syringomyelia, spondylosis, and alleged shoulder separation that causes him extreme pain.

24 Plaintiff also has schizophrenia, and at times has suicidal ideations due to pain.  Plaintiff contends

25 that defendants have delayed and denied him adequate medical care resulting in the unnecessary

26 wanton infliction of pain and inability to conduct basic necessities, such as exercise, sleep, etc., in

27 deliberate indifference to his serious medical needs.  (ECF No. 88 at 2.)  Specifically, plaintiff

28 alleges the following in his three claims for relief.

1

In his first claim, plaintiff states that for four years, he was prescribed morphine, 30 mg, twice a day for pain management.  (ECF No. 88 at 6.)  On November 28, 2018, plaintiff was transferred to the California Health Care Facility ("CHCF").  Plaintiff alleges that defendant Dr. Barber immediately began threatening to take plaintiff off opioids.  Subsequently, a psych tech falsely reported that plaintiff was "cheeking" his medications.  The next day, February 17, 2019, Dr. Barber had plaintiff sign a narcotic contract and began reducing plaintiff's morphine.  One week later, on February 25, 2019, the morphine was completely stopped, and plaintiff was given Tylenol that offered no pain relief.  Plaintiff began having extreme pain and withdrawals.  Despite putting in repeated sick call slips, he was denied care and defendant Nurse Escobar told plaintiff to "drink water" for the withdrawals.[1]  Plaintiff suffered withdrawal symptoms for two weeks or more without any medical assistance.  On March 6, 2019, plaintiff saw Dr. Barber, and informed her of his suffering.  Plaintiff told Dr. Barber that he had reported her to her superiors and submitted a Medical Board complaint.  Plaintiff claims Dr. Barber became enraged, told plaintiff to "suffer" and made him leave.  Dr. Barber then entered a false note claiming plaintiff was caught cheeking medication two days in a row and that was why she stopped his pain medication.  On June 12, 2019, Dr. Singh and Dr. Recarey found Dr. Barber violated policy by writing such a false note.  (ECF No. 88 at 7, referencing CHCF SC 119000126.)

On March 15, 2019, plaintiff saw an outside neurosurgeon, who requested a current MRI of disc herniation for surgery and recommended a non-narcotic pain medication (Ultram).  On March 25, 2019, Dr. Barber denied the MRI and the pain medication, and discontinued plaintiff's prescription for orthopedic shoes which plaintiff had for two years to help him walk with syringomyelia, etc.  On March 25, 2019, Dr. Barber referred plaintiff to the pain committee.

On May 3, 2019, plaintiff saw an outside orthopedist for plaintiff's shoulder separation that allegedly had gone unaddressed since December 2015.  The orthopedist recommended plaintiff receive a cortisone shot in his shoulder, which plaintiff did not receive until July 25, 2019; the shot did not help with the pain.  To date, plaintiff still has not had the MRI or a return

---

[1]  On December 3, 2019, defendant Escobar was dismissed without prejudice.  (ECF No. 38.)

1   appointment with the specialist, a twelve-month delay.  (ECF No. 88 at 7.)  Following Dr.

2   Barber's false note, plaintiff refused to see her.

3       On July 10, 2019, Dr. Barber was out on leave, and by TV appointment, plaintiff saw Dr.

4   Mansour, who would not order an MRI or the orthopedic shoes because Dr. Barber said plaintiff

5   does not need them.  Dr. Mansour did not evaluate plaintiff and denied plaintiff pain medication

6   despite plaintiff reporting that the Tylenol does not help at all.  Plaintiff saw Dr. Mansour again

7   on July 25, 2019, again reporting terrible pain, but Dr. Mansour did nothing, telling plaintiff he

8   would be seen by a pain specialist on July 26, 2019.  (ECF No. 88 at 8.)  On July 26, 2019,

9   plaintiff went to see the pain specialist but was told the appointment was cancelled because he

10  was told no report was needed anymore.  By TV appointment, plaintiff reported his daily pain and

11  problems to Dr. Nikolic, who did no evaluation except have plaintiff squeeze the nurse's fingers;

12  the doctor refused to order the MRI, and said she could not order any narcotics due to the

13  cheeking reports, but referred plaintiff to physical therapy.  On August 15, 2019, plaintiff again

14  reported his pain, impairments, and inefficacy of Tylenol to Dr. Mansour, who refused to

15  prescribe anything for pain, denied the MRI, but ordered a neck x-ray that said nothing was

16  wrong with plaintiff's neck.  (ECF No. 88 at 9.)

