UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

KEENAN WILKINS, aka NERRAH BROWN,

Plaintiff,

v.

DR. CHRISTINE S. BARBER, et al.,

Defendants.

No.  2:19-cv-1338 WBS KJN P

ORDER AND

FINDINGS & RECOMMENDATIONS

Plaintiff is a state prisoner, proceeding pro se and in forma pauperis.  Plaintiff's motions for summary judgment are fully-briefed and, as set forth below, the undersigned recommends that plaintiff's motion for summary judgment be denied.  In addition, plaintiff's motions to strike and to serve are denied, and it is recommended that his motion for partial judgment (ECF No. 251) be denied as untimely.

I.  Plaintiff's Allegations

This action proceeds on plaintiff's verified second amended complaint; he alleges the following.  Plaintiff suffers from myriad serious medical conditions including a disc herniation, syringomyelia, spondylosis, and alleged shoulder separation that causes him extreme pain. Plaintiff also has schizophrenia, and at times has suicidal ideations due to pain.  (ECF No. 88 at 11.)  Defendants have allegedly delayed and denied him adequate medical care resulting in the unnecessary wanton infliction of pain and inability to conduct basic necessities, such as exercise,

1

1   sleep, etc., in deliberate indifference to his serious medical needs.  (ECF No. 88 at 2.)

2   Specifically, plaintiff raises three claims for relief.

3       First Claim:  For four years, plaintiff was prescribed morphine, 30 mg, twice a day for

4   pain management.  (ECF No. 88 at 6.)  On November 28, 2018, plaintiff was transferred to the

5   California Health Care Facility ("CHCF").  Defendant Dr. Barber immediately began threatening

6   to take plaintiff off opioids.  Subsequently, a psych tech falsely reported that plaintiff was

7   "cheeking" his medications.[1]  The next day, February 18, 2019, Dr. Barber had plaintiff sign a

8   narcotic contract and began reducing plaintiff's morphine.  One week later, on February 25, 2019,

9   the morphine was completely stopped, and plaintiff was given Tylenol that offered no pain relief.

10  Plaintiff began having extreme pain and withdrawals.  Despite putting in repeated sick call slips,

11  he was denied care and defendant Nurse Escobar told plaintiff to "drink water" for the

12  withdrawals.[2]  Plaintiff suffered withdrawal symptoms for two weeks or more without any

13  medical assistance.  On March 6, 2019, plaintiff saw Dr. Barber, and informed her of his

14  suffering.  Plaintiff told Dr. Barber that he had reported her to her superiors and submitted a

15  Medical Board complaint.  Plaintiff claims Dr. Barber became enraged, told plaintiff to "suffer"

16  and made him leave.  Dr. Barber then allegedly entered a false note claiming plaintiff was caught

17  cheeking medication two days in a row and that was why she stopped his pain medication.  On

18  June 12, 2019, Dr. R. Singh and Dr. Recarey found Dr. Barber violated policy by writing such a

19  false note.  (ECF No. 88 at 7, referencing CHCF SC 119000126.)

20      On March 15, 2019, plaintiff saw an outside neurosurgeon, who requested a current MRI

21  of disc herniation for surgery and recommended a non-narcotic pain medication (Ultram).  On

22  March 25, 2019, Dr. Barber denied the MRI and the pain medication, and discontinued plaintiff's

23  prescription for orthopedic shoes which plaintiff had for two years to help him walk with

24  syringomyelia, etc.  On March 25, 2019, Dr. Barber referred plaintiff to the pain committee.

---

[1]  It is undisputed that "cheeking" is when an inmate pretends to take their medication but does not and instead diverts the medication into their cheek or elsewhere for subsequent improper use or sale.

[2]  On November 20, 2019, plaintiff consented to the dismissal of defendant Escobar (ECF No. 33), who was dismissed without prejudice on December 3, 2019 (ECF No. 38).

2

On May 3, 2019, plaintiff saw an outside orthopedist for plaintiff's shoulder separation that allegedly had gone unaddressed since December 2015.  The orthopedist recommended plaintiff receive a cortisone shot in his shoulder, which plaintiff did not receive until July 25, 2019; the shot did not help with the pain.  By May 31, 2020, plaintiff still had not had the MRI or a return appointment with the specialist, a twelve-month delay.  (ECF No. 88 at 7.)  Following Dr. Barber's false note, plaintiff refused to see defendant Dr. Barber.

On July 10, 2019, Dr. Barber was out on leave, and by TV appointment, plaintiff saw Dr. Mansour, who would not order an MRI or the orthopedic shoes because Dr. Barber said plaintiff does not need them.  Dr. Mansour did not evaluate plaintiff and denied plaintiff pain medication despite plaintiff reporting that the Tylenol does not help at all.  Plaintiff saw Dr. Mansour again on July 25, 2019, again reporting terrible pain, but Dr. Mansour did nothing, telling plaintiff he would be seen by a pain specialist on July 26, 2019.  (ECF No. 88 at 8.)  On July 26, 2019, plaintiff went to see the pain specialist but was told the appointment was cancelled because he was told no report was needed anymore.  By TV appointment, plaintiff reported his daily pain and problems to Dr. Nikolic, who did no evaluation except to have plaintiff squeeze the nurse's fingers; the doctor refused to order the MRI, and said she could not order any narcotics due to the cheeking reports, but referred plaintiff to physical therapy.  On August 15, 2019, plaintiff again reported his pain, impairments, and inefficacy of Tylenol to Dr. Mansour, who refused to prescribe anything for pain, denied the MRI, but ordered a neck x-ray that said nothing was wrong with plaintiff's neck.  (ECF No. 88 at 9.)

On September 18, 2019, the first false cheeking report was removed from plaintiff's central file when officers verified it was false.  (ECF No. 88 at 9:10-12.)

On October 3, 2019, plaintiff attended physical therapy for his shoulder, but was informed it would not help his shoulder.  On November 12, 2019, plaintiff saw Dr. Dredar with a correctional officer present.  Dr. Dredar did not evaluate plaintiff, despite plaintiff reporting his extreme pain and that Tylenol did not help.  Dr. Dredar denied plaintiff adequate pain medication and the MRI.  After the appointment, plaintiff alleges Dr. Dredar entered a false note stating plaintiff was evaluated, was uncooperative, and that after the appointment, Dr. Dredar watched

1    plaintiff with an officer outside and plaintiff was using his arm.  Plaintiff alleges Officer Acero

2    provided written verification that this was all false, and plaintiff now refuses to see Dr. Dredar.

3    (ECF No. 88 at 9.)

4           On November 12, 2019, plaintiff submitted a sick call slip, appending copies of past

5    MRI's showing the serious condition of his neck.  Dr. Dredar approved an MRI, which was done

6    on December 4, 2019, but it was not done with contrast as requested by the specialist, but did

7    show the serious condition not shown in the August 19, 2019 x-ray.  (ECF No. 88 at 10.)

8           On January 31, 2020, plaintiff was seen by Dr. Singh, who ordered Tramadol for

9    management of plaintiff's pain.  However, Dr. Singh later cancelled the Tramadol after being told

10   that plaintiff had cheeked morphine twice, which was false.  Instead, Dr. Singh ordered Lidocaine

11   patches, which plaintiff claims offer no relief for his neck pain.  On March 12, 2020, plaintiff was

12   seen by Dr. Greenberg, who informed plaintiff that he could not adjust plaintiff's pain medication

13   due to the cheeking reports; instead, he ordered a heating pad, which plaintiff has not received.

14          On March 31, 2020, plaintiff saw Dr. Brar, who told plaintiff he could not order pain

15   medication due to the cheeking reports.  On April 3, 2020, plaintiff saw a neurosurgeon, who

16   insisted he needed a contrast MRI.

17          Plaintiff claims that he has fallen several times due to his extreme pain, impairments,

18   numbness, etc., and hit his head on the ground the last time he fell.  Plaintiff suffers lack of sleep

19   and cannot exercise due to the extreme pain.  He has been unable to obtain the surgery a specialist

20   found plaintiff needs.  Plaintiff alleges that defendants Recarey, Adams and Gates, despite their

21   roles as administrators, failed to intervene and ensure plaintiff is provided adequate pain

22   medication or the surgery, despite being informed on numerous occasions about plaintiff's

23   medical issues.  (ECF No. 88 at 4-5, 11.)  Fifteen months later, plaintiff still has not received the

24   pain management committee's review.

25          Second claim:  Dr. Barber retaliated against plaintiff because plaintiff sought redress via

26   medical grievances and complaints by Dr. Barber telling plaintiff to "suffer," and then

27   discontinued plaintiff's prescription orthopedic shoes, and denied plaintiff an MRI and surgery,

28   and denied plaintiff the Ultram prescription recommended by the specialist.  As a result of his