17      On September 18, 2019, the first false cheeking report was removed from plaintiff's

18  central file when officers verified it was false.  (ECF No. 88 at 9.)

19      On October 3, 2019, plaintiff attended physical therapy for his shoulder, but was informed

20  it would not help his shoulder.  On November 12, 2019, plaintiff saw Dr. Dredar with a

21  correctional officer present.  Dr. Dredar did not evaluate plaintiff, despite plaintiff reporting his

22  extreme pain and that Tylenol did not help.  Dr. Dredar denied plaintiff adequate pain medication

23  and the MRI.  After the appointment, plaintiff alleges Dr. Dredar entered a false note stating

24  plaintiff was evaluated, was uncooperative, and that after the appointment, Dr. Dredar watched

25  plaintiff with an officer outside and plaintiff was using his arm.  Plaintiff alleges Officer Acero

26  provided written verification that this was all false, and plaintiff now refuses to see Dr. Dredar.

27  (ECF No. 88 at 9.)

28  ////

On November 12, 2019, plaintiff submitted a sick call slip, appending copies of past MRI's showing the serious condition of his neck.  Dr. Dredar approved an MRI, which was done on December 4, 2019, but it was not done with contrast as requested by the specialist, but did show the serious condition not shown in the August 19, 2019 x-ray.  (ECF No. 88 at 10.)

On January 31, 2020, plaintiff was seen by Dr. Singh, who ordered Tramadol for management of plaintiff's pain.  However, Dr. Singh later cancelled the Tramadol after being told that plaintiff had cheeked morphine twice, which was false.  Instead, Dr. Singh ordered Lidocaine patches, which plaintiff claims offer no relief for his neck pain.  On March 12, 2020, plaintiff was seen by Dr. Greenberg, who informed plaintiff that he could not adjust plaintiff's pain medication due to the cheeking reports; instead, he ordered a heating pad, which plaintiff has not received.

On March 31, 2020, plaintiff saw Dr. Brar, who told plaintiff he could not order pain medication due to the cheeking reports.   On April 3, 2020, plaintiff saw a neurosurgeon, who insisted he needed a contrast MRI.

Plaintiff claims that he has fallen several times due to his extreme pain, impairments, numbness, etc., and hit his head on the ground the last time he fell.  Plaintiff suffers lack of sleep and cannot exercise due to the extreme pain.  He has been unable to obtain the surgery a specialist found plaintiff needs.  Plaintiff alleges that defendants Recarey, Adams and Gates, despite their roles as administrators, failed to intervene and ensure plaintiff is provided adequate pain medication or the surgery, despite being informed on numerous occasions about plaintiff's medical issues.  (ECF No. 88 at 11.)  Fifteen months later, plaintiff still has not received the pain management committee's review.

In his second claim, plaintiff alleges Dr. Barber retaliated against plaintiff because plaintiff sought redress via medical grievances and complaints by Dr. Barber telling plaintiff to "suffer," and then discontinued plaintiff's prescription orthopedic shoes, and denied plaintiff an MRI and surgery, and denied plaintiff the Ultram prescription recommended by the specialist.  As a result of his allegations in claims one and two, plaintiff suffers daily pain, impairment, mental anguish and emotional distress.  (ECF No. 88 at 12.)

////

4

In his third claim, plaintiff raises various state law claims for libel/defamation/slander, negligence and medical malpractice.  (ECF No. 88 at 13-14.)

Plaintiff seeks unspecified injunctive relief, declaratory relief, and money damages.  (ECF No. 88 at 15.)

II.  Prior Motions for Injunctive Relief

Prior to filing the two instant motions, plaintiff previously filed three motions for injunctive relief.  (ECF Nos. 6, 26, 47.)  In response to plaintiff's prior motions for preliminary injunction, and pursuant to the court's order, the state provided responses by special appearance (ECF Nos. 15, 32).  Following replies by plaintiff, plaintiff's motions were denied by the district court on February 25, 2020, adopting the undersigned's January 24, 2020 findings and recommendations.  (ECF Nos. 59, 52.)