                                                      4

1    allegations in claims one and two, plaintiff suffers daily pain, impairment, mental anguish and
2    emotional distress.  (ECF No. 88 at 12.)
3        Third claim:  Plaintiff raises state law claims against defendant Barber for fraud, (citing
4    Cal. Civil Code § 1714) entering fraudulent medical note on March 6, 2019; libel/ slander/
5    defamation for such note which caused multiple doctors to deny or cancel adequate pain
6    medications, citing Cal. Civ. Code §§ 44, 45 and 46); negligence and medical malpractice (citing
7    Cal. Gov. Code §§ 844.6, 845.6) for the denial of care for disc herniation, separated shoulder,
8    denying adequate pain medication, and denial of help for opioid withdrawals (2/26/19 to 3/25/19)
9    after she reduced 4 years of opioid therapy in just one week, and cancelled plaintiff's permanent
10    orthopedic shoes without evaluation or cause; and prescribed high doses of Tylenol for long
11    periods without regard for plaintiff's liver/kidneys.  (ECF No. 88 at 13-14.)
12        Plaintiff raises state law claims for libel/slander/defamation against defendant Dredar
13    based on the November 12, 2019 note which plaintiff states is fraudulent.  (ECF No. 88 at 14.)
14    Defendants Singh, Adams and Recarey failed to take action on plaintiff's claims of libel, medical
15    malpractice, negligence and fraud.  (ECF No. 88 at 4-5.)  Defendant Gates failed to act when
16    made aware of the alleged unconstitutional actions.  (ECF No. 88 at 5.)
17        Plaintiff pled compliance with the California Government Claims Act as to his state law
18    claims against defendants Barber and Dredar.  (Id. at 14.)
19    II.  Background
20        On July 14, 2020, plaintiff's motion to amend was granted, and the court found that
21    plaintiff's second amended complaint stated potentially cognizable Eighth Amendment claims
22    against defendants Barber, Mansour, Singh, Recarey, Adams, Gates, and Dr. Dredar, and a
23    retaliation claim against defendant Dr. Barber, as well as various state law claims.  (ECF No. 99
24    at 3.)  The undersigned recommended that plaintiff's claims against defendant Le be dismissed,
25    which were adopted over plaintiff's objections on August 6, 2020.  (ECF No. 99, 105.)
26        On June 24, 2021, plaintiff filed a motion for summary judgment, including his
27    declaration.  (ECF No. 166.)  Defendant Barber sought and was granted an extension of time until
28    August 15, 2021, to file an opposition.  (ECF No. 172.)  Defendant Barber filed an opposition on

1   August 16, 2021.  (ECF No. 179.)  Not having requested or received an extension of time,

2   defendants Recarey, Adams and Gates filed an untimely opposition on August 16, 2021.  (ECF

3   No. 180.)  Plaintiff filed replies on August 26, 2021, and September 13, 2021.  (ECF Nos. 184,

4   192.)

5            Three months after plaintiff filed his motion, defendants filed motions for summary

6   judgment.  Because the record evidence was different for such subsequently-filed motions, and

7   there are procedural differences as to plaintiff's motion, the court separately addresses plaintiff's

8   motion.[3]

9   III.  <u>Legal Standards for Summary Judgment</u>

10           Summary judgment is appropriate when it is demonstrated that the standard set forth in

11  Federal Rule of Civil Procedure 56 is met.  "The court shall grant summary judgment if the

12  movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

13  judgment as a matter of law."  Fed. R. Civ. P. 56(a).

14              Under summary judgment practice, the moving party always bears
                the initial responsibility of informing the district court of the basis
15              for its motion, and identifying those portions of "the pleadings,
                depositions, answers to interrogatories, and admissions on file,
16              together with the affidavits, if any," which it believes demonstrate
                the absence of a genuine issue of material fact.
17

18  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

19  56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving party need

20  only prove that there is an absence of evidence to support the non-moving party's case."  <u>Nursing</u>

21  <u>Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.)</u>, 627 F.3d 376,

22  387 (9th Cir. 2010) (citing <u>Celotex Corp.</u>, 477 U.S. at 325); <u>see also</u> Fed. R. Civ. P. 56 Advisory

23  Committee Notes to 2010 Amendments (recognizing that "a party who does not have the trial

24  burden of production may rely on a showing that a party who does have the trial burden cannot

25  produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment

26

27  _____
    [3]  For example, plaintiff provided additional documentary evidence in support of his opposition to
28  defendants' motions, and defendants provided the expert declaration of Dr. Feinberg in support of
    their motions.

6

should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at

255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 586 (citation omitted).

V.  Plaintiff's Motion for Summary Judgment

     A.  Plaintiff's Evidence

     In addition to his verified pleading, plaintiff provides his own declaration and various exhibits in support of his motion for summary judgment.  (ECF No. 166 at 22-27; 28-95.)  The court considers plaintiff's statements concerning events within plaintiff's own personal knowledge but does not consider argument or speculative statements regarding a claim where there is no indication plaintiff has personal knowledge of such claim.  See S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines) v. Walter Kidde & Co., 690 F.2d 1235, 1238 (9th Cir. 1982) (A party may not create a triable issue of fact merely by presenting argument in its legal memoranda.); see also Estrella v. Brandt, 682 F.2d 814, 819-20 (9th Cir. 1982) (on summary judgment, statements in legal memoranda are not evidence and "do not create issues of fact capable of defeating an otherwise valid summary judgment motion").

     1.  Plaintiff has serious medical conditions in his neck and shoulder, and provides a December 16, 2010 radiological interpretation by Dr. Chung Lee at the Alameda County Medical Center, citing the following impressions:

> Inherently narrow AP diameter of the cervical vertebral canals. (¶)
> Mild-to-moderate central spinal stenosis at C3-4 and C4-5.  (¶)
> Diffuse disc bulge at C5-6 causing severe central spinal stenosis and cord compression.  (¶)  There is syringohydromyella in the cervical spinal cord measuring 1.2 cm in length at the level of C6-7.  This could be the result of the cord compression at C5-6.  No abnormal contrast enhancement is demonstrated in the cervical spinal cord.

1  (ECF No. 166 at 29-30 (Pl.'s Ex. A).)

2       2.  Alameda County Sheriff's Office Medical Information Transfer form dated December

3  27, 2012, confirming plaintiff was prescribed Vicodin three times a day from December 30, 2012,

4  to January 28, 2013, and 300 mg of Gabapentin (also known as Neurontin) per day from

5  November 11, 2012, to February 8, 2013.  (ECF No. 166 at 32 (Pl.'s Ex. B).)

6       3.  A Physician Request for Services, signed by Dr. Afshin Arya on May 6, 2016, seeking

7  ACDF surgery by neurosurgeon, and identifying the diagnosis as:  "Right C6 radiculopathy due

8  to discal herniation."  (ECF No. 166 at 34 (Pl.'s Ex. C).)  Dr. Arya described the medical

9  necessity ("within one month"):

10              Has R C5-6 discal herniation (confirmed by MRI) with worsening
               Right mono radiculopathy in the upper and lower extremity.  Has not
11              responded to conservative treatment by NSAIDS (3wks) and
               exercise (6Wk)/activity modification (6Wk).  Has continued
12              paresthesia in the upper extremity and gait disturbance.
               Neurosurgery consultant has recommended anterior cervical
13              discectomy and fusion (ACDF) surgery.  Previous RFS expired.

14  (ECF No. 166 at 34.)

15       4.  A medical administration record reflecting plaintiff was administered extended release

16  morphine on February 17 and 18, 2019.  (ECF No. 166 at 36 (Pl.'s Ex D).)

17       5.  Plaintiff declares that on his first encounter with Dr. Barber, she claimed plaintiff did

18  not need the morphine he was prescribed for nearly five years and was going to take plaintiff off

19  it, and did not perform a physical evaluation.  (ECF No. 166 at 23.)

20       Dr. Barber recounted plaintiff's "history of chronic pain secondary to syringomyelia and

21  cervical disc impingement and chronic dislocation of shoulder," and noted plaintiff was "fully

22  functional in his ADLs with the exception of having trouble getting up and down for alarms."

23  (ECF No. 166 at 38 (Pl.'s Ex. E); ECF No. 179-2 at 4.)  Barber charted:

24              continues to insist that he needs MS ER 30 g bid so that he can turn
               his head.  I still do not see significant distress.  He asked again about
25              his orthotics, which I cannot see an indication for, but which he had
               previously at RJD.  I also do not know why he has a mobility vest.
26              MA Weldon is looking into the orthotics.

27              The pain is a "pressure" sensation on the back of his neck, giving
               him pain with turning his head side to side and sometimes with
28              radiation down his arms.  He is also asking for new orthopedic shoes.

> He states he gets a new pair every year because walking makes his feet hurt which makes his neck hurt.  He was not happy when I suggested that his morphine dose might be decreased and that I was not sure that he meets medical necessity for new shoes every year or otherwise.  He states that he walks a little for exercise.

(Id.)  Dr. Barber's January 23, 2019 progress note included a physical exam section, noting his vitals, and stating:  "Gen:  Young male, anxious but only visible distress is a disinclination to turn head without turning entire body with it.  (¶)  Normal gait, on and off exam table without difficulty."  (ECF No. 166 at 38.)  Dr. Barber noted the following assessment/plan:

> 1.  Syringomyelia (¶) I am not convinced that this patient requires this amount of morphine for pain control and management of ADLs. I will ask custody to keep an eye on him and ensure that he has safe access to programs at his current functional level.  Follow up requested with copies of MRI to review.  (¶)  Ordered:  (¶)  Follow Up Neurosurgery Referral (¶) Mobility Impaired Disability Vest Permanent.
>
> 2.  Separation of acromioclavicular joint (¶) Chronic old stable.
>
> Orders:   (¶)   7362  RN  initial  Visit  (Symptomatic)  (¶)  Medical Episodic Care Follow Up 20 (¶) onychomycosis (¶) Patient education cosmetic, no treatment indicated.

(ECF No. 166 at 38-39.)

6.  Plaintiff declares that Psych Tech Le's February 17, 2019 report that plaintiff cheeked his morphine is false.  (ECF No. 166 at 23.)  On February 18, 2019, Dr. Barber began to reduce plaintiff's morphine, and completely stopped it in one week.  (ECF No. 166 at 24.)  Plaintiff provided a March 2019 CCHCS Care Guide:  Pain Management Part 3 -- Opioid Therapy form" which appears to address Calculating the Total Daily Dose of Opioids and Tapering/ Discontinuing Opioids.  (ECF No. 166 at 41 (Pl.'s Ex. F).)[4]

7.  Plaintiff sought help for the withdrawals and was told by a nonparty nurse to "drink water."  Plaintiff saw Dr. Barber on March 6, 2019, and told her plaintiff was reporting her for her actions.  Plaintiff claims Dr. Barber stood up and said, "suffer while you do," and ordered

---

[4]  Plaintiff contends this exhibit demonstrates that the morphine should have been tapered off at 10-15% of the starting dose each week.  (ECF No. 166 at 4.)  Plaintiff argues his case is similar to Miller v. California Dep't of Corr. & Rehab., 2018 WL 534306, at *15-17 (N.D. Cal. Jan. 24, 2018), where the inmate was taking the same amount of morphine as plaintiff and was tapered over a five-week period.  (ECF No. 166 at 12.)