III.  Law Governing Motions for Injunctive Relief

"A preliminary injunction is an extraordinary remedy never awarded as of right."  Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 24 (2008) (citation omitted).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co., 571 F.3d 873, 877 (9th Cir. 2009) (quoting Winter, 555 U.S. at 20).  An injunction may only be awarded upon a clear showing that the plaintiff is entitled to relief.  See Winter, 555 U.S. at 22 (citation omitted).

The propriety of a request for injunctive relief hinges on a significant threat of irreparable injury that must be imminent in nature.  Caribbean Marine Serv. Co. v. Baldridge, 844 F.2d 668, 674 (9th Cir. 1988).  Speculative injury does not constitute irreparable harm.  See id.; Goldie's Bookstore, Inc. v. Superior Court, 739 F.2d 466, 472 (9th Cir. 1984).  A presently existing actual threat must be shown, although the injury need not be certain to occur.  Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 130-31 (1969); FDIC v. Garner, 125 F.3d 1272, 1279-80 (9th Cir. 1997), cert. denied, 523 U.S. 1020 (1998).

////

In cases brought by prisoners involving conditions of confinement, any preliminary injunction "must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct the harm." 18 U.S.C. § 3626(a)(2). "[I]n the prison context, a request for injunctive relief must always be viewed with great caution because judicial restraint is especially called for in dealing with the complex and intractable problems of prison administration." Goff v. Harper, 60 F.3d 518, 520 (8th Cir. 1995) (citation and internal quotation marks omitted).

IV.   Plaintiff's April 16, 2020 Motion

    A.   The Parties' Positions

        1.   Plaintiff's Arguments

Plaintiff's "renewed" motion for preliminary injunction seeks "to enjoin criminal acts and irreparable injury." (ECF No. 75.) [2] Plaintiff claims that the "criminal actions" of defendants are depriving him of a basic human necessity, exercise, because defendants refuse to prescribe adequate pain medication for the pain he suffers as a result of his serious medical needs, including diffuse disc bulge at C5-6 causing severe central stenosis and cord compression." (ECF No. 75 at 2.) Based on this diagnosis, plaintiff claims that "ALL doctors" have prescribed plaintiff narcotics for the past ten years. (ECF No. 75 at 2.) On February 25, 2019, plaintiff's time-release morphine prescription for 30 mg two times a day was removed based on alleged false reports that plaintiff was "cheeking" the medication. On March 15, 2019, a specialist recommended that plaintiff receive a "non-narcotic" pain medication, Tramadol. (ECF No. 75 at 3.) Dr. Barber denied the request for pain medication. On January 31, 2020, Dr. Singh ordered Tramadol to be prescribed for plaintiff. Subsequently, after being told about the alleged cheeking reports, Dr. Singh cancelled the Tramadol prescription and prescribed Lidocaine patches instead. (ECF No. 75 at 3.) Plaintiff contends the patches fail to help his neck pain at all. On March 12, 2020,

---

[2]  In the instant motion, plaintiff claims he filed a motion for temporary restraining order "that to date is unanswered." (ECF No. 75 at 1.) However, the court docket does not reflect the filing of such a motion. In support of his prior motions, plaintiff signed a declaration on March 10, 2020, which was filed with the court on March 13, 2020. (ECF No. 67.) But at the time the instant motion was filed, the only pending motion for preliminary relief was the motion addressed by the instant findings and recommendations.

plaintiff was seen by nonparty Dr. Greenberg, who said he would not order any narcotic pain medication due to the cheeking reports, and ordered a heating pad, which plaintiff was never given.  On March 31, 2020, nonparty Dr. Brar also advised he could not order any pain medications due to the cheeking reports.