10

plaintiff to leave her office.  Plaintiff provided a copy of Dr. Barber's March 6, 2019 progress note:

> History of Present Illness
>
> Patient had narcotics tapered off after being caught cheeking his medication twice in two days.  I saw the residue, which was significant, in the cup on the second occasion when the psych tech came to speak with me.
>
> Today he is threatening me with a lawsuit, telling me that he has complained about me up to the Receiver, that the action was a lie, and that "You can't just make someone go cold turkey", which I manifestly did not.  He also asked for another doctor, which I explained was not possible either.  I explained to him that I am unable to continue him on narcotics because of the rules.  He said he should have had a warning -- which he did on the first occasion he was cheeking.  The fact that he was cheeking twice in two days shows that he did not have a strong need for the narcotic and was able to do without it.  He also reviewed and signed an opiate contract on the second occasion.
>
> MA Weldon spoke with the officer in Mr. Brown's building.  The officer stated that Mr. Brown has never complained of any pain to him, and has not shown any obvious discomfort.
>
> I have watched the patient ambulate and move, and he does not show that he is unable to function, complete his ADLs, or is unable to access any programming.
>
> I escorted the patient out of my office when he began to raise his voice and lie about cutting him off cold turkey and filing a lawsuit. As before, I watched him leave, limping as he left my office but with a swift normal gait when he turned the corner to leave the area.

(ECF No. 166 at 43 (Pl.'s Ex. G).)  Dr. Barber's assessment/plan noted "chronic pain; no indication for narcotics; patient caught cheeking x 2.  Patient continues to have non-narcotic medication available.  RTC prn."  (Id.)[5]

Plaintiff provided a document that is stamped "CHCF Library," titled Pain Management Formulary - Abbreviated, but provides no source information.  (ECF No. 166 at 45 (Pl.'s Ex. H);

---

[5]  Plaintiff claims that after he left her office, Dr. Barber entered a false note that on February 18, 2019, an unnamed psych tech brought her a cup of plaintiff's morphine residue and the substantial amount indicated cheeking 2 days in a row and this was why she discontinued the medication.  (ECF No. 166 at 24.)  Plaintiff argues that Barber's 3/6/19 note was "fraudulently entered" "to attempt to justify why she took [plaintiff] off the med and so rapidly," and that the "cup of residue" was virtually impossible because plaintiff was on non-crush medication.  (ECF No. 166 at 13.)

11

192 at 34.)  The chart divides drug classifications and sets forth restrictions/administration; for morphine, the entries for all Morphine state "must be crushed/floated," except for Morphine SR (MS Contin, Oramorph) which states "DO NOT CRUSH."  (ECF No. 166 at 45 (Pl.'s Ex. H).)

8.  On March 15, 2019, plaintiff saw a neurosurgeon who requested a current MRI for surgery and a non-narcotic medication to help with plaintiff's pain.  (ECF No. 166 at 24-25.) Neurological Surgeon Majid Rahimifar, M.D., saw plaintiff on March 15, 2019, for plaintiff's AC separation left shoulder and inability to raise his left arm from nipple line or above his shoulder. (ECF No. 166 at 47 (Pl.'s Ex. I).)  Dr. Rahimifar reviewed plaintiff's December 15, 2016 MRI, noting a small non-surgical syringomyelia behind the vertebral body of C6," and "a disc herniation at C5-C6 above the syringomyelia."  (Id.)  Upon exam, the doctor noted "marked limitation" of plaintiff's range of motion of his left arm.  The specialist recommended:

> 1.  Repeat MRI cervical spine with/without contrast.
>
> 2.  It is necessary to obtain an orthopedic consultation in regards to his left shoulder before seeing him again.  I need that Note so that I can plan treatment in regards to his neck.
>
> 3.  Pain management will include non-narcotic analgesic, Ultram one tablet q 6 h PO prn.  If approved by authorities.

(ECF No. 166 at 47 (Pl.'s Ex. I).)

9.  Plaintiff states he saw Dr. Barber on March 25, 2019, and she denied the MRI, denied the pain medication recommended by the surgeon, and discontinued plaintiff's permanent ortho shoe order.  (ECF No. 166 at 25.)  Dr. Barber prescribed no pain medication other than over the counter ("OTC") Tylenol, which plaintiff informed her did not help.  (ECF No. 166 at 25.)  Dr. Barber referred plaintiff to the pain review committee, which as of June 21, 2021 (the date plaintiff signed his declaration), still had not taken place.

Dr. Barber's March 25, 2019 progress notes recount plaintiff's chief complaint as Tylenol not working; needs orthotic boots for his painful feet; and follow-up from telemedicine neurosurgery initial consult.  (ECF No. 166 at 49 (Pl.'s Ex. J).)  Dr. Barber charted the following:

> 47 year old male seen for c/o pain and telemedicine neurosurgery consult.  His narcotics were discontinued after he was caught cheeking them twice in two days.  He has threatened to sue me

12

because I am not treating his pain, even though he has been told that I cannot use narcotics because of his misuse.

I continue to speak with his building officer every time I see Mr. Brown. C/O Sloan stated today that he has not complained of pain, he does not appear to be in distress, and he goes to his groups regularly.

In contrast, Mr. Brown stated that he wanted me to document that because of his pain he is not attending groups and it is my fault.

Neurosurgeon recommended Ultram (Tramadol) as a non-narcotic alternative. Unfortunately, Ultram does work on the mu receptors just like other narcotics, and this is not an acceptable medication either. I informed Mr. Brown that I am referring him to the pain committee to look for suggestions for adjuvant medication other than narcotics, because I do not wish him to be in pain.

In addition, NS feels that the AC separation needs an MRI and orthopedic surgery evaluation, and then he should return to NS; not for the non-surgical syringomyelia, but for a C5-6 disc herniation. The patient was referred for the syringomyelia, it is non-surgical, and he will not be referred back to NS at this time. I appreciate the orthopedic recommendation and will refer him to orthopedic surgery, but not order an MRI until orthopedics has assessed the patient. Recent x-ray only show mild DJD at AC joint, no note of AC separation.

According to the 7362, in addition to wanting something stronger than Tylenol, he was requesting orthotics because his feet hurt. This is not a medical indication for orthotics and they will not be requested.

(ECF No. 166 at 49 (Pl.'s Ex. J).) Dr. Barber charted that plaintiff was "ambulating easily and without distress, on and off exam table without difficulty," and was "observed leaving clinic and moving easily and quickly." (ECF No. 166 at 50.) Her assessment/plan included referral to ortho for evaluation; ordered request for orthopedic surgery; no indication for orthotics; syringomyelia was non-surgical; no further evaluation by neurosurgery indicated," and chronic pain by history, repeated cheeking by observation. Refer to pain committee." (ECF No. 166 at 50.)

10. Plaintiff learned of Dr. Barber's alleged false note on March 6, 2019, and plaintiff wrote a staff complaint. (ECF No. 166 at 25.) On June 12, 2019, nonparty R. Singh, M.D., Chief Physician and Surgeon, found staff "violated [CDCR] policy." (Id. at 25, 52 (Pl.'s Ex. K).) Plaintiff provided a copy of the institutional level response to his Health Care Staff Complaint CHCF SC 19000126 confirming Dr. Singh's finding. (ECF No. 166 at 52 (Pl.'s Ex. K).)

13

Plaintiff claims that after he filed litigation CME Adams told the court that the finding would change.  Plaintiff received an amendment notice dated September 4, 2019, and the finding was changed on September 30, 2019, to say Dr. Barber did not violate policy.  (ECF No. 166 at 26.)  Plaintiff provided a copy of the notice and the Amended Institutional Level Response in CHCF SC 19000126.  (ECF No. 166 at 59-62) (Pl.'s Ex. L).)  The amended decision stated that any inaccurate information was removed, and any additions were in bold font; the additions were interviews of B. Ashaolu, PT and N. Thai, PT, and review of Informed Consent for Treatment with Opioid Medications dated February 18, 2019, and plaintiff's outpatient progress notes dated February 18, 2019 and March 6, 2019.  (ECF No. 166 at 60-61.)  The March 6, 2019 outpatient progress note is listed twice and was considered in the original appeal response.  (ECF No. 166 at 52.)  Defendant Recarey, the reviewing authority, concluded that staff "did not violate [CDCR] policy."  (ECF No. 166 at 61.)

11.  Results from the August 19, 2019 x-ray of plaintiff's "cervical spine 4 views with flexion-esten" which concluded "[y]our test results are essentially within normal limits or are unchanged and no provider follow-up is required."  (ECF No. 166 at 64 (Pl.'s Ex. M).)

12.  On May 3, 2019, plaintiff saw orthopedic surgeon Michael Brown, M.D. by telemedicine.  (ECF No. 166 at 66 (Pl.'s Ex. N).)[6]  Dr. Brown charted:

> On physical examination, patient does have adduction to 120 degrees, forward flexion past 90 degrees.  He can internally rotate to neutral.  He is tender in the AC joint region.  Questionable drop arm test.  Tender in the subacromial region.  Radial and ulnar pulses are intact.  Motor and sensory function of the hand, wrist and fingers are all within normal limits.  Radial, ulnar and median nerve function within normal limits.  Sensory examination within normal limits.
>
> On x-ray, there is no acute fracture or dislocation seen.  Mild degenerative changes of the acromioclavicular joint.
>
> ASSESSMENT:  (¶)  Left shoulder impingement, possible rotator cuff injury.
>
> PLAN:  (¶)  I would have his doctors repeat a cortisone injection to

---

[6]  Plaintiff declares that on May 3, 2019, an orthopedist requested an MRI of plaintiff's shoulder that as of June 21, 2021, had not been done.  (ECF No. 166 at 26.)  However, the medical record does not support such statement.