On April 3, 2020, a neurosurgeon recommended plaintiff be prescribed adequate pain medications.  (ECF No. 75 at 4.)  Plaintiff was to have a follow-up appointment with a prison doctor on April 10, 2020, but he was not seen.  The nurse told plaintiff that the doctor would not order the recommended pain medications due to "that cheeking thing."  (ECF No. 75 at 5.) In response to his subsequent medical slip seeking adequate pain medication to allow him to exercise, plaintiff was seen by a nurse who, following consultation with the doctor, said the doctor could not order pain medications due to the cheeking reports, but recommended plaintiff take two over the counter Tylenol.  Plaintiff states he has tried taking five over the counter Tylenol without any pain relief.  (ECF No. 75 at 5.)

Due to the denial of adequate pain medication, plaintiff has been unable to exercise for approximately one year.  He contends that such lack of care amounts to a "criminal act under state law Penal Code § 673."  (ECF No. 75 at 7.)  Plaintiff also relies on Wilson v. Seiter, 501 U.S. 294 (1991), and Hearns v. Terhune, 413 F.3d 1036 (9th Cir. 2005), to support his view that exercise is a basic human need.  (ECF No. 75 at 1, 6.)

Plaintiff seeks a "preliminary injunction prohibiting CHCF medical officials from denying plaintiff adequate pain medications due to libel/slanderous cheeking reports," and "adequate pain medication which would allow exercising without torment."  (ECF No. 75 at 7.)

### 2. Declaration By A. Adams

On June 9, 2020, A. Adams, Chief Medical Executive at the California Health Care Facility, who reviewed plaintiff's medical records, filed a declaration in response to the court's order.  Dr. Adams provided a copy of a March 4, 2020 "Physical Medicine and Rehab Consultation" note by Dr. Gabriel Williams, who documented that plaintiff was able to demonstrate the exercise program he was given by physical therapy to Dr. Williams.  (ECF No. 89 at 2, 5-6.)  Plaintiff "expressed complaints about pain and his concerns with programming and

7

1   getting around, but noted that both gentle stretching and the lidocaine patches he is prescribed

2   makes his pain better.  [Plaintiff] is able to independently perform activities of daily living."

3   (ECF No. 89 at 2.)  In addition, physical therapy evaluation notes from March 3, 2020, indicate

4   that plaintiff "is able to ambulate steadily with his mobility device."  (ECF No. 89 at 2.)

5          Dr. Adams opines that plaintiff's claim that he has been unable to exercise for a year is

6   contradicted by his medical records, which do not suggest that plaintiff is physically incapable of

7   exercise "as he is independently mobile and displays steady ambulation."  (ECF No. 89 at 2.)

8   "There does not appear to be any medical indication or reason why [plaintiff] could not exercise.

9   He is participating in physical therapy and was given an exercise program to perform, which he

10  was able to demonstrate to medical providers."  (Id.)

11         As for plaintiff's referral to the pain management committee, Dr. Adams states that while

12  the inmate does not formally appear before a committee, he is required to complete and submit

13  documentation, as are his medical providers.  "This documentation was recently submitted

14  completing the referral packet for the Pain Management Committee meeting."  (ECF No. 89 at 3.)

15         With regard to opportunities to exercise, despite COVID-19 restrictions, Dr. Adams states

16  that plaintiff "has daily access to the dayroom and yard time which allows for various modes of

17  exercise."  (ECF No. 89 at 3.)

18                 3.  Plaintiff's Reply[3]

19         Plaintiff reiterates his serious medical condition includes a "diffuse disc bulge at C5-6

20  causing severe central spinal stenosis."  (ECF No. 96 at 2, 11.)  "To help manage the (at times)

21  EXTREME pain from this condition, plaintiff was prescribed Vicodin 3 times a day with

22  Gabapentin."  (ECF No. 96 at 2, 13-15 (2012-13).)  However, once taken into CDCR custody,

23  plaintiff was taken off such medications; after trying several other medications that did not help,

24  plaintiff was put on 30 mg of morphine twice a day which he took for nearly five years before

---

25  [3]  Plaintiff objects that he was "NEVER served defendants' response."  (ECF No. 96 at 1.)

26  However, the declaration is accompanied by a declaration of service by U.S. Mail on plaintiff on
    June 9, 2020.  (ECF No. 89 at 13.)  Moreover, after plaintiff advised the court that he had not

27  received the declaration, the court ordered the Clerk to serve a copy of the declaration on
    plaintiff, and granted him an extension of time in which to file his reply.  (ECF No. 94.)