14

1   his left shoulder since it did give him relief in the past.  If no
2   improvement, consider MRI of the left shoulder without contrast and
    I will see him in the clinic following on a p.r.n. basis.  He is in
3   agreement with this plan.

4   (ECF No. 166 at 66-67 (Pl.'s Ex. N).)

5       13.  Plaintiff cites Dr. Barber's responses to special interrogatories.  (ECF No. 166 at 69-

6   73 (Pl.'s Ex. O).)  Defendant Barber identified N. Thai as the psych tech who came to see Barber

7   with the residue in the cup.[7]  (ECF No. 166 at 72 (No. 1).)  Defendant Barber confirmed that

8   "Pursuant to CDCR, ER formulations are usually not crushed."  (ECF No. 166 at 72 (No. 3).)

9       14.  In response to discovery, Adams states that his review of plaintiff's medication

10  administration records identified no dates in 2019 that Psych Tech N. Thai provided plaintiff his

11  medication.  (ECF No. 166 at 76 (Pl.'s Ex. P, Interrogatory No. 2).)  Adams has no personal

12  knowledge of the identity of the officer who insisted plaintiff comply with DOT procedure and

13  found medication under plaintiff's tongue on February 17, 2019, and a review of available

14  documents, including plaintiff's medical records and the rules violation report counseling chrono

15  did not indicate the name of the officer.  (ECF No. 166 at 76 (No. 3).)

16      15.  Plaintiff cites the September 20, 2019 amended confidential inquiry report issued by

17  defendant Recarey as to plaintiff's grievance CHCF SC 19000126.  (ECF No. 166 at 79-81 (Pl.'s

18  Ex. Q).)  Recarey's findings were:

19      Based on all of the interviews including the patient, PT Le, and Dr.
    Barber, it is clear that the patient was caught cheeking his Morphine
20  on February 17 and again when presented to Dr. Barber by PT Thai.

21      The claims that the medication was stopped "cold turkey" was not
    true as there is a progress note indicating that the plan of care was to
22  taper the medication to off.

23      There is no violation in policy as presented by the patient as there is
    not sufficient evidence to support the allegations of retaliation or
24  false documentation; medication was titrated in accordance with
    policy.
25
        The confidential inquiry revealed the policy was violated in that the
26

27  [7]  Plaintiff argues that Dr. Barber's November 25, 2020 declaration, stating psych tech brought
    her a cup of plaintiff's morphine residue, is false because he was prescribed extended release
28  morphine which is not crushed.  (ECF No. 166 at 26.)

> documentation of the exact time of the second incident where the PT showed Dr. Barber the residual in the cup with the potential cheeking/diverting of the pain medication should have been mentioned along with the name of the person who gave her the information/evidence.  In addition, the policy was also violated as PT Thai failed to document medication diverting.  Both violations are not identified in the conclusion as a violation of policy with respect to the health care staff complaint.
>
> There was no evidence, however of retaliation as stated by the patient.

(ECF No. 166 at 80.)  Plaintiff included all of the documents in connection with grievance CHCF SC 19000126 with his reply.  (ECF No. 184 at 15-27.)

16.  Defendants Gates, Recarey and Adams all admit that plaintiff wrote to them about being in pain.  (ECF No. 166 at 27.)  (ECF No. 166 at 83-95 (Pl.'s Ex. R, S, T).)

With his reply, plaintiff provided additional documents:

17.  A copy of plaintiff's February 20, 2019 grievance CHCF HC 19000402, through the April 18, 2019 institutional level response, in which plaintiff challenged defendant Barber's decision to take plaintiff off morphine.  (ECF No. 192 at 22-30 (Pl.'s Ex. A).)

18.  Plaintiff's ADA/Effective Communication Patient Summary dated February 22, 2019, reflecting plaintiff was issued a mobility impaired disability vest and therapeutic shoes/orthotics, both of which were permanent.  (ECF No. 192 at 39 (Pl.'s Ex. E).)

19.  Dr. Barber's May 8, 2020 progress note:

> [Plaintiff] again refused to see me.  One of the issues he has raised has been to be evaluated by pain committee.  I submitted this request last year but he was never reviewed.  MA Rojas is going to get a copy of the evaluation to him to update, and I have contacted Medical Administration to schedule him to be reviewed.

(ECF No. 192 at 41 (Pl.'s Ex. F).)

20.  July 3, 2019 letter from the Prison Law Office to CCHCS and the Receiver's Office requesting that plaintiff be assigned to a different medical provider in light of the June 12, 2019 institutional level response finding that staff violated policy.  (ECF No. 192 at 43 (Pl.'s Ex. G).)

21.  "Pocket Guide:  Tapering Opioids for Chronic Pain," Guidelines for Prescribing Opioids for Chronic Pain, issued by the Centers for Disease Control and Prevention, www.cdc.gov/drugoverdose.  (ECF No. 192 at 45-47 (Pl.'s Ex. H).)

16

B. Defendant Barber's Evidence

1. Defendant relies on a portion of defendant Barber's January 23, 2019 progress note. (ECF No. 179-2 at 4 (Ex. A).) (See Pl.'s Evidence No. 5, infra.)  Defendant also cites Barber's January 31, 2019 progress note stating plaintiff "continues to insist that he needs MS ER 30 mg bid so that he can turn his head.  I still do not see significant distress." (ECF No. 179-2 at 4 (Ex. A).)  Barber noted plaintiff's request for orthotics, which Barber "cannot see an indication for, but which he had previously at RJD," and did not know why plaintiff had a mobility vest.  Barber charted that MA Weldon is looking into the orthotics.  (Id.)

2. Plaintiff's March 10, 2021 deposition testimony confirmed that plaintiff had no evidence that Dr. Barber knew, on February 18, 2019, when she took plaintiff off the morphine, that what psych tech Le said was false.  (ECF No. 179-2 at 9 (Ex. B).)

3. Barber's February 18, 2019 progress note stated that

> I have watched [plaintiff] ambulate and move, and he does not show that he is unable to function, complete his ADLs, or is unable to access any programming.  I escorted [plaintiff] out of my office when he began to raise his voice and lie about cutting him off cold turkey and filing a lawsuit.  As before, I watched him leave, limping as he left my office but with a swift normal gait when he turned the corner to leave the area.

(ECF No. 179-2 at 13 (Ex. C).)  This photocopy also contains defendant Barber's outpatient progress note re narcotics cheeking, dated February 18, 2019, which states:

> Patient received RVR and documentation by medication PT that he cheeked his narcotics in the morning pill line.

> Patient stated that he didn't want to put his dirty finger into his mouth, and that he would appeal my decision to taper off his morphine. He did not claim to not know he shouldn't cheek.

> In the past I have seen the patient look pain free on a fairly substantial amount of morphine, and we have discussed tapering it off before. At this time, based on his cheeking as well as presenting without evidence of discomfort on multiple occasions, I will taper off his narcotics. He states he is allergic to ibuprofen, so I will prescribe Tylenol.  He is planning to appeal.

> We reviewed the CDCR-7474 "informed consent for treatment with opioid medication" and he signed it.

> Currently on morphine ER 30mg bid

17

1    Decreased to 15mg bid x 5 days, then 15mg daily x5 days, then fully
2    discontinued.

3    Patient was observed ambulating quickly and easily in and out of
     clinic, with full range of motion of head, neck and arms. He had no
4    visible physical distress.

     Officer Ledford present.
5

6    (ECF No. 179-2 at 13 (Ex. C); see also ECF No. 216-1 at 45 (Feinberg Decl.).)

7        4.  February 17, 2019 email from psych tech Le to defendant Barber stated:

8    This email is to notify you that [plaintiff] was caught cheeking his
     MorphineER 30 mg during the AM medication line.   I/P was
9    instructed to follow DOT procedure; he refused at the first time.
     With the unit officer's assistance, [plaintiff] was cooperative.
10   Medication was found under his [tongue].   [Plaintiff] took his
     medication at the end.
11

12   (ECF No. 179-2 at 15 (Ex. D).)

13       C.  Legal Standards

14   Section 1983

15       To prevail on a claim under § 1983, a plaintiff must demonstrate:  (1) the violation of a

16   federal constitutional or statutory right; and (2) that the violation was committed by a person

17   acting under the color of state law.  See West v. Atkins, 487 U.S. 42, 48 (1988); Jones v.

18   Williams, 297 F.3d 930, 934 (9th Cir. 2002).  An individual defendant is not liable on a civil

19   rights claim unless the facts establish the defendant's personal involvement in the constitutional

20   deprivation or a causal connection between the defendant's wrongful conduct and the alleged

21   constitutional deprivation.  See Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989); Johnson v.

22   Duffy, 588 F.2d 740, 743-44 (9th Cir. 1978).  That is, plaintiff may not sue any official on the

23   theory that the official is liable for the unconstitutional conduct of his or her subordinates.

24   Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  The requisite causal connection between a

25   supervisor's wrongful conduct and the violation of the prisoner's constitutional rights can be

26   established in a number of ways, including by demonstrating that a supervisor's own culpable

27   action or inaction in the training, supervision, or control of his subordinates was a cause of

28   plaintiff's injury.  Starr v. Baca, 652 F.3d 1202, 1208 (9th Cir. 2011).

18

1    Eighth Amendment Standards

2           The Eighth Amendment imposes a duty upon prison officials to provide humane

3    conditions of confinement.  Farmer v. Brennan, 511 U.S. 825, 831 (1994).  This duty includes

4    ensuring that inmates receive adequate food, clothing, shelter, and medical care, and taking

5    reasonable measures to guarantee the safety of inmates.  Id.  To establish an Eighth Amendment

6    violation for inadequate medical care, a plaintiff must demonstrate that he had a serious medical

7    need, and that defendants' response to that need was deliberately indifferent.  Jett v. Penner, 439

8    F.3d 1091, 1096 (9th Cir. 2006) (citing McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1991),

9    overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997 (en

10   banc)).  The Eighth Amendment's deliberate indifference standard is a "high legal standard."  See

11   Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004).