28

1  being transferred to CHCF.  (ECF No. 95 at 2-3.)  "After being threatened to be taken off the

2  morphine at [plaintiff's] very first appointment with defendant Barber, a false cheeking report

3  was made on 2/17/19 and used by Barber to reduce and stop the pain medication in one week."

4  (ECF No. 96 at 3.)  On March 15, 2019, plaintiff saw a neurosurgeon who requested a current

5  MRI prior to needed surgery, and recommended plaintiff be prescribed a "non-narcotic analgesic,

6  Ultram" for pain.  (ECF No. 96 at 3, quoting ECF No. 96 at 21.)  Plaintiff contends that many

7  inmates at CHCF receive Ultram for pain; policy requires it to be "'crushed and floated' (placed

8  in water)" to reduce the risk of misuse.  (ECF No. 96 at 3.)  On March 25, 2019, an unidentified

9  defendant Barber denied the MRI, the Ultram or any adequate pain medication.  (Id.)  Plaintiff

10  claims that after this action and multiple grievances were filed, he received a neck x-ray "that

11  incredulously stated nothing wrong with his neck."  (ECF No. 96 at 4, citing ECF No. 96 at 22.[4])

12          Eventually, on December 4, 2019, plaintiff was given an MRI.  However, on April 4,

13  2020, the neurologist reiterated he needed an MRI with contrast before performing surgery.

14          On January 31, 2020, defendant Dr. Singh prescribed Ultram for plaintiff, but later

15  cancelled it after told plaintiff had "cheeked" morphine, after plaintiff had demonstrated the

16  allegation was false.  Dr. Singh prescribed lidocaine patches instead.  (ECF No. 96 at 4.)  Plaintiff

17  claims he has repeatedly informed prison medical staff that the lidocaine patches help plaintiff's

18  separated shoulder "some," but provide no relief for plaintiff's neck.  (ECF No. 96 at 4-5, citing

19  ECF No. 96 at 29-35.)  As of July 6, 2020, plaintiff had not had a pain committee review.  (ECF

20  No. 96 at 5.)

21          Plaintiff claims that the lack of adequate pain medication prevents him from exercising

22  due to the "extreme pain" in trying to do so.  (ECF No. 96 at 5.)  He rarely goes outside because

23  "walking most times shoots pain up/down plaintiff's neck/back/legs/feet;" "lifting his left arm is

24  extreme and at times unbearable."  (ECF No. 96 at 5.)  Plaintiff claims that when he was

25  "prescribed adequate pain medication he was able to endure the pain to exercise and/or at least

26  walk."  (ECF No. 96 at 5.)

27  _____

28  [4]  The report states:  "Your test results are essentially within normal limits or are unchanged and no provider follow-up is required."  (ECF No. 96 at 22 (emphasis added).)

Plaintiff provides the following rebuttal to Adams' declaration:

1. "[E]vidence shows" the March 4 note of Dr. Williams was his third time writing a fraudulent note, which plaintiff contends is a custom at CHCF as shown by patient complaints, and plaintiff claims there is a current active medical staff complaint on the fraudulent aspects of this March 4, 2020 (and other) notes by Dr. Williams who has never physically evaluated plaintiff.  (ECF No. 96 at 6.)

2. Dr. Adams' statement that plaintiff has stated that the lidocaine patches help is misleading because "plaintiff has repeatedly asserted that the patches do not help his neck at all but at times help his shoulder some."  (ECF No. 96 at 7, citing ECF No. 96 at 29-35.)

3. Plaintiff refutes Dr. Adams' claim that plaintiff is able to "independently perform activities of daily living," because "plaintiff can only do activities with unbearable pain (at times) and withstands some activities (exercising) due to the untreated pain it will cause."  (ECF No. 96 at 7.)  Plaintiff's position is supported by "a vast amount of medical slips and grievances notifying medical staff of the difficulty he is having walking, sitting, standing, [and] attempting to exercise."  (Id.)