12          The Eighth Amendment is violated only when a prison official acts with deliberate

13   indifference to an inmate's serious medical needs.  Snow v. McDaniel, 681 F.3d 978, 985 (9th

14   Cir. 2012), overruled in part on other grounds, Peralta v. Dillard, 744 F.3d 1076, 1082-83 (9th

15   Cir. 2014); Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012).  A prison official is

16   deliberately indifferent to a serious medical need if he "knows of and disregards an excessive risk

17   to inmate health."  Farmer, 511 U.S. at 837.  To be found liable under the Eighth Amendment,

18   "the official must both be aware of facts from which the inference could be drawn that a

19   substantial risk of serious harm exists, and he must also draw the inference."  Id.  "If a [prison

20   official] should have been aware of the risk, but was not then the [official] has not violated the

21   Eighth Amendment, no matter how severe the risk."  Gibson v. Cty of Washoe, 290 F.3d 1175,

22   1188 (9th Cir. 2002), overruled on other grounds by Castro v. County of Los Angeles, 833 F.3d

23   1060, 1076 (9th Cir. 2016).

24          "A showing of medical malpractice or negligence is insufficient to establish a

25   constitutional deprivation under the Eighth Amendment."  Toguchi, 391 F.3d at 1060; see also

26   Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990) ("While poor medical treatment will

27   at a certain point rise to the level of a constitutional violation, mere malpractice, or even gross

28   negligence, does not suffice.")  To establish deliberate indifference, plaintiff "must show that the

19

1  course of treatment the doctors chose was medically unacceptable under the circumstances" and

2  that the doctors "chose this course in conscious disregard of an excessive risk to plaintiff's

3  health." Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996), overruled in part on other

4  grounds by Peralta, 744 F.3d at 1076; see also Snow, 681 F.3d at 987).

5  "Typically, a difference of opinion between a physician and the prisoner -- or between

6  medical professionals -- concerning what medical care is appropriate does not amount to

7  deliberate indifference." Edmo v. Corizon, Inc., 935 F.3d 757, 786 (9th Cir. 2019) (citations,

8  quotations and brackets omitted); Jackson, 90 F.3d at 332. "But that is true only if the dueling

9  opinions are medically acceptable under the circumstances." Edmo, 935 F.3d at 786 (citation

10 omitted). To determine whether the treatment was medically acceptable, courts must consider

11 "the record, the judgments of prison medical officials, and the views of prudent professionals in

12 the field. . . ." Id. "Accepted standards of care and practice within the medical community are

13 highly relevant in determining what care is medically acceptable and unacceptable." Id.

14 A complete denial of medical care is not required to show deliberate indifference. Lopez

15 v. Smith, 203 F.3d 1122, 1132 (9th Cir. 2000). Deliberate indifference may be found where

16 prison officials "intentionally interfere with treatment once prescribed." Wakefield v. Thompson,

17 c, 1165 (9th Cir. 1999) (internal citation and quotation omitted). Deliberate indifference may be

18 found if defendants "deny, delay, or intentionally interfere with [a prisoner's serious need for]

19 medical treatment." Hallet v. Morgan, 296 F.3d 732, 734 (9th Cir. 2002). The requisite state of

20 mind is one of subjective recklessness, which entails more than ordinary lack of due care. Snow,

21 681 F.3d at 985 (citation and quotation marks omitted); Wilhelm, 680 F.3d at 1122.

22 D. Discussion re Defendant Barber

23 Initially, plaintiff objects that defendant Barber's opposition was filed one day late.

24 However, the August 15, 2022 deadline fell on a Sunday.

25 Rule 6(a) also can be used for the computation of time in the context
   of a specified date. Therefore, if the district court orders certain
26 requests and motions to be filed by a specified date and the date is
   actually a Saturday, Sunday, or legal holiday, the court can extend
27 the deadline to the next day that is not a weekend day or a legal
   holiday. This is consistent with the recognition that district courts
28 should possess broad discretion in managing their calendars.

20

1    4B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1162 (2010 Supp.).

2    Here, because the specified date of filing fell on a Sunday, the undersigned exercises discretion

3    and considers defendant Barber's opposition, filed the next day, was timely-filed.

4              1.  Eighth Amendment Medical Claims

5              It is undisputed that plaintiff suffers from serious medical conditions.  In determining

6    whether plaintiff is entitled to summary judgment, the issue is whether there is no genuine issue

7    of material fact refuting that defendant Barber was deliberately indifferent to plaintiff's serious

8    medical needs as a matter of law.  While it is clear that plaintiff disagrees with the decisions made

9    by defendant Barber, plaintiff is required to adduce evidence that demonstrates defendant Barber

10   knew plaintiff faced a substantial risk of serious harm yet disregarded such risk by failing to take

11   reasonable steps to abate it.  Farmer, 511 U.S. at 837.  Mere awareness "of facts from which the

12   inference could be drawn that a substantial risk of serious harm exists" is insufficient; rather,

13   defendant Barber "must also draw the inference."  Id.  Moreover, where alternative courses of

14   treatment were involved, plaintiff must demonstrate that defendant Barber chose treatment that

15   was medically unacceptable under the circumstances and chosen in conscious disregard of an

16   excessive risk to plaintiff's health.

17             As discussed below, plaintiff's motion for summary judgment fails to adduce competent

18   evidence demonstrating that plaintiff is entitled to summary judgment as a matter of law.

19                       a.  Removal from Morphine

20             Plaintiff contends that on February 18, 2019, Barber disregarded her "many available

21   options," choosing instead to take plaintiff off the morphine.  (ECF No. 192 at 7.)  However, it is

22   undisputed that on February 18, 2018, defendant Barber was not aware that the cheeking claim

23   was false, if it was.  The evidence demonstrates defendant Barber took plaintiff off the morphine

24   because of the cheeking claim.  While plaintiff may have previously been prescribed narcotics for

25   pain, the cheeking incident interrupted such history and supported defendant Barber's

26   discontinuation of such narcotics.  Plaintiff fails to demonstrate, with competent evidence, that

27   the decision to remove plaintiff from morphine was medically unacceptable under the

28   circumstances.  Plaintiff is not entitled to summary judgment on this claim.

1        b.  Tapering/Withdrawals

2        Plaintiff contends defendant Barber improperly reduced plaintiff's morphine in 7 days

3    contrary to CCHCS policy requiring a reduction of 10-15% each week to minimize withdrawals.

4    (Pl.'s Ex. F.)  However, absent expert testimony addressing whether or not the tapering period

5    was insufficient, plaintiff is not entitled to summary judgment on such claim.  As a layperson,

6    plaintiff cannot testify as to the appropriate period for tapering given his medical conditions and

7    the amount of morphine he was prescribed.  His citation to prison policy or a CDC pocket guide

8    is insufficient.  In addition, plaintiff fails to adduce evidence that he suffered withdrawals, what

9    they entailed, and how long he suffered them.  Plaintiff fails to adduce evidence as to what, if

10   anything, defendant Barber should have given plaintiff for such withdrawals.  Plaintiff claims he

11   sought help with his withdrawals, submitting medical slips, but was denied care and only told by

12   Nurse Escobar to "drink water."  (ECF No. 192 at 8.)  However, plaintiff provided no such

13   medical slips for review, and even if he did, fails to show defendant Barber was aware that

14   plaintiff was suffering withdrawal symptoms during the time of such withdrawals, or that such

15   withdrawals posed an excessive risk of harm to plaintiff.  Indeed, it appears plaintiff did not see

16   defendant Barber again until March 6, 2019.  Importantly, on that visit, the medical record states

17   his chief complaint was "narcotics" and noted his chronic pain, but there is no mention of plaintiff

18   complaining of withdrawal symptoms or seeking relief from such symptoms.  Plaintiff's evidence

19   does not demonstrate that there is no genuine dispute of material fact as to the tapering of

20   plaintiff's morphine, or as to the treatment for his withdrawals by defendant Barber.[8]

21        c.  Tylenol

22        In his motion, plaintiff claims that he repeatedly told medical officials Tylenol was not

23   helping him "at all."  (ECF No. 166 at 5.)  As to defendant Barber, however, the evidence reflects

24   plaintiff saw Barber on March 6, 2019, and 25, 2019; aside from progress notes from those two

25   [8]  In his reply, plaintiff contends that defendant Barber conceded this claim because she failed to
26   argue against it.  However, the undersigned finds plaintiff's contention unavailing.  Defendant
     Barber included argument and evidence in support of her opposition to plaintiff's motion.
27   Moreover, plaintiff has the burden to demonstrate that the tapering schedule chosen by defendant
     Barber was medically unacceptable under the circumstances and that defendant Barber chose
28   such schedule in conscious disregard of an excessive risk to plaintiff's health.  Plaintiff failed to
     do so.

1    visits, there is no other evidence he complained to Barber about pain or the Tylenol not working.

2    On March 6, 2019, plaintiff's chief complaint was charted as "narcotics," which raises an

3    inference that the Tylenol was not working.  (ECF No. 166 at 43.)  However, defendant Barber

4    observed that plaintiff "ambulate[s] and move[s]," "does not show that he is unable to function,

5    complete his ADLs, or is unable to access any programming."  Id.  Further, she noted that MA

6    Weldon spoke with the officer in plaintiff's building, who said plaintiff had "never complained of

7    any pain to him, and has not shown any obvious discomfort."  Id.  In addition, while plaintiff was

8    limping when he left Barber's office, Barber charted that plaintiff walked "with a swift normal

9    gait when he turned the corner to leave the area."  Id.  Barber's notes on March 25, 2019, were

10   similar in noting plaintiff did not appear to be in distress, which his building officer again

11   confirmed.  (ECF No. 166 at 49.)