4. Dr. Adams' attempt to relate physical therapy to an exercise program is misleading because plaintiff received one-hour sessions of physical therapy once a week for only one month because the sessions were suspended in February due to COVID-19.  (ECF No. 96 at 8.)

5. Despite the alleged March 25, 2019 referral to the pain management committee, as well as multiple medical slips, 22 forms, letters, etc., plaintiff has not received such review.  On January 31, 2020, Dr. Singh re-referred plaintiff to the pain committee on an urgent basis, but to date, it remains undone.[5]  Plaintiff cites numerous cases where such reviews only take about thirty days.  (ECF No. 96 at 9.)

In conclusion, plaintiff reiterates his request for preliminary injunctive relief and for defendants to provide plaintiff pain management committee review.  (ECF No. 96 at 10.)

////

---

[5] Plaintiff refers to exhibit H-1, but there is no exhibit bearing that number.  (ECF No. 96, passim.)

1  B. Discussion

2  Initially, the undersigned reiterates that this action is a civil action.  (ECF No. 85 at 3.)  A

3  private right of action under a criminal statute has rarely been implied.  See Chrysler Corp. v.

4  Brown, 441 U.S. 281, 316 (1979).  Plaintiff's continued characterization of defendants' actions as

5  criminal is not persuasive or appropriate in this civil action.

6  Second, Chief Medical Executive A. Adams now declares that plaintiff's documentation

7  was submitted to the pain management committee for review.  (ECF No. 89 at 3.)

8  Third, plaintiff has repeatedly sought injunctive relief in this action.  The current motion

9  now attempts to obtain injunctive relief on the basis that the alleged denial of adequate pain

10  medication deprives plaintiff of exercise.  However, plaintiff's amended complaint alleges that

11  the defendants' denial of adequate pain medication deprives plaintiff of sleep and exercise.  The

12  fact that plaintiff's pending motion for injunctive relief reflects the ultimate issues in this case

13  renders preliminary injunctive relief inappropriate.[6]  "Since the ultimate issues in this lawsuit are

14  inextricably intertwined with the assertions in this motion for injunctive relief, a ruling on the

15  motion might be perceived as speaking in some way to the ultimate issues in this case.  In such

16  instances, the Court should refrain from prematurely granting such relief."  Green v.

17  Hawkinberry, 2015 WL 507057, at *3, 2015 U.S. Dist. LEXIS 14597, at *7 (W.D. Pa. Feb. 6,

18  2015) (collecting cases), reconsideration denied, 2015 WL 757407, 2015 U.S. Dist. LEXIS 21260

19  (W.D. Pa. Feb. 23, 2015).[7]  See also Wesley v. Sec'y Pennsylvania Dep't of Corr., 569 F. App'x

20  _____

21  [6] Ultimately, plaintiff must show that the challenged course of treatment was medically
unacceptable under the circumstances and chosen in conscious disregard of an excessive risk to

22  plaintiff's health.  Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1986).  The difference of
opinion between a prisoner and physician regarding treatment does not establish deliberate

23  indifference.  Id.  This rule applies whether the difference is between the medical professional(s)
and a prisoner or two or more medical professionals.  Hamby v. Hammond, 821 F.3d 1085, 1092

24  (9th Cir. 2016) (citation omitted).

25  [7] Where a prisoner's "'request for immediate relief in his motion for preliminary injunction
necessarily seeks resolution of one of the ultimate issues presented in [the] . . . Complaint, . . .

26  [the] [p]laintiff cannot demonstrate that he will suffer irreparable harm if he is not granted a
preliminary injunction, because the ultimate issue presented will be decided either by this Court

27  or at trial.  As a result, [p]laintiff's motion for preliminary injunction should be denied.'"  Green,

28  2015 WL 507057, at *2, 2015 U.S. Dist. LEXIS 14597, at *8-9, quoting Messner v. Bunner, 2009

123, 125 (3d Cir. 2014) (plaintiff "sought the same ultimate injunctive relief that he sought in his complaint," suggesting "a disagreement about a course of medical treatment provided in a prison. Accordingly, the likelihood of [plaintiff's] success on the merits was unclear. . . . [and he] did not make a clear showing of immediate irreparable harm.").  For these reasons, the court finds that plaintiff has failed to demonstrate a likelihood of success on the merits of this action, or irreparable harm in the absence of preliminary injunctive relief for his chronic pain.