12        Such records confirm that defendant Barber disagreed with plaintiff's complaints of pain;

13   but in any event does not demonstrate that there are no material disputes of fact supporting

14   summary judgment for plaintiff.

15                     d.  Denial of Specialists' Recommendations

16        Plaintiff argues that on March 25, 2019, defendant Barber denied the specialist's request

17   for a current MRI of plaintiff's neck for surgery that had previously been approved, and denied

18   the specialist's recommendation for the non-narcotic pain medication Ultram that would help

19   plaintiff with pain and mobility.  However, defendant Barber's medical record rebuts plaintiff's

20   argument.  Defendant Barber deferred the MRI until after plaintiff was seen by the orthopedist so

21   that the orthopedist could recommend the appropriate tests.  (ECF No. 166 at 49 (Barber "will

22   refer [plaintiff] to orthopedic surgery, but not order an MRI until orthopedics has assessed the

23   patient.")).  In addition, the specialist did not prescribe Ultram for plaintiff, but stated pain

24   management would include the "non-narcotic analgesic, Ultram," "if approved by authorities."

25   (ECF No. 166 at 47.)  In her progress note, defendant explained that she did not prescribe Ultram

26   (Tramadol) because it "does work on the mu receptors just like other narcotics, and this is not an

27   acceptable medication either."  (ECF No. 166 at 49.)  In addition, defendant Barber referred

28   plaintiff to the pain management committee.  Thus, on the evidence presented, plaintiff's

                                                    23

1    disagreement with the actions taken by defendant Barber appear to be a difference of opinion

2    between plaintiff and defendant Barber at that time.  In any event, plaintiff is not entitled to

3    summary judgment based on the record evidence.

4                           e.  Denial of Orthopedic Shoes

5            Plaintiff contends that defendant Barber discontinued plaintiff's permanent order for

6    therapeutic shoes he had been provided for over two years.  (ECF No. 192 at 9.)  Plaintiff now

7    claims that before he told Barber he was reporting her actions, plaintiff was told that he was

8    awaiting a fitting for new shoes.  Thus, plaintiff was not seeking another chrono for orthopedic

9    shoes, as argued by defendant Barber (opp'n at 9:19).  (ECF No. 192 at 9.)

10          Plaintiff argues that the Ninth Circuit holds that a physician's failure to provide treatment

11   that would alleviate an inmate's significant pain can constitute deliberate indifference.  (ECF No.

12   192 at 10) (citing Reed v. Barcklay, 634 F. App'x 184 (9th Cir. 2015) (unpublished); see also Jett,

13   439 F.3d at 1091.)

14          However, plaintiff's motion fails for lack of evidence.  In Reed, the prisoner adduced

15   evidence that since he was incarcerated in 1994, at least eight different physicians treated Reed

16   for migraine headaches, and each of them prescribed Cafergot as treatment, yet Dr. Barcklay

17   refused to do so.  Id.[9]  Here, plaintiff does not provide a medical record demonstrating a doctor

18   determined plaintiff required therapeutic shoes/orthotics.  The only evidence plaintiff submitted

19   was the February 22, 2019, ADA/Effective Communication Patient Summary reflecting that

20   plaintiff had been issued permanent chronos for a mobility impaired disability vest and

21   therapeutic shoes/orthotics.  (ECF No. 192 at 39 (Pl.'s Ex. E).)  Such summary does not explain

22   who ordered the chrono, or why such chrono was medically needed, if it was, or when the chrono

23   was issued.  Plaintiff's declaration only states that defendant Barber discontinued plaintiff's ortho

24   shoe order, and does not address the vest.  (ECF No. 166 at 25.)  Plaintiff did not provide a copy

25   of a permanent chrono for either the shoes or the vest.

26   ////

27   _____

28   [9]  See also Reed v. Barcklay, No. 2:11-cv-01339-JAT (D. Az. Sept. 30, 2015) (ECF No. 286 at 3-
     4.)

1    In addition, defendant Barber explained to plaintiff that the doctor did not see a medical

2    indication for the shoes (ECF No. 166 at 38 & 49), and plaintiff provided no medical evidence in

3    rebuttal.

4    On this record, plaintiff is not entitled to summary judgment as a matter of law.

5    f.  Delay

6    Plaintiff challenges the delay in receiving adequate pain medication from February 26,

7    2019, to May 1, 2021.  Plaintiff claims defendant Barber knew and was aware on March 6 and 25,

8    2019, that plaintiff was asserting extreme pain and was not helped by the over the counter Tylenol

9    and she refused to afford him meaningful pain medication.  (ECF No. 192 at 10.)  However, the

10   medical records reflect that defendant Barber did not believe plaintiff was in distress or suffering

11   extreme pain, and had spoken with plaintiff's building officer to inquire about plaintiff's pain.

12   Therefore, it appears that defendant Barber disagreed that plaintiff required additional pain

13   medication.

14   Moreover, as for the lengthy delay cited by plaintiff, it is undisputed that plaintiff refused

15   to see defendant Barber after March 25, 2019.  Plaintiff claims Barber "acknowledges in notes

16   from March 2019 to June 2020 she was aware of plaintiff's complaints of pain," but he points to

17   no evidence demonstrating defendant Barber was aware plaintiff suffered extreme pain after

18   March 26, 2019.  (ECF No. 192 at 12.)  He claims that evidence shows other doctors who treated

19   plaintiff took actions (id.), but such subsequent actions also fail to demonstrate defendant Barber

20   was aware of subsequent pain complaints.

21   Further, although plaintiff claims that defendant Barber did not provide adequate pain

22   relief, defendant provided plaintiff a prescription for 1300 mg of Tylenol per day, and also

23   referred plaintiff to the pain committee and to physical therapy.  Thus, plaintiff fails to

24   demonstrate that no genuine dispute of material fact exists that would entitle him to summary

25   judgment as to this claim.  Plaintiff's claim that the pain management committee review was

26   unduly delayed fails for the same reason.  Plaintiff refused to see defendant Barber after March

27   25, 2019, and at some point was assigned defendant Dr. Dredar, who plaintiff also refused to see.

28   Plaintiff submits no competent evidence demonstrating that the delay in the pain committee

1    review process was caused by defendant Barber.  Moreover, while defendant Barber did renew

2    the referral to the pain management committee on May 8, 2020, such referral, standing alone,

3    does not demonstrate her prior failure to properly refer plaintiff, or evidence an earlier awareness

4    that plaintiff was suffering extreme pain or had not received committee review.

5            It is clear plaintiff suffered a delay in obtaining review by the pain management

6    committee, but to obtain summary judgment as to defendant Barber, plaintiff must demonstrate,

7    with competent evidence, that defendant Barber was responsible for such delay.  Plaintiff has not

8    done so.

9            For all the above reasons, the undersigned finds that plaintiff failed to carry his burden to

10   affirmatively demonstrate that no reasonable trier of fact could find other than for plaintiff.

11   Plaintiff's motion for summary judgment on his Eighth Amendment claims against defendant

12   Barber should be denied.

13           2.  First Amendment - Retaliation

14                   a.  The Parties' Arguments

15           Plaintiff claims that immediately after he informed defendant Barber plaintiff would

16   report her actions, defendant Barber denied plaintiff care for his pain and withdrawals and

17   ordered him to leave her office.  Subsequently, defendant Barber allegedly entered a false note in

18   plaintiff's medical record in an effort to justify the wrongful acts plaintiff reported.  On March 25,

19   2019, defendant Barber denied plaintiff Ultram, which the specialist recommended, and

20   discontinued plaintiff's permanent therapeutic shoe order, and denied plaintiff an MRI for his

21   neck surgery.  (ECF No. 166 at 17-18.)  Plaintiff contends defendant Barber's actions "did not

22   advance penological goals in any kind of way."  (ECF No. 166 at 18.)

23           Defendant Barber counters that even assuming, arguendo, that a threat of filing a

24   complaint constitutes protected conduct, plaintiff failed to establish that such threat was the

25   substantial or motivating factor for the alleged retaliatory conduct.  Plaintiff provided no

26   documentary or other evidence, other than his own conclusory allegations based on his own

27   beliefs, that demonstrate a causal link between his threat and any of defendant Barber's conduct.

28   Notably, defendant Barber had already informed plaintiff before the March 6, 2019 medical

1   encounter that Barber believed that orthopedic shoes and morphine might not be medically

2   warranted.  Thus, such decisions could not have been caused by plaintiff's subsequent threat.

3   (ECF No. 179 at 14.)

4          Moreover, defendant contends that plaintiff fails to demonstrate a triable issue of material

5   fact exists as to whether defendant Barber's actions did not serve legitimate correctional goals.

6   Defendant Barber ordered plaintiff to leave her office because plaintiff raised his voice at her,

7   which served an important penological interest of protecting order and the doctor's personal

8   safety.  Dr. Barber's subsequent "alleged 'retaliatory' conduct were just medical decisions," each

9   "supported with an underlying medical basis."  (ECF No. 179 at 14.)  Finally, plaintiff was not

10  chilled from exercising his rights because he did file complaints of multiple kinds against

11  defendant Barber after the March 6, 2019 encounter.  (ECF No. 179 at 15) (citing ECF No. 166 at

12  52 (Pl.'s Ex. K).)

13         In reply, plaintiff argues that defendant Barber retaliated against plaintiff for exercising

14  his constitutional rights and her actions did not advance legitimate penological goals.  Plaintiff

15  contends that on March 6, 2019, he informed Barber that plaintiff was reporting her actions;

16  Barber became enraged, told plaintiff to "suffer while you do," and ordered plaintiff to leave her

17  office "without care for his withdrawals."  (ECF No. 192 at 8.)  Barber then sought to justify her

18  actions by entering a false progress note that an unknown psych tech brought her a cup of

19  plaintiff's morphine residue on February 18, 2019.  (ECF No. 192 at 8.)  Plaintiff contends such

20  false note blacklisted him from receiving adequate pain medication for over two years (May

21  2021).  (ECF No. 192 at 10.)  Plaintiff now claims that everything Barber did after this notice was

22  adverse to plaintiff including ending the appointment on March 6, 2019, without any care for

23  plaintiff's withdrawals.  (ECF No. 192 at 16.)  Plaintiff contends that Barber's filing of a false

24  report is the most significant evidence of her retaliatory intent.  Due to such false report, plaintiff

25  stopped seeing Dr. Barber on advice from the Prison Law Office.

26              b.  Legal Standards

27         "Prisoners have a First Amendment right to file grievances against prison officials and to

28  be free from retaliation for doing so."  Watison v. Carter, 668 F.3d 1108, 1114 (9th Cir. 2012)

(citing Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009)).  A viable retaliation claim in the prison context has five elements:  "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir. 2005).  The provision of adequate medical care to inmates to maintain their health is a legitimate correctional goal.

Nevertheless, First Amendment retaliation is not established simply by showing adverse activity by a defendant after protected speech; rather, the plaintiff must show a nexus between the two.  See Huskey v. City of San Jose, 204 F.3d 893, 899 (9th Cir. 2000) (retaliation claim cannot rest on the "logical fallacy of post hoc, ergo propter hoc, literally, 'after this, therefore because of this.'").  The plaintiff must allege specific facts demonstrating that the plaintiff's protected conduct was "the 'substantial' or 'motivating' factor behind the defendant's conduct." Brodheim, 584 F.3d at 1271 (quoting Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir. 1989)).  Thus, plaintiff must "'put forth evidence of retaliatory motive, that, taken in the light most favorable to him, presents a genuine issue of material fact as to [defendant's] intent'" in taking the adverse action. Brodheim, 584 F.3d at 1271 (quoting Bruce v. Ylst, 351 F.3d 1283, 1289 (9th Cir. 2003).)

c. Discussion

Here, it is undisputed that on March 6, 2019, plaintiff informed Barber that plaintiff was seeking redress for her actions:  "Today he is threatening me with a lawsuit, telling me that he has complained about me up to the Receiver." (ECF No. 166 at 43 (Pl.'s Ex. G).)  The Ninth Circuit has reiterated that the constitutional right to redress of grievances "embraces threats to sue[.]" Entler v. Gregoire, 872 F.3d 1031, 1039 (9th Cir 2017) (citing Jones v. Williams, 791 F.3d 1023, 1035-36 (9th Cir. 2015)).  In Entler, the Ninth Circuit noted that in Jones, the court held that dismissal of a retaliation claim was improper because the inmate's complaints of discrimination to his supervisors and threats that he intended to sue them were constitutionally protected. Entler, 872 F.3d at 1039.  Thus, plaintiff's verbal threat was protected conduct.

28

1    However, plaintiff fails to demonstrate that defendant Barber's actions were taken because

2    of plaintiff's March 6, 2019 threat to file a lawsuit against her.  Rather, the evidence shows that

3    defendant Barber informed plaintiff as early as January 23, 2019, the first time she saw plaintiff,

4    that she did not believe plaintiff's medical conditions warranted morphine.  Importantly, the

5    evidence shows that defendant Barber began tapering off plaintiff's morphine based on cheeking

6    reports Barber received from psych tech Le on February 17, 2019.  While plaintiff claims that

7    defendant Barber's March 6, 2019 report was false, he adduces no competent evidence that

8    defendant Barber knew that the cheeking report by psych tech Le was false on February 18, 2019,

9    when the tapering began.  Further, even assuming Barber's March 6, 2019 report was false, there

10   is no causal connection through timing, because the tapering of the morphine began on February

11   18, 2019, before plaintiff told Barber on March 6, 2019, that plaintiff would be filing a lawsuit

12   against her.

13    Plaintiff's claim that defendant Barber ordered plaintiff out of her office without treating

14   his withdrawal symptoms also fails because he provides no evidence demonstrating he was

15   suffering from severe withdrawal symptoms at that time.  Rather, defendant Barber again charted

16   that plaintiff failed to show he was unable to function, complete his ADLs or access

17   programming, and that she observed plaintiff limping as he left her office, but walking with a

18   swift normal gait when he turned the corner.  In light of such medical record, plaintiff is not

19   entitled to summary judgment as a matter of law.

20    Plaintiff is required to adduce evidence demonstrating that the plaintiff's protected

21   conduct was "the 'substantial' or 'motivating' factor behind the defendant's conduct."  Brodheim,

22   584 F.3d at 1271 (quoting Soranno's Gasco, Inc. 874 F.2d at 1314).  Plaintiff fails to do so.

23   Although he vociferously contends the cheeking allegations were false, he adduces no evidence

24   that defendant Barber knew the February 17, 2019 cheeking report was false.  Because the

25   discontinuation and tapering of the morphine took place before defendant Barber told plaintiff to

26   "suffer," such actions cannot form the basis of a viable retaliation claim.

27    Plaintiff's new claim that "everything" Barber did after the March 6, 2019 notice was

28   adverse to plaintiff is insufficient, without more, to demonstrate a causal connection between

1  defendant Barber's subsequent actions or omissions.  In addition, the evidence reflects that on

2  March 25, 2019, defendant Barber requested plaintiff be referred to orthopedics and to the pain

3  committee.  (ECF No. 166 at 50.)  Thus, taking as true that on March 6, 2019, defendant told

4  plaintiff to "suffer," defendant Barber continued to provide plaintiff medical care, although

5  arguably it was not the care plaintiff wanted.  On this record, plaintiff is not entitled to summary

6  judgment as a matter of law on his retaliation claim against defendant Barber.

7      3.  State Law Claims[10]

8      The undersigned is persuaded that plaintiff's motion as to his state law claims contains

9  only plaintiff's conclusory arguments without addressing each element of his state law claims,

10  and points to no specific evidence demonstrating he is entitled to summary judgment on each

11  state law claim.  Indeed, as pointed out by defendant Barber, plaintiff's argument barely exceeds

12  one page:

13          State law claims (libel, defamation, negligence, malpractice)[11]

14          The evidence shows the very insidious actions of Barber.  (¶) On
            3/6/19 she willfully set out to defame plaintiff with actual malice.  In
15          clear libelous fashion (Civ Code 45) on 3/6/19 Barber entered a false
            note that caused plaintiff to be shunned (denied adequate medication
16          for pain) from 3/6/19 to 5/1/21.

17          Barber's false note, read by doctors treating him caused them to not
            prescribe needed medication due to cheeking.  (¶)  The clearly false
18          note defamed plaintiff (blacklisted him from getting relief from
            terrible daily pain and suffering) as doctors relied on the false note to
19          his detriment.  (New York Times Co. v. Sullivan (1964) 376 U.S.
            254)
20
            It is clear that Barber's actions based on the foregoing facts . . .
21          amount    to    professional    negligence    and    malpractice
            (denying/delaying care, false notes, etc.).
22

23  ─────────────────

24  [10]  Buried in plaintiff's 48 page opposition is plaintiff's claim that he was confined to quarters and
    unable to reply to defendants' arguments on plaintiff's state law claims, and stated that unless the
25  court -- "biased in favor of defendants" -- grants him an extension of time, plaintiff must submit
    on his "opposition," which the court construes to mean his motion.  (ECF No. 192 at 19.)  The
26  record reflects that plaintiff is well aware how to seek an extension of time, but on this occasion
    chose not to.
27

28  [11]  Plaintiff did not include fraud as one of the state law claims and therefore the court does not
    find that plaintiff moved for summary judgment on a state law claim for fraud.

1    (ECF No. 166 at 19.)  Such conclusory recitation of only some of the elements of multiple claims

2    and his failure to cite to specific evidence is insufficient to demonstrate plaintiff is entitled to

3    summary judgment as a matter of law.  In addition, as to his state law claim of medical

4    malpractice, plaintiff provided no expert testimony establishing the requisite standard of care.

5    Hutchinson v. United States, 838 F.2d 390 (9th Cir. 1988) (explaining that in California, the

6    standard of care of medical personnel can be proven only by expert testimony).  Finally, plaintiff

7    failed to address defendant's argument that all of plaintiff's state law claims are barred by

8    California Government Code § 820.20.

9         The undersigned finds that plaintiff failed to meet his burden in seeking summary

10    judgment on his state law claims for libel/defamation, negligence, or medical malpractice, and his

11    motion should be denied.

12         E.  Discussion re Defendants Recarey, Adams and Gates

13         Initially, the undersigned observes that plaintiff is correct that defendants Recarey, Adams

14    and Gates failed to seek an extension of time to oppose plaintiff's motion for summary judgment,

15    which was due July 15, 2021.  Such defendants did not file their opposition until August 16,

16    2021, over a month late.  Therefore, the undersigned does not consider the late filing by such

17    defendants, and need not address plaintiff's reply thereto.  That said, the undersigned finds that

18    plaintiff is not entitled to summary judgment as a matter of law as discussed below.

19         1.  Plaintiff's Argument

20         Plaintiff argues he was denied adequate pain medication from February 26, 2019, to May

21    1, 2021, and the delay was due to denial of care, no pain review committee, and refusal to follow

22    a specialist's recommendation.  (ECF No. 166 at 15) (citing Snow, 681 F.3d at 978).)  Aside from

23    his detailed allegations concerning defendant Dr. Barber (ECF No. 166 at 2-8), the sole section

24    directed toward defendants CEO Recarey, CME Adams and Director Gates is based on their

25    answers to discovery.  (ECF No. 166 at 16) (citing Pl.'s Exs. R, S and T).  Plaintiff argues that

26    each of these defendants acknowledged they were aware of plaintiff's repeated claims that he was

27    not being helped by over the counter Tylenol, but they all failed to take action on plaintiff's pleas

28    for help.  (ECF No. 166 at 16.)  Plaintiff contends that supervisors who are made aware of

31

1    unconstitutional actions and fail to act are liable.  (ECF No. 166 at 16) (citing <u>Taylor v. List</u>, 880

2    F.2d 1040 (9th Cir. 1989); <u>Pogue v. Igbinosa</u>, 2012 WL 603230, 2012 US Dist. LEXIS 23150

3    (E.D. Cal. Feb. 23, 2012); <u>Damian v. Breen</u>, 2019 WL 4295314, 2019 U.S. Dist. LEXIS 167057

4    (C.D. Cal. June 10, 2019.)

5         Plaintiff states that after he filed this case, defendant Adams told the court the finding that

6    Barber violated policy would change.  (ECF No. 186 at 25.)  Defendant CEO Recarey reviewed

7    the amended confidential inquiry report issued September 20, 2019.  (ECF No. 166 at 79.)  In his

8    declaration, plaintiff reiterates his claim that defendants Gates, Recarey and Adams "all admit

9    that plaintiff wrote to them about being in pain."  (ECF No. 166 at 27.)

10        2.  <u>Governing Standards</u>

11        Summary judgment is proper when "there is no genuine dispute as to any material fact and

12   the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  <u>See</u> <u>Celotex Corp.</u>,

13   477 U.S. at 323-24.  The court must draw all reasonable inferences in the light most favorable to

14   the non-moving party.  <u>Johnson v. Rancho Santiago Cmty. Coll. Dist.</u>, 623 F.3d 1011, 1018 (9th

15   Cir. 2010).

16        Where the moving party bears the burden of proof at trial, that party bears the initial

17   burden of producing evidence that would entitle it to a directed verdict at trial.  <u>See</u> <u>C.A.R.</u>

18   <u>Transp. Brokerage Co. v. Darden Rests., Inc.</u>, 213 F.3d 474, 480 (9th Cir. 2000).  If the moving

19   party does not satisfy its initial burden, then the non-moving party has no obligation to produce

20   anything, and summary judgment must be denied.  <u>Nissan Fire & Marine Ins. Co. v. Fritz Cos.</u>,

21   210 F.3d 1099, 1102 (9th Cir. 2000).  If, however, the moving party satisfies its initial burden of

22   production, then the non-moving party must produce admissible evidence to show there is a

23   genuine dispute of material fact.  <u>Id.</u> at 1102-03.

24        However, "[w]here the evidentiary matter in support of the motion does not establish the

25   absence of a genuine issue, summary judgment must be denied <u>even if no opposing evidentiary</u>

26   <u>matter is presented.</u>"  Fed. R. Civ. P. 56(e), Adv. Comm. Notes, 1963 Amend. (emphasis added).

27   The moving party's evidentiary burden cannot be abrogated by the opposing party's failure to

28   ////

1   respond; the moving party must affirmatively establish its entitlement to summary judgment.  See

2   Martinez v. Stanford, 323 F.3d 1178, 1183 (9th Cir. 2003) (quoting Fed. R. Civ. P. 56(a)).

3          3.  Discussion

4          Here, plaintiff fails to demonstrate there is no material dispute of fact that would support

5   summary judgment in favor of plaintiff as a matter of law.  The court has carefully reviewed all of

6   the responses provided and considered plaintiff's arguments and finds that the discovery

7   responses do not demonstrate that plaintiff is entitled to summary judgment.  None of the

8   discovery requests propounded to defendants Recarey, Adams or Gates provide sufficient factual

9   details for the undersigned to determine whether each defendant was deliberately indifferent

10  under the circumstances.  (See Pl.'s Exs. P, R, S, T.)  "The deliberate indifference inquiry

11  depends on the facts actually known to a defendant when he [or she] acts or fails to act."  Miller

12  v. California Dep't of Corr. & Rehab., 2018 WL 534306, at *15 (N.D. Cal. Jan. 24, 2018).

13         In his second amended complaint, plaintiff sets forth the dates he wrote each of these three

14  defendants.  (ECF No. 88 at 11.)  However, plaintiff does not provide copies of such letters,

15  which prevents the court from determining whether there is no dispute of material fact as to what

16  each of these three defendants were informed or when.  Plaintiff alleges that Gates and Adams

17  "failed to act when made aware," without specific factual details.  (ECF No. 88 at 5.)  Given the

18  nature of their roles in connection with plaintiff and his claims herein, such failure precludes

19  summary judgment as a matter of law as to defendants Recarey, Adams and Gates.  Their

20  discovery responses, standing alone, are insufficient to show an absence of a dispute of material

21  fact such that plaintiff is entitled to summary judgment as a matter of law.

22         Finally, plaintiff did not address his state law claims raised against Adams and Recarey;

23  therefore, the undersigned finds that plaintiff did not move for summary judgment on such

24  grounds.

25         Plaintiff's motion should be denied as to defendants Gates, Recarey and Adams inasmuch

26  as plaintiff failed to show that no reasonable trier of fact could find other than for plaintiff.

27  ////

28  ////

1    VI.  Remaining Motions

2         A.  September 13, 2021, and March 30, 2022 Motions to Strike

3         In his reply and subsequent oppositions to defendants' motions, plaintiff sought to strike

4    his own deposition and its exhibits.  (ECF Nos. 192 at 2; 237 at 4; 238 at 4.)  In his reply, plaintiff

5    moves to strike Exhibit B of the declaration filed by counsel for defendant Barber, claiming he

6    was "denied the requested right to review the deposition before completed (*See withheld

7    deposition -- Rule 30(e)(1))."  (ECF No. 192 at 2.)  In his oppositions, plaintiff claimed

8    defendants filed plaintiff's deposition with their motions for summary judgment before plaintiff

9    had reviewed his deposition, in violation of Rule 30 of the Federal Rules of Civil Procedure.

10   (ECF No. 192 at 2; 237 at 4; 238 at 4.)

11        Rule 30 provides:

12              On request by the deponent or a party before the deposition is
              completed, the deponent must be allowed 30 days after being notified
13              by the officer that the transcript or recording is available in which:

14              (A) to review the transcript or recording; and

15              (B) if there are changes in form or substance, to sign a statement
              listing the changes and the reasons for making them.
16

17   Fed. R. Civ. P. 30.

18        Plaintiff's deposition was taken on March 10, 2021.  Plaintiff does not cite a page number

19   in his 208 page deposition transcript where he asked to review the deposition transcript before the

20   deposition ended.  Rather, in his motion, plaintiff simply claims, in conclusory fashion, that he

21   was denied the right to request review and the defense disregarded plaintiff's request.  He does

22   not specifically identify to whom or when he posed the request.  Plaintiff provides no competent

23   evidence that he requested such review from the shorthand reporter before plaintiff's deposition

24   was completed.  Further, defendant Barber's opposition was filed on August 16, 2021, over five

25   months after the deposition was completed.  (ECF No. 179.)  Plaintiff points to no actions he took

26   once he received the opposition to object that he was not provided an opportunity to review the

27   deposition, or to obtain a copy of the deposition.  Plaintiff's motions to strike the deposition and

28   its exhibits are denied.

34

B. <u>Motion to Serve</u>

Plaintiff filed a motion requesting the court order the prison to mail plaintiff's documents to counsel for Barber, claiming that the prison has a policy that for indigent prisoners the prison will only mail documents to the courts and the Office of the Attorney General.  Plaintiff stated that his mailing to counsel for Barber (private counsel) was rejected for postage.

However, defendant Barber has been represented by private counsel since March 13, 2020, and this is the first time plaintiff experienced such difficulty.  In addition, because counsel for defendant Barber receives electronic notice of plaintiff's filings, no such order is required. Therefore, plaintiff's motion for order (ECF No. 240) is denied.

C. <u>Motion for Partial Judgment</u>

On June 6, 2022, after defendants' motions for summary judgment were fully-briefed, plaintiff filed a motion for partial judgment on the pleadings (ECF No. 251) which is now fully-briefed.  Plaintiff argues that defendants did not contest his allegations that Dr. Barber's decision to taper him off morphine was a constitutional violation.  However, plaintiff made such arguments in his own motion for summary judgment, as well as his oppositions to defendants' motions for summary judgment addressed above.  As such, his motion for partial judgment is duplicative and redundant.

In any event, the undersigned agrees with defendants that plaintiff's motion is based on matters outside his second amended complaint, and therefore must be considered a motion for summary judgment under Rule 56.  "If, on a motion under … 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d).  Plaintiff's motion, properly considered a motion for summary judgment, was filed on June 6, 2022, almost nine months after the deadline for filing pretrial motions expired on September 25, 2021.  (ECF No. 190 at 2.)  Thus, such motion is untimely and should be denied.

VII.  <u>Objections</u>

The issues in this action have been extensively briefed by both parties.  For that reason, objections to these findings and recommendations shall be no longer than fifteen pages.

1

2   VIII.   Conclusion

3          Accordingly, IT IS HEREBY ORDERED that:

4          1.  Plaintiff's motions to strike his deposition (ECF Nos. 237, 238) are denied; and

5          2.  Plaintiff's motion to serve (ECF No. 240) is denied.

6          Further, IT IS RECOMMENDED that:

7          1.  Plaintiff's motion for summary judgment (ECF No. 166) be denied; and

8          2.  Plaintiff's motion for partial judgment (ECF No. 251) be denied as untimely.

9          These findings and recommendations are submitted to the United States District Judge

10   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within thirty days after

11   being served with these findings and recommendations, any party may file written objections with

12   the court and serve a copy on all parties.  Such a document should be captioned "Objections to

13   Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be

14   filed and served within fourteen days after service of the objections.  The parties are advised that

15   failure to file objections within the specified time may waive the right to appeal the District

16   Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

17   Dated:  January 26, 2023

18

19                                              KENDALL J. NEWMAN
                                                UNITED STATES MAGISTRATE JUDGE
20   /wilk1338.Apl.msj

21

22

23

24

25

26

27

28