In addition, the balance of equities weighs in favor of defendants because plaintiff seeks preliminary injunctive relief on ultimate issues in this case, and the public interest weighs in favor of not interfering with prison administration, particularly with regard to medical treatment. "Defendants' interests and the public interests in penological order could be adversely [a]ffected if the Court began dictating the treatment for the plaintiff, one inmate out of thousands in the state prison system." Green, 2015 WL 507057, at *4, 2015 U.S. Dist. LEXIS 14597, at *9-10 (citation and internal punctuation and quotation marks omitted).

For all of the above reasons, the undersigned finds that the factors warranting preliminary injunctive relief weigh against plaintiff, and his April 16, 2020 motion (ECF No. 75) should be denied.

V. Plaintiff's May 29, 2020 Motion

On May 29, 2020, plaintiff filed another "renewed" motion for "TRO and Preliminary Injunction," claiming that plaintiff is "still to date being denied medical care unless he sees defendant Barber, who [allegedly] has subjected [plaintiff] to criminal . . . acts."  (ECF No. 86.) He contends that despite the state's declaration that defendant Barber was no longer plaintiff's doctor, plaintiff is still being required to see Dr. Barber or be denied medical care.  (ECF No. 86 at 3.)  As a result, plaintiff contends he is daily subjected to the unnecessary and wanton infliction of pain, impairments, lack of sleep and inability to exercise.  (Id. at 3-4.)  Plaintiff seeks a restraining order "restraining medical officials at CHCF from requiring he see Dr. Barber to obtain medical care."  (ECF No. 86 at 4.)

---

WL 1406986, at *5 (W.D. Pa. May 19, 2009).

1  Plaintiff previously moved for injunctive relief on the grounds that he was still being

2  required to see Dr. Barber, and sought an order restraining prison officials from requiring plaintiff

3  to see Dr. Barber during the pendency of this action.  (ECF No. 26.)  Plaintiff's motion was

4  denied.  (ECF No. 59.)  As the undersigned previously explained, the denial of plaintiff's prior

5  motions for injunctive relief was not based on whether or not Dr. Barber was assigned as

6  plaintiff's primary physician.  (ECF No. 85 at 3.)  The same reasoning that supported the prior

7  denial remains.  (ECF No. 52 at 7-9.)  "[W]hile plaintiff has a possibility of succeeding on the

8  merits of his claims should he be able to demonstrate a defendant's deliberate indifference, the

9  undersigned cannot find that plaintiff is likely to succeed on the merits of his claims at this stage

10  of the proceedings."  (ECF No. 52 at 9.)

11  Moreover, contrary to plaintiff's claim that he is denied medical care if he does not see

12  Dr. Barber, the record reflects that plaintiff has been seen by multiple physicians, including Dr.

13  Dredar, Dr. Singh and Dr. Brar, as well as specialists.

14  Finally, even if plaintiff's request to be assigned a physician other than Dr. Barber was

15  denied, "the denial of plaintiff's request to be assigned to a different medical provider does not

16  state a [civil rights] claim."  Torricellas v. Bedford, 2017 WL 3275969, at *4 (C.D. Cal. May 10,

17  2017), adopted, 2017 WL 3271703 (C.D. Cal. July 30, 2017) (collecting cases).

18  For all of the above reasons, the undersigned recommends that plaintiff's second motion

19  for injunctive relief (ECF No. 86) be denied.

20  VI.  Conclusion

21  Accordingly, IT IS HEREBY RECOMMENDED that plaintiff's motions for injunctive

22  relief (ECF Nos. 75, 86) be denied.

23  These findings and recommendations are submitted to the United States District Judge

24  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

25  after being served with these findings and recommendations, any party may file written

26  objections with the court and serve a copy on all parties.  Such a document should be captioned

27  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

28  objections shall be filed and served within fourteen days after service of the objections.  The

13

1    parties are advised that failure to file objections within the specified time may waive the right to

2    appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

3    Dated:  August 25, 2020

4

5

6    /wilk1338.pi4.5

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE