1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    KEENAN WILKINS, aka NERRAH          No.  2:19-cv-1338 WBS KJN P
      BROWN,
12
                      Plaintiff,
13
             v.                           ORDER AND
14
      DR. CHRISTINE S. BARBER, et al.,    FINDINGS & RECOMMENDATIONS
15
                      Defendants.
16

17          Plaintiff is a state prisoner, proceeding pro se and in forma pauperis.  Defendants' motions

18   for summary judgment are fully-briefed and, as set forth below, the undersigned recommends that

19   defendant Barber's motion be granted, and the remaining defendants' motion be granted.  Further,

20   plaintiff's motions to strike are denied, and his motion to file a sur-reply is granted.

21   I.  Plaintiff's Allegations

22          This action proceeds on plaintiff's verified second amended complaint brought under 42

23   U.S.C. § 1983.  (ECF No. 88.)  As set forth in detail in the findings and recommendations on

24   plaintiff's dispositive motion, plaintiff alleges that all of the defendants were deliberately

25   indifferent to his serious medical needs while he was incarcerated at California Health Care

26   Facility ("CHCF"), in violation of the Eighth Amendment (claim one); defendant Barber

27   retaliated against plaintiff (claim two); and plaintiff raises various state law allegations (claim

28   three) against defendants Barber, Dredar, Singh, Recarey, Adams and Gates.

                                              1

1    II.  Background

2         On July 14, 2020, plaintiff's motion to amend was granted, and the court found that

3    plaintiff's second amended complaint stated potentially cognizable claims.  (ECF No. 99 at 3.)

4    Defendant Le was dismissed on August 6, 2020.  (ECF Nos. 99, 105.)  Plaintiff's June 24, 2021

5    motion for summary judgment was addressed separately.

6         On September 24, 2021, defendant Barber filed a motion for summary judgment.  (ECF

7    No. 198.)  The same day, defendants Mansour, Gates, Recarey, Adams, Singh and Dredar filed

8    their summary judgment motion.  (ECF No. 199 (hereafter "remaining defendants").)  Plaintiff

9    opposed the motions.  (ECF No. 238 (re Barber); ECF No. 237 (re remaining defendants.))

10   Plaintiff filed a declaration in support of his oppositions.  (ECF No. 239.)[1]  Plaintiff also filed a

11   response to defendants' statements of undisputed facts.  (ECF No. 242.)  Defendants filed replies.

12   (ECF Nos. 243 (remaining defendants), 244 (Barber).)  The declarations of defendants' expert

13   witness, B. Feinberg, M.D., were re-filed with appropriate redactions.  (ECF Nos. 216-1 (Barber);

14   217-1 (remaining defendants).)

15        On October 27, 2021, plaintiff's request for the appointment of a court-appointed medical

16   expert under Rule 706(a) of the Federal Rules of Evidence was denied without prejudice.  (ECF

17   No. 212.)  That same day, by separate order, the court denied plaintiff's request to reopen

18   discovery under Rule 56(d) of the Federal Rules of Civil Procedure because plaintiff failed to

19   demonstrate how statements by Officers Rushing and Hasan related to the custody 128 chrono, if

20   such statements existed, would preclude summary judgment.  (ECF No. 213 at 6.)

21   ////

22

23   [1]  On April 6, 2022, plaintiff filed a separate title page, "Declaration of Plaintiff in Support of
     Opposition to Defendant Barber's Motion for Summary Judgment," accompanied by documents
24   purporting to return plaintiff's mailing to counsel for Barber due to improper postage.  (ECF No.
     241 at 2-4.)  However, in what appears to be plaintiff's handwriting, at the top of the first page is
25   written:  "Same as for other defendants sent last week."  (ECF No. 241 at 1.)  In defendant
     Barber's reply, defense counsel noted plaintiff's declaration was received a little more than a
26   week after plaintiff's opposition was filed, and the declaration was 32 pages (excluding exhibits).
     (ECF No. 244.)  The declaration plaintiff submitted in support of his opposition to the remaining
27   defendants' motion is also 32 pages (excluding exhibits).  (ECF No. 239.)  In light of plaintiff's
     note that his declaration was the same, the court will not require that the declaration be re-filed.
28
                                                    2

1   On January 27, 2022, plaintiff's subsequent motion for discovery under Rule 56(d) was

2   denied in part because plaintiff failed to provide facts showing why the requested items were

3   essential to oppose summary judgment, his motion to modify the scheduling order to reopen

4   discovery was denied, and he was granted an extension of time to oppose the summary judgment

5   motions.  (ECF No. 231.)

6   III.  Legal Standards for Summary Judgment

7   Summary judgment is appropriate when it is demonstrated that the standard set forth in

8   Federal Rule of Civil Procedure 56 is met.  "The court shall grant summary judgment if the

9   movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

10  judgment as a matter of law."  Fed. R. Civ. P. 56(a).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

15  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

16  56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving party need

17  only prove that there is an absence of evidence to support the non-moving party's case."  Nursing

18  Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376,

19  387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 Advisory

20  Committee Notes to 2010 Amendments (recognizing that "a party who does not have the trial

21  burden of production may rely on a showing that a party who does have the trial burden cannot

22  produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment

23  should be entered, after adequate time for discovery and upon motion, against a party who fails to

24  make a showing sufficient to establish the existence of an element essential to that party's case,

25  and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.

26  "[A] complete failure of proof concerning an essential element of the nonmoving party's case

27  necessarily renders all other facts immaterial."  Id. at 323.

28  ////

Consequently, if the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of such a factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

1   demonstrate a genuine issue, the opposing party "must do more than simply show that there is

2   some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could

3   not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

4   trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

5       By notices filed September 24, 2021 (ECF Nos. 198-1; 199-1), plaintiff was advised of the

6   requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil

7   Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v.

8   Eikenberry, 849 F.2d 409 (9th Cir. 1988).

9       The undersigned carefully reviewed all documents submitted in connection with the

10  instant motions, oppositions, and replies in issuing these findings and recommendations, and

11  considered all arguments, points and authorities, declarations, plaintiff's deposition, exhibits,

12  statements of undisputed facts and responses thereto, objections and other papers filed by the

13  parties.  If an argument, document, case or objection is not referenced herein, such omission

14  should not be construed as a failure to consider such argument, document, case or objection.  The

15  undersigned thoroughly reviewed and considered the evidence deemed material.

16  IV.  Facts[2]

17      1.  At all relevant times, plaintiff was an inmate incarcerated by the California Department

18  of Corrections and Rehabilitation ("CDCR") at California Health Care Facility ("CHCF").

19      2.  Defendant Barber is a physician and surgeon employed at CHCF from March 22, 2018,

20  until her retirement in August of 2020.  Dr. Barber saw plaintiff as his primary care physician

21  ("PCP") on five occasions:  January 23, 2019, January 31, 2019, February 18, 2019, March 6,

22  2019, and March 25, 2019.

23      3.  Defendant Dredar is a physician and surgeon assigned to CHCF in 2019.  Dr. Dredar

24  saw plaintiff on two occasions:  May 21, 2019, relating to plaintiff's inmate health care grievance,

25  and November 12, 2019, for a follow-up appointment to address plaintiff's complaints of chronic

26  pain and shoulder pain.

27  ────────────────────

28  [2]  These facts are undisputed for purposes of summary judgment, unless otherwise noted.

4. During 2019, defendant Mansour, a physician and surgeon, was assigned to conduct telemedicine appointments with inmates at CHCF when the inmate's PCP or other staff members were unavailable.  (ECF No. 199-8 at 1-2.)  Dr. Mansour conducted telemedicine appointments with plaintiff on three occasions:  July 10, 2019, July 25, 2019, and August 15, 2019.

5. At all times relevant herein, defendant R. Singh was chief physician and surgeon at CHCF, responsible for the supervision of physicians and surgeons at CHCF.  Dr. R. Singh has not provided medical care to plaintiff or made medical treatment decisions for plaintiff.  Dr. R. Singh's involvement with plaintiff was limited to reviewing and responding to plaintiff's health care grievances.

6. Defendants Recarey, Chief Executive Officer of Health Care at CHCF, and S. Gates, Chief, Health Care Correspondence and Appeals Branch ("HCCAB"), California Correctional Health Care Services ("CCHCS"), are not doctors, have no medical training, and cannot make medical treatment decisions.  Their roles were purely administrative, limited to reviewing inmates' health care grievances.  Defendants Recarey and Gates never provided plaintiff with medical treatment.

7. At all relevant times, defendant Adams, a physician and surgeon, was chief medical executive at CHCF, responsible for overseeing the medical operations at CHCF.  Dr. Adams does not personally provide care or make medical decisions for inmates, but is available to consult with treating providers and to review inmates' medical records.

8. Plaintiff suffers serious medical needs.[3]  A spinal cervical MRI with and without contrast on December 16, 2010, recorded the following impressions:

> Inherently narrow AP diameter of the cervical vertebral canals.  ¶ Mild-to-moderate central spinal stenosis at C3-4 and C 4-5.  ¶ Diffuse disc bulge at C5-6 causing severe central spinal stenosis and cord compression.  ¶  There is syringohydromyella in the cervical spinal cord measuring 1.2 cm in length at the level of C6-7.  This could be the result of the cord compression at C5-6.  No abnormal contrast enhancement is demonstrated in the cervical spinal cord.

---

[3]  Plaintiff also suffers mental health issues.  (ECF Nos. 88 at 6, 11; 217-1 at ¶¶ 9-13, 27 & Ex. B.)  Plaintiff confirmed he has been diagnosed with schizophrenia, mood disorder, and bipolar disorder.  (Pl. Dep. at 182.)

1   (ECF No. 239 at 34.)  On May 6, 2016, nonparty Dr. Arya diagnosed plaintiff's R C6

2   radiculopathy due to disc herniation and requested surgery for plaintiff's right radiculopathy

3   "within one month," charting:

> Has R C5-6 discal herniation (confirmed by MRI) with worsening
> Right mono radiculopathy in the upper and lower extremity.  Has not
> responded to conservative treatment by NSAIDS (3wks) and
> exercise (6Wk)/activity modification (6Wk).   Has continued
> paresthesia in the upper extremity and gait disturbance.
> Neurosurgery consultant has recommended anterior cervical
> discectomy and fusion (ACDF) surgery.  Previous RFS expired.

8   (ECF No. 239 at 41.)  A handwritten statement added:  "Pt. has refused in the past."  (Id.)

9          On December 21, 2016, plaintiff was seen by Dr. Shakiba at RJD for a 180 day review of

10   plaintiff's chronic medical conditions.  (ECF No. 217-1 at 3, 21-22.)  Noted were chronic neck

11   pain secondary to spondylosis and myelopathy; recent MRI showed mild interval progression of

12   arthritis in the cervical spine and a cyst (syringomyelia) stable in appearance.  Plaintiff's chronic

13   pain was felt to be controlled on morphine.  (ECF No. 217-1 at 3, 21.)  His foot pain was noted

14   and Dr. Shakiba ordered orthopedic shoes.  (ECF No. 217-1 at 21.)

15          Before he arrived at CHCF, plaintiff was diagnosed with a cyst (syringomyelia), cervical

16   arthritis (spondylosis), myelopathy, and chronic neck pain, had declined surgery for his neck, and

17   instead had been prescribed morphine for pain.

18          9.  Plaintiff was taking morphine on December 21, 2016, while housed at RJ Donovan

19   Correctional Facility ("RJD").  (ECF No. 217-1 at 3, 21-22.)

20          10.  On November 28, 2018, plaintiff was transferred from RJD to CHCF.

21          11.  At the time of the transfer, plaintiff was prescribed 30 mg. of morphine, twice a day,

22   for pain management.  On December 4, 2018, plaintiff was seen by Dr. South, who continued

23   plaintiff's morphine prescription "until his new primary care physician arrives and he is evaluated

24   by neurosurgery."  (ECF No. 217-1 at 4, 34-36.)  A request for neurosurgery evaluation issued

25   because "history of syringomyelia and cervical disc impingement needs eval for future surgical

26   correction sec to sig pain requiring opiates."  (ECF No. 239 at 114.)

27          12.  On January 23, 2019, Barber declares she informed plaintiff that morphine and

28   orthopedic shoes might not be medically necessary.  (ECF No. 198-5 at 3 (Barber Decl.).)

Plaintiff declares that on January 23, 2019, Barber told plaintiff she was going to stop his

morphine prescription because he did not need it, and that plaintiff did not need his mobility vest,

and Barber "did no examination/evaluation." (ECF No. 239 at 4.)

13. Barber declares that plaintiff was fully functional in all his activities of daily living

("ADLs"), other than being able to get down to the ground readily for alarms. Barber personally

observed plaintiff get on and off the exam table without difficulty and walk with a normal gait on

multiple occasions; the only distress she observed was a disclination of plaintiff to turn his head

without turning his entire body. (ECF No. 198-5 at 2.)

14. Barber declares that on January 31, 2019, plaintiff again requested his morphine be

continued at 30 mg twice per day, but Barber did not observe "significant distress of the level that

would justify continuation of any narcotics," and plaintiff also asked again to be prescribed

orthotics. (ECF No. 198-5 at 3.)[4]

15. On February 17, 2019, Psych Tech J. Le informed Barber that plaintiff had been

caught "cheeking" his morphine medication. (ECF No. 88 at 6; 107 at ¶ 9, ECF No. 217-1 at 5,

41 (Le email).)[5] Plaintiff declared that on February 17, 2019, he "refused to line [his] gums as

ordered by Psych Tech J. Le," and thereafter J. Le "made a false report that [plaintiff] cheeked the

morphine." (ECF No. 239 at 4.) Defendants Mansour, Dredar, Gates, Recarey, Adams, and

---

[4] Plaintiff disputes that Barber discussed discontinuing plaintiff's morphine or ortho shoes at this visit, claiming Barber only spoke of discontinuing morphine on January 23, 2019, and did not talk about the shoes before March 25, 2019. (ECF No. 242 at 11.) However, plaintiff does not address the January 31, 2019 visit in his declaration (ECF No. 239, *passim*), and the medical record from the January 31, 2019 visit expressly notes Barber suggested plaintiff's morphine might be decreased, and Barber was "not sure he meets medical necessity for new shoes." (ECF No. 179-2 at 4; '198-5 at 13.)

[5] Plaintiff responds that the February 17, 2019 cheeking report was false, which Barber knew, and plaintiff declares that the cheeking report has now been removed. (ECF No. 242 at 12.) But plaintiff points to no evidence Barber knew the February 17 cheeking report was false, if it was, and the subsequent removal of the counseling only rules violation report from plaintiff's file (ECF No. 239 at 43) does not demonstrate that Barber knew the report was false on February 18, 2019, when she began tapering off plaintiff's morphine. Indeed, in his deposition, plaintiff conceded he had no evidence demonstrating Barber knew the report was false on February 18, 2019. (Pl. Dep. at 188.)

1   Singh were not present during the February 17, 2019 cheeking incident that was reported in

2   plaintiff's medical records.

3       16.  "Cheeking" is when an inmate pretends to take their medication but does not, instead

4   diverts the medication into their cheeks or elsewhere for subsequent improper use or sale.

5       17.  On February 18, 2019, plaintiff was called to see Barber and was told about "the false

6   cheeking report," apparently referring to the February 17, 2019 report.  (ECF No. 239 at 4.)[6]

7   Plaintiff asked Barber to speak to the custody officers present at the time of the incident or to

8   view the video to prove the accusation was false, but she disregarded plaintiff's requests.  (ECF

9   No. 239 at 4-5.)  Barber had plaintiff sign a narcotic contract, began tapering plaintiff off

10  morphine, and prescribed 1300 mg of Tylenol per day for his pain.[7]

11      18.  Barber ordered that plaintiff's morphine be decreased to 15 mg twice a day for five

12  days, then 15 mg daily for five days, then fully discontinued.  Plaintiff and the remaining

13  defendants agree that plaintiff was tapered off morphine from February 18, 2019, through

14  February 25, 2019.  (ECF No. 242 at 2.)  Such tapering occurred over a period of eight days

15  (counting February 25).

16  
17  [6] Defendant Barber addresses a second alleged cheeking incident in which she claims PT N. Thai
    came to Barber's office on February 18, 2019, with a paper cup used to dispense medication,
18  which held a significant amount of white residue.  (ECF No. 198-5 at 3.)  Thai informed Barber
    that Thai had observed "the patient" cheek his morphine and then threw the cup into the trash
19  when she ordered the patient to show her the contents.  Although Barber saw the cup, she does
    not know who actually administered plaintiff his medication.  Indeed, defendant Adams reviewed
20  plaintiff's medication administration records and identified no dates in 2019 that Psych Tech N.
    Thai provided plaintiff his medication.  (ECF No. 166 at 76 (Pl.'s Ex. P, Interrogatory No. 2).)
21  Unlike the paper trail surrounding the earlier cheeking incident, there are no messages or other
    documentary evidence to support this second accusation.  Also, Dr. Feinberg did not include the
22  second incident in his expert report.  Plaintiff adamantly contends that the second incident is
    false, primarily based on his evidence that his extended release morphine is never crushed.  (ECT
23  No. 239 at 8.)  And while defendant Barber declares she advised plaintiff on February 18 that she
    was discontinuing his morphine based on these two episodes of cheeking, her progress notes from
24  that date do not reference the second incident.  In his previous declaration, plaintiff stated he did
    not learn of the second alleged cheeking incident until March 6, 2019, and challenged Barber's
25  accusation in staff complaint CHCF SC 19000126 submitted April 5, 2019.  (ECF No. 166 at 25,
26  54.)

27  
28  [7] Plaintiff responds that Barber did this despite knowing that even Tylenol #3 did not previously
    help him (ECF No. 242 at 13), but plaintiff points to no evidence in support.

19.  Tapering plaintiff off opioid pain medication comported with nationally recognized standards of care for pain management.  (ECF No. 217-1 at ¶ 58:24-26.)  Plaintiff disputes this fact, claiming that such tapering violated CCHCS and CDC tapering guidelines to minimize withdrawals.  (ECF No. 242 at 13.)

20.  It is not uncommon for inmates to appeal medical decisions they do not like.

21.  On several occasions, Barber documented that she did not believe plaintiff required the amount of morphine he was getting, that she had seen him on multiple occasions ambulating quickly and easily with full range of motion, in no apparent distress and pain-free, and that he did not have any inability to function or perform his activities of daily living ("ADLs"), and that other prison staff had observed the same.  (ECF No. 217-1 ¶¶ 17 (January 23, 2019), 20 (February 18, 2019), 22 (March 6, 2019), 24 (March 25, 2019) & Ex. B.)

22.  Plaintiff saw Barber on March 6, 2019, and told her plaintiff was reporting her for her actions.  Plaintiff claims Barber stood up and said, "suffer while you do," and ordered plaintiff to leave her office.  Barber declares that plaintiff raised his voice at her and threatened to file a lawsuit, told her he had reported Barber to the Receiver and accused her of cutting him off from morphine "cold turkey."  (ECF No. 198-5 at 5.)  Barber declares that per CDCR policy, she escorted plaintiff out of the office due to his raised voice and threats; plaintiff "limped as he left [her] office but switched to a swift normal gait when he turned the corner to leave the area."  (Id.) Barber's version of events is documented in her March 6, 2019 progress note.  (ECF No. 216-1 at 59.)

23.  On March 15, 2019, plaintiff was seen by neurosurgeon M. Rahimifar, M.D., who reviewed plaintiff's previous cervical spine MRI, and recommended the following:  a repeat MRI cervical spine with/without contrast, an orthopedic consultation as to his left shoulder, and "non-narcotic analgesic, Ultram" for pain "if approved by authorities."  (ECF No 217-1 at 6, 58; Pl. Dep. 89:11-90.)  Dr. Rahimifar needed the orthopedic consultation note to "plan treatment in regard to [plaintiff's] neck."  (ECF No. 239 at 117.)

24.  On March 25, 2019, Barber saw plaintiff for the last time.  (ECF No. 242 at 3.) Barber deferred ordering a cervical MRI until after plaintiff was seen by orthopedic surgery and

10

1    submitted a referral.  (ECF Nos. 198-5 at 6; 242 at 14.)  Barber discontinued plaintiff's orthotic

2    shoe order, declined to prescribe plaintiff morphine or Ultram, and referred plaintiff to physical

3    therapy and the pain management committee ("PMC").  (ECF No. 242 at 3.)  Plaintiff admits this

4    is partially true, but claims Barber denied care for the disc bulge in plaintiff's neck.  (Id.)

5         25.  On or about May 3, 2019, plaintiff was seen for an orthopedic consultation and was

6    diagnosed with impingement syndrome of his left shoulder, possible rotator cuff injury, with a

7    recommendation for a cortisone injection and consider follow up shoulder MRI if no

8    improvement from the injection.  (ECF No. 217-1 at 63-64; 239 at 129-30.)

9         26.  On May 21, 2019, plaintiff first met Dr. Dredar, who interviewed plaintiff about his

10   grievance, and charted:  plaintiff's syringomyelia was non-operable and there was no indication

11   for surgery, plaintiff did not wish to undergo a steroid injection as recommended for his shoulder,

12   plaintiff had been caught cheeking, plaintiff was on Tylenol and did not exhibit any signs of

13   discomfort or distress, and plaintiff had no medical indication for orthotic shoes as he had no foot

14   deformities, no gait instability, and ambulated without assistance.[8]  (ECF No. 217-1 at 6, 67; Pl.

15   Dep. 142:3-19.)

16        27.  On July 10, 2019, plaintiff, complaining of pain in his neck and shoulders, first met

17   Dr. Mansour, who reviewed neurosurgery and orthopedic surgery evaluations indicating plaintiff

18   was not a candidate for surgery for the syringomyelia; noted that plaintiff was clinically doing

19   well, ambulating freely about the exam room and able to get onto the exam table without any

20   difficulty.[9]  (ECF No. 217-1 at 10, 68-69; Mansour Decl. ¶ 6; ECF No. 88 at 8; Pl. Dep 106:22-

21   107:3, 108:5-10.)

22   ////

23

24   [8]  Plaintiff contends defendant Dredar's medical note is "false as custody [officer] Acero provides
     written verification."  (ECF No. 242 at 3.)  However, the document signed by Officer Acero
25   refers to plaintiff's November 12, 2019 appointment, not the May 21, 2019 interview concerning
     plaintiff's grievance.  (ECF No. 239 at 175.)
26

27   [9]  Plaintiff contends that on July 10, 2019, Dr. Mansour "falsified an evaluation," but points to no
     evidence.  (ECF No. 242 at 3.)
28

28.  During the July 10, 2019 appointment, defendant Mansour declined to order an MRI, but submitted a request for a cortisone injection of plaintiff's left shoulder as recommended by an orthopedic surgeon, noted "per chart" that plaintiff was referred to PMC for further recommendation regarding pain control; plaintiff was "currently on Tylenol and Cymbalta," and plaintiff's request for orthotic shoes had been addressed during plaintiff's May 21, 2019 meeting with defendant Dredar.  (ECF No. 217-1 at 10,[10] 68; ECF No. 199-8 at 2-3; ECF No. 88 at 8; Pl. Dep. 104:23-105:2, 112:3-11, 140:9-141:4.)

29.  On July 25, 2019, plaintiff received a cortisone shot in his left shoulder.  (ECF No. 217-1 at 70.)  Plaintiff was then seen for follow up by defendant Mansour, who noted that plaintiff was previously taking morphine which controlled his pain; Mansour discussed with plaintiff that morphine was not recommended for chronic pain and that the risks of using narcotics for chronic pain outweighed its benefit; plaintiff again requested orthotic shoes and complained of pain in his right foot, but plaintiff appeared to ambulate without difficulty, and Mansour declined to order orthotic shoes, but ordered x-rays of plaintiff's right foot and lumbar spine; Mansour noted plaintiff has Tylenol for pain and is also on Cymbalta at 120 mg daily. (ECF Nos. 217-1 at 10, 73-74; 199-8 at 3; Pl. Dep. 105:19-106:4, 110:3-22, 156:5-6.)  Plaintiff contends that defendant Mansour continued ineffective treatment plan and denied care for plaintiff's neck and allowed pain.  (ECF No. 242 at 4.)

30.  On August 12, 2019, plaintiff was seen by nonparty Dr. Nikolic who noted that plaintiff's calm demeanor did not fit his reported pain (10/10) and that plaintiff had no red flags or issues with activities of daily living, and referred plaintiff to physical therapy before ordering repeat MRIs for plaintiff's neck and shoulder pain; plaintiff insisted he takes the duloxetine

////

---

[10]  Dr. Feinberg states that "as to pain medications, Dr. Mansour noted plaintiff was currently receiving Tylenol and Cymbalta."  (ECF No. 217-1 at 10.)  However, Dr. Mansour's medical record simply states plaintiff was on Cymbalta, not expressly identifying the medication as prescribed for pain.  (ECF No. 217-1 at 68.)  Plaintiff denies he was prescribed Cymbalta for pain.  (ECF No. 242 at 4.)  In his deposition, plaintiff testified that his psychiatrist changed plaintiff's schizophrenic medication to Cymbalta in an effort to help plaintiff with his pain, but plaintiff informed him it provided no pain relief.  (Pl. Dep. at 140-41.)

1   (Cymbalta) "for schizophrenia only, and it does not help pain."  (ECF No. 217-1 at 10-11, 75-76;

2   Pl. Dep. 113:17-22.)

3          31.  On August 15, 2019, defendant Mansour saw plaintiff one last time for follow up and

4   declined to order an MRI, noting that plaintiff was seen three days earlier for the same issue,

5   Dr. Nikolic had referred plaintiff to physical therapy, plaintiff appeared clinically stable, charted

6   that plaintiff was receiving Tylenol and Cymbalta for pain, and that the best course of action was

7   to get x-rays of plaintiff's neck and try physical therapy before ordering repeat MRIs.[11]  (ECF

8   Nos. 217-1 at 11, 77-78; 199-8 at 3-4; 88 at 9; Pl. Dep. 113:20-114:7.)

9          32.  On November 12, 2019, defendant Dredar saw plaintiff for follow up and noted that

10   in contradiction to his complaints of pain and limited range of motion, plaintiff had no muscle

11   atrophy or wasting of his left arm and had been seen using his arms beyond what he was able to

12   do during the appointment, and prescribed plaintiff Tylenol and a topical capsaicin.[12]  (ECF Nos.

13   217-1 at 86; 237 at 18-19, 35-36.)  Dredar ordered physical therapy for plaintiff's neck pain and a

14   repeat MRI of plaintiff's cervical spine.  (ECF No. 217-1 at 11, 86-87; 199-5 at 3; 88 at 9; Pl.

15   Dep. 146:20-23, 149:15-18.)

16

17   [11]  Plaintiff contends Mansour ordered "ineffective x-ray" and denied neck care, but cites no
     evidence.  (ECF No. 242 at 4.)

18
19   [12]  In his response to undisputed facts, plaintiff claims that "Dredar wildly falsified his notes,"
     without citing specific facts or evidence.  (ECF No. 242 at 5.)  In his opposition, plaintiff claims
20   that on November 12, 2019, defendant Dredar entered a "libel medical note in efforts to
     negatively impact plaintiff's care and litigation."  (ECF No. 237 at 65.)  Plaintiff claims "sworn
21   peace officer Acero verifies the false libel notes."  (Id., citing ECF No. 239 at 175 (Pl.'s Ex. Z).)
     However, Acero's responses on the CDCR 22 request for interview form are not signed under
22   penalty of perjury.  The questions and Acero's responses were as follows:

23              1.  Did you see me receive a physical evaluation?  "Yes, as far as
                conversation but nothing physical."  ¶ 2.  Did you see or hear me
24              being uncooperative?  "No."  ¶ 3.  Did you watch me leave clinic and
                raise arm?  When I left you were still in office with doctor.  "I
25              observed you leave the room and clinic without you raising your
                arm."
26
     (ECF No. 239 at 175.)  Such cryptic responses do not refute that Dr. Dredar saw plaintiff on
27   November 12, 2019, continued plaintiff's Tylenol and topical capsaicin, and ordered physical
     therapy and a repeat MRI for plaintiff's cervical spine.  Thus, any conflicting observations do not
28   constitute material disputes of fact for purposes of summary judgment.

Following the appointment, on November 12, 2019, plaintiff submitted a health care request form stating that he saw Dredar who told plaintiff the x-ray showed nothing wrong with plaintiff's neck and no surgery needed, and that the doctor had not reviewed plaintiff's file or past MRIs, and the doctor did no evaluation.  (ECF No. 239 at 172.)  Plaintiff attached the MRI showing severe cord compression and May 2016 surgery referral noting surgery is needed; and that plaintiff sought specialist.  On November 13, 2019, the form was received and reviewed by the triage nurse, and the form has RN line crossed out.  (ECF No. 239 at 172.)  On November 13, 2019, plaintiff was seen by RN Tollestrup, who noted plaintiff did not refuse appointment with Dredar on November 12, 2019, and that after reviewing notes and medical records, Dredar ordered an updated MRI of plaintiff's neck.  (ECF No. 239 at 173.)

33.  On or about December 4, 2019, an MRI of plaintiff's cervical spine was taken.  (ECF No. 217-1 at 11-12, 89; 199-5 at 3-4; 88 at 10; Pl. Dep. 152:3-19.)  Plaintiff does not dispute that he received such MRI, but contends it was done without contrast which the surgeon needed. (ECF No. 242 at 5.)

34.  Plaintiff subsequently refused appointments with defendant Dredar on December 12, 17, and 31, 2019; however, defendant Dredar still submitted a referral request for neurosurgical evaluation.  (ECF Nos. 217-1 at 11-12, 40-41, 88-93; 199-5 at 3; Pl. Dep 96:18-25, 149:19-5, 152:3-7.)

35.  On January 31, 2020, plaintiff was seen by nonparty Dr. H. Singh.  (ECF No. 217-1 at 98-99.)  Plaintiff requested Ultram for pain.  After obtaining a pertinent history and performing a physical exam, Dr. H. Singh prescribed lidocaine patches for pain, referred plaintiff to the PMC, and noted plaintiff was waiting to see physical therapy and had a neurosurgery appointment pending.  (ECF No. 217-1 at 12, 98-99.)  Plaintiff adds that Dr. H. Singh prescribed Ultram until told plaintiff was a seeker and cancelled the prescription (ECF No. 242 at 5), which is supported by the medical records showing Dr. H. Singh ordered tramadol (Ultram) at 11:14 PST, but then cancelled the order at 11:24 PST (ECF No. 239-1 at 11, 13).

36.  By March 4, 2020, plaintiff was using a Rollator walker with seat.  (ECF No. 217-1 at 105.)  On March 4, 2020, plaintiff was seen by nonparty Dr. Williams, who found plaintiff

independent with ADLs, and modified independent with mobility using the Rollator with seat. (ECF No. 217-1 at 106.)  Dr. Williams charted that plaintiff was able to perform gentle neck stretches as taught by physical therapy and he participates in physical therapy.  (Id.)  Plaintiff reported his pain is generalized and beyond the area of the neck, "much worse and is all body encompassing, spreading from the cervical spine to the rest of his body."  (Id.)  Dr. Williams diagnosed plaintiff with chronic neck pain and whole body pain syndrome, along with substantial physical impairments, such as myofascial pain, recommended that plaintiff follow up with mental health to address pain coping strategies, and advised plaintiff that patients who undergo surgery and are taking chronic opioids have worse outcomes from the perspectives of pain management, medical, and rehabilitation, and told plaintiff that cervical spine surgery would not take away his whole body pain.[13]  (ECF No. 217-1 at 12-13, 104-07.)

     37.  On April 3, 2020, nonparty neurosurgeon Dr. Ramberg recommended a repeat cervical MRI before considering surgery and deferred to plaintiff's primary care doctor for a decision on pain management.[14]  (ECF No. 217-1 at 13, 109-10.)  Dr. Ramberg noted there was more recently numbness and tingling into both plaintiff's arms and hands and electrical feelings in the legs intermittently.  (ECF No. 217-1 at 109.)

     38.  On April 11, 2020, nonparty Dr. Lehil ordered the cervical MRI, declined to order opiate pain medication because the risk outweighed the benefit as plaintiff was able to independently function and perform activities of daily living, and instead increased the amount of Tylenol, and noted plaintiff received topical capsaicin and lidocaine.  (ECF No. 217-1 at 13, 111.)  Plaintiff states he never saw this doctor.  (ECF No. 242 at 5.)

////

---

[13]  Plaintiff responds that "Williams falsified notes in CHCF practice," but points to no specific note, facts or evidence.  (ECF No. 242 at 5.)

[14]  Plaintiff claims that "Ramberg said he could not give adequate meds due to cheeking -- ordered heat pad." (ECF No. 242 at 5.)  Dr. Ramberg's notes do not reflect any reference to cheeking, stating "In the interim I do not object to him having any pain medications as you see best." (ECF No. 216-1 at 112.)  The report also does not reflect an order for a heating pad.  (Id.)

1   39.  On May 6, 2020, a cervical spine MRI with contrast was done.  (Pl. Dep. at 152:11-

2   22.)

3   40.  On May 8, 2020, plaintiff sought an appointment for follow-up re pain, noting he saw

4   neurosurgeon by telemedicine and wants pain medication for his chronic pain issues, lidocaine

5   and Tylenol not working, and wants PMC ASAP.  (ECF No. 217-1 at 114.)  Plaintiff refused to

6   see Barber and asked to see a different doctor.  (Id.)  Barber noted that despite her request to have

7   plaintiff evaluated by the PMC last year, plaintiff was never reviewed.  Barber wrote that the

8   medical assistant would get a copy of the evaluation for plaintiff to update, and Barber contacted

9   medical administration to schedule plaintiff to be reviewed.  (ECF No. 217-1 at 115.)

10   41.  Plaintiff refused to see Barber on April 18, 2019, May 16, 2019, June 6,

11   2019, September 3, 2019, October 1, 2019, October 24, 2019, April 28, 2020, and May 8, 2020,

12   which hampered efforts to provide him safe and effective medical care.  (ECF No. 217-1 at ¶ ¶

13   28, 32, 38, 48, 61 and Ex. B (*passim*); Pl. Dep at 95:11-22; 99:6-13.)

14   42.  On August 21, 2020, nonparty Dr. Ramberg reviewed the cervical MRI, finding it

15   "consistent with post traumatic syrinx and cervical spine injury."  (ECF No. 217-1 at 118.)

16   Plaintiff reported cervical pain with radiation down the back and some numbness in his legs.  (Id.)

17   Dr. Ramberg recommended pain management injections into plaintiff's facet joints instead of

18   surgery, with a six months follow-up in February 2021.[15]  (ECF No. 217-1 at 13, 117-18.)

19

20   [15]  In their statement of undisputed facts (no. 25), defendants claim that after the May 6, 2020
21   cervical MRI, plaintiff declined surgery and opted instead for pain management, citing plaintiff's
     deposition testimony.  (ECF No. 242 at 6, citing Wilkins' Dep 152:23-153:23 "I begged him to
22   just give me a pain management plan because I don't know what kind of shape I'm going to be in
     with this terrible carrier.  So then he had put pain management of injections into my spine at my
23   request.")  (See also Pl. Dep. at 25-28.)  Plaintiff now contends it is "completely false" that he
     declined surgery and opted instead for pain management.  (ECF No. 242 at 6.)  Plaintiff's
24   deposition testimony was confused as to the dates he saw Dr. Ramberg, but plaintiff confirmed
     that after the MRI was done "the plan was not to get surgery; rather, Dr. Ramberg "made a pain
25   management plan to get injections into my spine."  (Pl. Dep. at 153:18-23.)  In any event, Dr.
     Ramberg's medical record says nothing about plaintiff declining surgery.  (ECF No. 217-1 at
26   117-18.)  Defendants did not provide a copy of a medical record reflecting plaintiff declined
     surgery at this time.  Indeed, Dr. Singh's August 28, 2020 follow-up record confirms Dr.
27   Ramberg recommended that plaintiff be treated with injections.  (ECF No. 217-1 at 119.)

28

16

43.  On August 28, 2020, nonparty Dr. K. Singh submitted a request for facet joint injections and prescribed plaintiff Tylenol with codeine until plaintiff received the injections. (ECF No. 217-1 at 13-14, 119-20.)  Plaintiff also signed Informed Consent for Treatment with Opioid Medication form on August 28, 2020.  (Id. at 121.)

44.  Dr. Feinberg declares that on November 25, 2020, plaintiff refused the scheduled interventional radiology appointment for facet joint injections recommended by the surgeon. (ECF No. 217-1 at 14-15, 129-30.)[16]  In his deposition, plaintiff explained that he chose not to go out because of COVID, the quarantine, and he was not vaccinated, and testified that he asked to reschedule.  (Pl. Dep. at 154:10-25.)

45.  Plaintiff saw Dr. Ramberg again on March 24, 2021; plaintiff was complaining of "increasing cervical pain and numbness in the arms."  (ECF No. 217-1 at 131-32.)  Plaintiff agreed to have an anterior cervical discectomy and fusion, and the surgery was approved and scheduled, but on June 27, 2021, the day before the surgery, plaintiff refused to have the cervical surgery.  (ECF No. 217-1 at 15, 133.)  The refusal form explained plaintiff was "extremely concerned with after care due to terrible mistreatment and also concerned with Delta variant covid."  (Id. at 133.)  In May of 2021, plaintiff was given Ultram.  (ECF No. 242 at 6.)

46.  Plaintiff does not have any medical training or medical education, and does not hold a license to practice medicine.  (Pl. Dep. at 17:16-19, 18:9-16.)  Plaintiff does not dispute this fact, but declares he was in daily extreme pain.  (ECF No. 239 at 10-11.)

47.  Plaintiff is able to independently perform activities of daily living, but experiences pain and occasional weakness while doing so.  (ECF No. 217-1, Ex. B; Pl. Dep. 156:13-157:2, 157:11-158:1.)  In his unverified response, plaintiff replies that "at times [he] cannot when pain unbearable."  (ECF No. 242 at 6.)

////

////

---

[16]  Nonparty P. Steward marked the box "patient refuses to sign" on the refusal of examination and/or treatment form, and on November 25, 2020, nonparty RN Azeke emailed Dr. Singh advising that plaintiff refused the joint injection appointment.  (ECF No. 217-1 at 129-30.)

48.  Plaintiff's pain management plan has been monitored and adjusted during his time at CHCF.  (ECF No. 217-1, Ex. B; ECF No. 15 at 4-11; Pl. Dep. 158:2-13.)  Plaintiff adds that he was finally given Ultram in May of 2021 which helps.  (ECF No. 242 at 6.)

49.  Current medical best practices, including those in use at CDCR facilities, disfavor the use of opioids for chronic non-cancer pain, so as to minimize the risks of opioid dependence, addiction, and overdose, which disproportionately affect the prison population and recommend discontinuation in cases where benefits are outweighed by risk, or where psychiatric instability, history of substance use disorder, or suspected abuse and/or diversion is present.  (ECF No. 217-1 at ¶¶ 25-27; 199-8 at ¶¶ 12-13; 199-5 at ¶¶ 12-13.)

50.  The Center for Disease Control and Prevention ("CDC") strongly warned against the use of opiates in the treatment of chronic non-cancer pain.  Continuing an opiate prescription for chronic non-cancer pain, in an individual suspected of opiate diversion, would be contraindicated and dangerous.  (ECF No. 217-1 at 15).)  The California Correctional Health Care Services Care Guide strongly disfavors opiates for the treatment of chronic non-cancer pain in California prisons.  (Id. at 8.)

51.  Complete pain relief is not the goal when treating chronic pain, instead it is to ensure that patients are able to independently perform activities of daily living and remain functional in a normal prison setting.  (ECF No. 199-4 at 3.)

52.  Defendant R. Singh did not provide plaintiff medical treatment but was involved in the review and response to nine of plaintiff's inmate health care grievances.  (ECF No. 199-9 at 2 (Singh Decl.); Pl. Dep. 118:6-16, 122:22-124:2.)  In his unverified response, plaintiff contends R. Singh had the power to act, but did not.  (ECF No. 242 at 7.)

53.  Based on review of plaintiff's grievances and medical records, defendant R. Singh found plaintiff was provided medically reasonable and appropriate care based on the medical providers' clinical judgment and expertise, that there was no evidence to support plaintiff's claims that his records were falsified, and that plaintiff merely disagreed with the decisions of his treatment providers.  (ECF No. 199-9 at 2-6; Pl. Dep. 116:19-117:3, 121:15-122:7.)  In his

////

18

1   unverified response, plaintiff claims that "Singh failed to act on unconstitutional issues."  (ECF

2   No. 242 at 7.)

3          54.  Defendant Recarey, Chief Executive Officer at CHCF, is not a doctor, does not have a

4   medical license, cannot make medical treatment decisions, never met with plaintiff, and never

5   provided any medical care to plaintiff or any other inmate.  (ECF No. 180-2 at 1-2 (Recarey

6   Decl.); Pl. Dep. at 124:16-125:8.)  In his unverified response, plaintiff claims Recarey "had power

7   to act."  (ECF No. 242 at 7.)

8          55.  Defendant Recarey had only an administrative role with respect to inmate health care

9   grievances and relied upon the clinical screening and review of records done by medical staff

10   members in order to review and approve responses to inmate grievances.  (ECF No. 180-2 at 2).

11   Plaintiff reiterates in his unverified response that "Recarey had power to act upon unconstitutional

12   issues."  (ECF No. 242 at 8.)

13          56.  Defendant Recarey has never been provided with evidence that staff violated policy

14   with respect to plaintiff's claims; however, even if such information had been presented to

15   Recarey, he would not have been able to dictate changes to plaintiff's treatment plan, as he is not

16   a doctor.[17]  (ECF No. 180-2 at 2-3.)

17          57.  Defendant Gates, Chief, Health Care Correspondence and Appeals Branch at

18   CCHCS, is not a doctor, does not have a medical license, cannot make medical treatment

19   decisions, never met with plaintiff, and never provided any medical care to plaintiff.  (ECF No.

20   180-1 at ¶¶ 2-4, 8 (Gates Decl.); Pl. Dep. at 133:7-14.)  In his unverified response, plaintiff states

21   that Gates "had power to act."  (ECF No. 242 at 8.)

22          58.  Defendant Gates had only an administrative role with respect to plaintiff's health care

23   grievances, relying upon the clinical screening and review of records done by medical staff

24   members in order to review and approve the responses to his grievances, and reviewing final level

---

25   [17]  In his unverified response to defendants' statement of undisputed facts, plaintiff responds that

26   this is false, stating:  "after litigation Recarey conspired to change adverse Barber findings."
(ECF No. 242 at 8.)  Although defendant Recarey issued the September 20, 2019 amended

27   confidential inquiry report (ECF No. 239-1 at 132-34), plaintiff points to no evidence supporting
his conclusory statement as to defendant Recarey.

28

1  grievance responses to ensure that staff took all appropriate steps to research the issues presented

2  by the inmate.  (ECF No. 180-1 at ¶¶ 3-12.)  In his unverified response, plaintiff claims that Gates

3  "knew of plaintiff's pain yet failed to act."  (ECF No. 242 at 8.)

4      59.  Defendant Gates has never been provided with evidence that staff violated policy

5  with respect to plaintiff's claims, instead, the information available to Gates indicated that staff

6  acted according to policy.  (ECF No. 180-1 at ¶¶ 10-13.)  In his unverified response, plaintiff

7  claims that Gates "chose to do nothing."  (ECF No. 242 at 8.)

8      60.  Even if defendant Gates had received information that staff violated policy, she

9  would not have been able to dictate changes to plaintiff's treatment plan, as she is not a doctor.[18]

10  (ECF No. 180-1 at ¶¶ 10-13.)

11     61.  Defendant Adams never personally met with plaintiff, never provided plaintiff

12  medical care, and never made any decisions with respect to his care.  (ECF No. 199-4 at ¶¶ 2, 4-6

13  (Adams Decl.); Pl. Dep. 136:6-9.)

14     62.  Defendant Adams' involvement with respect to plaintiff was initially limited to

15  reviewing his records after plaintiff first initiated this lawsuit.[19]  (ECF Nos. 15, 199-4 at ¶¶ 4-6.)

16  Subsequently, plaintiff began writing to Adams concerning his medical issues, and provided

17  evidence of her responses.  (ECF Nos. 237 at 49; 239-1 at 59, 62, 71.)

18  V.  Evidence

19      Second Amended Complaint & Declaration

20      In addition to his verified pleading (ECF No. 88), plaintiff provides his own declaration

21  and various exhibits in support of his motion for summary judgment.  (ECF No. 239, 239-1.)  The

22  court considers plaintiff's statements concerning events within plaintiff's own personal

23  knowledge but does not consider argument or speculative statements regarding a claim where

24  there is no indication plaintiff has personal knowledge of such claim.  See S.A. Empresa De

---

[18]  Plaintiff claims this is false because "Gates had power to act on false reports."  (ECF No. 242
at 8.)  But plaintiff cites no evidence demonstrating Gates was provided competent evidence that
any report was false.

[19]  Plaintiff now claims, without citing any evidence, that Adams "conspired with defendants to
deny care."  (ECF No. 242 at 8.)  Plaintiff's unverified and conclusory statement is unsupported.

1   Viacao Aerea Rio Grandense (Varig Airlines) v. Walter Kidde & Co., 690 F.2d 1235, 1238 (9th

2   Cir. 1982) (A party may not create a triable issue of fact merely by presenting argument in its

3   legal memoranda.); see also Estrella v. Brandt, 682 F.2d 814, 819-20 (9th Cir. 1982) (on

4   summary judgment, statements in legal memoranda are not evidence and "do not create issues of

5   fact capable of defeating an otherwise valid summary judgment motion").

6          Defendants' Declarations

7          All of the defendants provided declarations:  defendant Barber (ECF No. 198-5);

8   defendant Dredar (ECF No. 199-5); defendant Mansour (ECF No. 199-8); defendant R. Singh

9   (ECF No. 199-9); defendant Adams (ECF Nos. 15, 199-4); defendant Gates (ECF No. 180-1);

10  and defendant Recarey (ECF No. 180-2).

11         Declarations of Dr. Feinberg

12         Defendants submit the declarations of Dr. Feinberg, who is board certified in internal

13  medicine with more than 20 years of experience in the field.  (ECF No. 216-1 & 217-2 ¶ 2.)  Dr.

14  Feinberg currently serves as the Chief Medical Consultant for the CCHCS Office of Legal Affairs

15  and is familiar with the policies and procedures for access to medical care in CDCR prisons and

16  facilities based on his full-time employment as a PCP at Folsom State Prison and Mule Creek

17  State Prison from January 2010 to 2017.  (Id. ¶¶ 3-5.)  In preparing his declarations and stating

18  his medical opinions, Dr. Feinberg reviewed plaintiff's second amended complaint and his

19  medical records kept by CCHCS.  (Id. ¶ 8.)  Following review of such records and based on his

20  training experience, opined that, inter alia, "plaintiff was offered timely, adequate and

21  appropriate medical attention and care, and the course of treatment offered was medically

22  acceptable."  (ECF No. 216-1 & 217-1 ¶ 58.)  Dr. Feinberg found that Barber, Mansour and

23  Dredar provided medical care well within the standard of care.  Further, Dr. Feinberg opined that

24  there is no support within the medical records that demonstrate plaintiff suffered any damages

25  arising out of the medical care and treatment by Barber, Dredar and Mansour.  (Id. at ¶¶ 58-60.)

26         Finally, Dr. Feinberg further noted that "plaintiff self-sabotaged his care by his repeated

27  refusals of examinations and procedures."  (Id. at ¶ 61.)  While acknowledging plaintiff's right to

28  refuse medical treatment, Dr. Feinberg found that "plaintiff's repeated refusals to follow-up with

Drs. Barber and Dredar, refusal of prescribed MAT treatment for his diagnosed opioid use disorder, and last-minute refusals of facet joint injections and neurosurgical procedures, greatly hampered plaintiff's physicians in their efforts to provide him safe and effective medical care." (Id.)

### Plaintiff's Medical Records

The parties provided copies of plaintiff's medical records.  (ECF Nos. 216-1 at 23-135, '198-5 at 9-13; 217-1 at 21-133, 239 at 34-41; 98; 101; 114-22; 126-33; 145-49; 161; 173, 176-78; 239-1 at 8-13; 43; & 140.)

### Plaintiff's Health Care Request Forms During Tapering & Withdrawals

February 18, 2019 request for health care inquiring as to the plan to address his disc bulge in neck (surgery) and separated shoulder because plaintiff will be in excruciating pain when the morphine discontinued.  (ECF No. 217-1 at 45, 48.)  The triage nurse saw plaintiff on February 19, 2019, noting "symptomatic," "RN line routine teaching."  (Id.)  On February 20, 2019, plaintiff was seen by RN Escobar who took plaintiff's vitals, charted that plaintiff reported constant pain in his left shoulder.  (ECF No. 217-1 at 49-56.)

February 21, 2019, request for health care setting forth plaintiff's health issues and stating that he has been in daily pain since doctor took him off meds; unnecessary pain neck/shoulder. (ECF No. 217-1 at 46.)  Plaintiff was seen on February 22, 2019, by the triage nurse who charted "symptomatic -- RN line teaching."  (Id.)

February 25, 2019 request for health care services, stating plaintiff appears to be having withdrawal symptoms; he had nausea and vomited two times, cramps in abdomen.  (ECF No. 239 at 59.)  Plaintiff asked to see the doctor, stating he feared the symptoms would get worse.  (Id.)

A second request for health care services dated February 25, 2019, stating plaintiff was told his pain medication would expire the next day; plaintiff was having "daily unnecessary pain since the reduction."  (ECF Nos. 217-1 at 47; 239 at 60.)  He stated he "dread[ed] the extra pain he will be in starting tomorrow.  Please help."  (Id.)  On February 26, 2019, at 07:30, plaintiff seen by the triage nurse who assessed plaintiff as "non-symptomatic" noting morphine was

////

1  tapered due to cheeking allegation; has Tylenol and "per PCP nothing stronger and no opiate will

2  be prescribed." (Id.)

3       March 1, 2019, health care services request form stating that despite being told he had two

4  PCP doctor appointments, plaintiff went to clinic and was told he had no appointments.  Plaintiff

5  was "being allowed to endure pain to neck and shoulder and reported withdrawal symptoms

6  (nausea, diarrhea, abdominal pains, etc.)." (ECF No. 239 at 61.)  On March 2, 2019, at 0700,

7  plaintiff was seen by the triage nurse, who charted "symptomatic." (Id.)

8       March 3, 2019, health care services request form identifying the problem as extreme pain,

9  was unable to see the doctor on March 1, 2019, and on March 2, 2019, plaintiff "called in pain to

10 see nurse," but "refused as nurse already said nothing they can do." (ECF No. 239 at 62.)

11 Plaintiff requested to see a doctor. (Id.)  On March 4, 2019, plaintiff was seen by the triage nurse

12 who wrote "symptomatic," "chronic issue, narcotics W/D after taper;" plaintiff has follow-up

13 appointment March 6, 2019.  (Id.)

14      On March 6, 2019, after seeing Barber, plaintiff submitted a request for health care

15 services stating he was in extreme pain neck/shoulder, blurry vision last few days, terrible pain

16 daily.  (ECF No. 239 at 63.)  The triage nurse saw plaintiff on March 7, 2019, assessing

17 "symptomatic," and noting plaintiff has Tylenol for pain control.

18      March 7, 2019, health care request form stating plaintiff in extreme pain (neck/shoulder)

19 and Tylenol not at all helping the pain.  (ECF No. 239 at 64.)  Hard to turn neck without pain; up

20 all night in agony.  Most withdrawal symptoms bearable now but still have blurry vision at times

21 since the medication was stopped.  On March 8, 2019, plaintiff was seen by the triage nurse who

22 charted "symptomatic." (Id.)

23      March 8, 2019, health care request form stating plaintiff was in extreme pain, hurts to turn

24 his neck and his shoulder hurts.  (ECF No. 239 at 65.)  Plaintiff was called to clinic but not seen

25 by a doctor, received no help -- "only threats not to turn any more slips in." (Id.)  Tylenol not

26 working and eyes still blurry.  On March 9, 2019, plaintiff was seen by the triage nurse who noted

27 "symptomatic." (Id.)

28 ////

1    Plaintiff's Subsequent Health Care Request Forms

2         Plaintiff subsequently submitted numerous health care request forms; plaintiff was seen by

3    the triage nurse who charted, "symptomatic."  (ECF No. 239 at 66 (April 13, 2019); 67 (April 14,

4    2019); 68 (April 15, 2019); 69 (June 23, 2019); 70 (June 27, 2019); 71 (September 8, 2019); 72

5    (September 13, 2019); 73 (September 14, 2019); 74 (September 23, 2019); 75 (September 27,

6    2019); 76 (December 7, 2019); ECF No. 239-1 at 16 (January 11, 2020); 18 (June 30, 2020).

7    Plaintiff's Grievances

8         Plaintiff provided copies of multiple staff complaints, grievances and responses:  April 5,

9    2019 Staff Complaint CHCF SC 19000126 (ECF No. 239 at 103-11; 239-1 at 133-34 (amended

10   confidential inquiry report); September 20, 2019 CDCR 22 (request for interview) (ECF No. 239

11   at 43); March 6, 2019 Grievance CHCF HC 19000491 (ECF No. 239 at 78- 88; see also ECF No.

12   239 at 92 (Grievance CHCF HC 19000491 processed as health care staff complaint CHCF SC

13   19000176); Staff Complaint CHCF SC 19000176 (ECF No. 239 at 91-93); February 20, 2019

14   Grievance CHCF HC 19000402 (ECF No. 239 at 50-57); November 26, 2019 Staff Complaint

15   CHCF SC 19000407 (ECF No. 239-1 at 1-7); May 21, 2019 Dredar's Progress Note re Grievance

16   CHCF HC 19000979 (ECF No. 217-1 at 67); July 28, 2019 Grievance CDCR HC 19001754

17   (ECF No. 239 at 135-43); September 5, 2019 Grievance CHCF HC 19002183 (ECF No. 239 at

18   151-59); September 22, 2019 Grievance CHCF HC 19002315 (ECF No. 239 at 163-70); February

19   11, 2020 Grievance CHCF HC 20000439 (ECF No. 239-1 at 26); April 16, 2020 Grievance

20   CHCF HC 20000996 (ECF No. 239-1 at 28-34); and August 17, 2020 Grievance CHCF HC

21   20002051 (ECF No. 239-1 at 45-51.)

22   Patient Health Care Inquiries

23        Plaintiff submitted various health care inquiries to the HCCAB.  (ECF No. 239-1 at 102

24   (2019), 103, 106, 107, 109-10 (2020).)  No further action was ordered in response to such

25   inquiries.

26   Additional Documents

27        Plaintiff also provided copies of letters, CDCR22 request for interview forms, and

28   discovery responses.  (ECF Nos. 239 at 43-45, 48, 124, 175; 239-1, *passim*.)

1   VI. Eighth Amendment Claims

2      A. Legal Standards

3         1. Section 1983 Standard

4   To prevail on a claim under § 1983, a plaintiff must demonstrate:  (1) the violation of a

5   federal constitutional or statutory right; and (2) that the violation was committed by a person

6   acting under the color of state law.  See West v. Atkins, 487 U.S. 42, 48 (1988); Jones v.

7   Williams, 297 F.3d 930, 934 (9th Cir. 2002).  An individual defendant is not liable on a civil

8   rights claim unless the facts establish the defendant's personal involvement in the constitutional

9   deprivation or a causal connection between the defendant's wrongful conduct and the alleged

10  constitutional deprivation.  See Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989); Johnson v.

11  Duffy, 588 F.2d 740, 743-44 (9th Cir. 1978).  That is, plaintiff may not sue any official on the

12  theory that the official is liable for the unconstitutional conduct of his or her subordinates.

13  Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  The requisite causal connection between a

14  supervisor's wrongful conduct and the violation of the prisoner's constitutional rights can be

15  established in a number of ways, including by demonstrating that a supervisor's own culpable

16  action or inaction in the training, supervision, or control of his subordinates was a cause of

17  plaintiff's injury.  Starr v. Baca, 652 F.3d 1202, 1208 (9th Cir. 2011).

18         2. Eighth Amendment Standard

19  The Eighth Amendment imposes a duty upon prison officials to provide humane

20  conditions of confinement.  Farmer v. Brennan, 511 U.S. 825, 831 (1994).  This duty includes

21  ensuring that inmates receive adequate food, clothing, shelter, and medical care, and taking

22  reasonable measures to guarantee the safety of inmates.  Id.  To establish an Eighth Amendment

23  violation for inadequate medical care, a plaintiff must demonstrate that he had a serious medical

24  need, and that defendants' response to that need was deliberately indifferent.  Jett v. Penner, 439

25  F.3d 1091, 1096 (9th Cir. 2006) (citing McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1991),

26  overruled on other grounds by WMX Techs., Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997 (en

27  banc)).  The Eighth Amendment's deliberate indifference standard is a "high legal standard."  See

28  Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir. 2004).

25

1    The Eighth Amendment is violated only when a prison official acts with deliberate

2   indifference to an inmate's serious medical needs.  Snow v. McDaniel, 681 F.3d 978, 985 (9th

3   Cir. 2012), overruled in part on other grounds, Peralta v. Dillard, 744 F.3d 1076, 1082-83 (9th

4   Cir. 2014); Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012).  A prison official is

5   deliberately indifferent to a serious medical need if he "knows of and disregards an excessive risk

6   to inmate health."  Farmer, 511 U.S. at 837.  To be found liable under the Eighth Amendment,

7   "the official must both be aware of facts from which the inference could be drawn that a

8   substantial risk of serious harm exists, and he must also draw the inference."  Id.  "If a [prison

9   official] should have been aware of the risk, but was not then the [official] has not violated the

10   Eighth Amendment, no matter how severe the risk."  Gibson v. Cty of Washoe, 290 F.3d 1175,

11   1188 (9th Cir. 2002), overruled on other grounds by Castro v. County of Los Angeles, 833 F.3d

12   1060, 1076 (9th Cir. 2016).

13    "A showing of medical malpractice or negligence is insufficient to establish a

14   constitutional deprivation under the Eighth Amendment."  Toguchi, 391 F.3d at 1060; see also

15   Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990) ("While poor medical treatment will

16   at a certain point rise to the level of a constitutional violation, mere malpractice, or even gross

17   negligence, does not suffice.")  To establish deliberate indifference, plaintiff "must show that the

18   course of treatment the doctors chose was medically unacceptable under the circumstances" and

19   that the doctors "chose this course in conscious disregard of an excessive risk to plaintiff's

20   health."  Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996), overruled in part on other

21   grounds by Peralta, 744 F.3d at 1076; see also Snow, 681 F.3d at 987.

22    "Typically, a difference of opinion between a physician and the prisoner -- or between

23   medical professionals -- concerning what medical care is appropriate does not amount to

24   deliberate indifference."  Edmo v. Corizon, Inc., 935 F.3d 757, 786 (9th Cir. 2019) (citations,

25   quotations and brackets omitted); Jackson, 90 F.3d at 332.  "But that is true only if the dueling

26   opinions are medically acceptable under the circumstances."  Edmo, 935 F.3d at 786 (citation

27   omitted).  To determine whether the treatment was medically acceptable, courts must consider

28   "the record, the judgments of prison medical officials, and the views of prudent professionals in

1   the field. . . ." Id.  "Accepted standards of care and practice within the medical community are

2   highly relevant in determining what care is medically acceptable and unacceptable."  Id.

3          A complete denial of medical care is not required to show deliberate indifference.  Lopez

4   v. Smith, 203 F.3d 1122, 1132 (9th Cir. 2000).  Deliberate indifference may be found where

5   prison officials "intentionally interfere with treatment once prescribed."  Wakefield v. Thompson,

6   177 F.3d 1160, 1165 (9th Cir. 1999) (internal citation and quotation omitted).  Deliberate

7   indifference may be found if defendants "deny, delay, or intentionally interfere with [a prisoner's

8   serious need for] medical treatment."  Hallet v. Morgan, 296 F.3d 732, 734 (9th Cir. 2002).  The

9   requisite state of mind is one of subjective recklessness, which entails more than ordinary lack of

10  due care.  Snow, 681 F.3d at 985 (citation and quotation marks omitted); Wilhelm, 680 F.3d at

11  1122.

12          B.  Plaintiff Has Serious Medical Needs

13          The parties do not dispute, and the undersigned finds, that based upon the evidence

14  presented by the parties, a reasonable juror could conclude that plaintiff suffers from serious

15  medical needs as a result of his serious medical conditions, disc herniation at C5-C6, and left

16  shoulder impingement or rotator cuff injury, and that he suffers shoulder pain and chronic neck

17  pain, for which he was previously prescribed morphine.  See McGuckin, 974 F.2d at 1059-60

18  ("The existence of an injury that a reasonable doctor or patient would find important and worthy

19  of comment or treatment; the presence of a medical condition that significantly affects an

20  individual's daily activities; or the existence of chronic and substantial pain are examples of

21  indications that a prisoner has a 'serious' need for medical treatment.").

22          C.  Allegedly False Medical Records

23          Before the court turns to the merits of plaintiff's Eighth Amendment claims, the

24  undersigned addresses plaintiff's continued complaints that Barber falsified the February 18,

25  2019 cheeking incident set forth in plaintiff's medical records and in Barber's declaration.  As

26  plaintiff has been repeatedly advised, he has no private right of action to press criminal charges in

27  this civil rights action against Barber.  Moreover, even if there is a dispute of fact as to the

28  accuracy of the February 18, 2019 cheeking incident, such dispute is not material.  It is

1   undisputed that Barber did not know on February 18, 2019, that psych tech Le's February 17,

2   2019 cheeking report was false, if it was, when Barber began tapering plaintiff off the morphine.

3   Importantly, even if both cheeking reports were false, the evidence demonstrates that opiates were

4   not appropriate for plaintiff's non-cancer related pain, as supported by Dr. Feinberg's declaration.

5   Plaintiff adduced no competent evidence in rebuttal.

6          Moreover, on summary judgment, this court evaluates the state of minds of the defendants

7   when they made or endorsed decisions regarding morphine and plaintiff's medical care at CHCF.

8   Statements in prior medical records are relevant in determining deliberate indifference only to the

9   extent that such records constitute information on which defendants relied.  If a defendant relied

10  on information from past medical providers, the inaccuracy of such records, even if proved, is not

11  probative of deliberate indifference.  Rather, each defendant was required to review and consider

12  all of plaintiff's medical records in reaching his or her own medical findings, assessments, and

13  treatment decisions.  Reliance on inaccurate medical records in making such medical findings

14  would only support a finding of deliberate indifference if the defendant was subjectively aware of

15  the inaccuracy, and deliberately disregarded a substantial risk to plaintiff.  Thus, the court

16  evaluates each defendant's state of mind in reviewing the evidence submitted.

17         Also, in his declaration, plaintiff broadly claims that "almost every medical official [he]

18  encounter[ed] has falsified [plaintiff's] [medical] notes."  (ECF No. 239 at 31.)  However, to the

19  extent plaintiff attempts to create genuine issues of material fact by claiming that various

20  defendants falsified their medical records, plaintiff must present competent evidence to

21  substantiate each allegation.  For example, plaintiff claims that the doctors falsified medical

22  records and that telemed doctors "falsify" that they are doing evaluations when they are not.

23  Such conclusory and speculative allegations, without any evidentiary support, are insufficient to

24  raise a genuine issue of fact.  See, e.g., FTC v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1171

25  (9th Cir. 1997) (as amended) ("A conclusory, self-serving affidavit, lacking detailed facts and any

26  supporting evidence, is insufficient to create a genuine issue of material fact."); Anheuser-Busch,

27  Inc. v. Nat. Beverage Distribs., 69 F.3d 337, 345 (9th Cir. 1995).  Plaintiff bears the burden of

28  proving such allegations.  See Johnson v. Roche, 2009 WL 720891, at *10 (E.D. Cal. Mar. 13,

1   2009), findings and recommendations adopted, 2009 WL 902261 (E.D. Cal. Mar. 31, 2009)).

2   Plaintiff must present competent evidence demonstrating that the doctors' progress notes are false

3   in material respects as related to the elements of his Eighth Amendment claims.  Here, there is no

4   evidence that the doctors did not see plaintiff as indicated in treatment notes, or that the doctors

5   did not pursue the course of treatment reflected in such records.  Plaintiff claims generally that

6   such doctors failed to "examine" or "evaluate" plaintiff or disputes the doctor's observations

7   recorded in the notes.  But plaintiff's general and conclusory contentions are insufficient to create

8   a genuine dispute regarding whether defendant doctors treated plaintiff as described in their

9   medical notes.  In addition, the court is not required to accept plaintiff's self-serving statements

10  where they are contradicted by such doctor's declarations and medical records, as well as the

11  medical records of other medical staff and specialists, and test results.  See Bond v. Knoll, 2014

12  WL 7076901, at *10 (C.D. Cal. Dec. 10, 2014) (plaintiff's speculation that defendants'

13  declarations and exhibits were fabricated was insufficient to defeat summary judgment); Toscano

14  v. Embree, 2007 WL 2753366, at *5 (N.D. Cal. Sept. 19, 2007) (explaining that the plaintiff

15  cannot create a triable issue of fact by simply misrepresenting the contents of a document).

16          The court now turns to the merits of plaintiff's claims.

17          D.  Did Defendants Violate Plaintiff's Eighth Amendment Rights?

18                  1.  Denial of Orthopedic Shoes

19          Plaintiff appears to contend that he demonstrates Barber's deliberate indifference by her

20  failure to abide by the permanent chrono for orthopedic shoes he claims he held for the past two

21  years.  It is true that allegations that a prison official ignored the instructions of a treating

22  physician are sufficient to state a deliberate indifference claim.  See Wakefield, 177 F.3d at 1165

23  ("In short, allegations that a prison official has ignored the instructions of a prisoner's treating

24  physician are sufficient to state a claim for deliberate indifference.")  But such general assertion

25  oversimplifies the law.  Plaintiff identifies no authority, and this court is not aware of any,

26  holding that a new treating physician must preserve the initial treatment plan prescribed by the

27  inmate's original doctor.  Instead, courts usually find that a plaintiff states a deliberate

28  indifference claim when a prison official refuses or without explanation fails to provide a

1  prescribed medication contrary to a doctor's order or fails to provide the same medical device.

2  See, e.g., Egberto v. Nevada Dep't of Corrs., 678 F. App'x 500, 504 (9th Cir. 2017) (prison

3  officials denied prisoner his prescribed spinal injections); Stinson v. Galaza, 73 F. App'x 312,

4  313 (9th Cir. 2003) (defendants refused to provide ice prescribed by prisoner's doctor to alleviate

5  pain from drug therapy); Thornberry v. Bal, 2021 WL 983294, at *14 (E.D. Cal. Mar. 16, 2021),

6  adopting findings and recommendations, 2021 WL 2038321 (E.D. Cal. May 21, 2021).  Based on

7  the evidence presented, that is not what occurred here.  Rather, the current record demonstrates

8  that Barber explained to plaintiff that Barber did not see a medical indication for the shoes.

9  Barber declares that "foot pain without anatomic deformation does not meet established criteria

10  for prescription medical devices such as orthopedic shoes."  (ECF No. 198-5 at 3.)  Dr. Feinberg

11  opined that Barber chose not to prescribe orthopedic shoes for plaintiff because they were not

12  medically indicated, and such opinion was shared by other physicians, including Dredar and

13  Mansour.  (ECF No. 217-1 at 15.)  Indeed, Mansour assessed no clear explanation for plaintiff's

14  right foot pain, but would check an x-ray of plaintiff's right foot.  (ECF Nos. 217-1 at 73; 239 at

15  146.)  Plaintiff points to no x-ray showing an anatomic deformation to his right foot.  Plaintiff

16  presents no expert medical opinion demonstrating plaintiff requires orthopedic shoes.  Therefore,

17  all of the defendants are entitled to summary judgment on plaintiff's claim concerning orthopedic

18  shoes.

19              2.  Pain Medication

20                   a.  Discontinuation of Morphine

21       It is undisputed that on February 18, 2019, Barber was not aware that the February 17,

22  2019 cheeking claim was false (if it was).[20]  The evidence demonstrates Barber took plaintiff off

23

24  _____

25  [20]  The undersigned has reviewed all of plaintiff's allegations that defendants falsified medical
    records and committed various criminal acts, as well as plaintiff's claims that certain officers and
26  medical staff would now verify that both cheeking allegations were false.  But the court is
    required to analyze plaintiff's constitutional claims under the governing standards as set forth by
27  the Supreme Court and the Ninth Circuit Court of Appeals, and determine whether there are
    material disputes of fact demonstrated by the competent evidence presented under such standards.
28

1  the morphine in part because of the February 17, 2019 cheeking claim,[21] and the February 17,

2  2019 cheeking incident is supported by Psych Tech Le's email to Barber reporting the incident.

3  Plaintiff was not present during any contact between Le and Barber.  Therefore, absent evidence

4  not provided here, plaintiff cannot personally refute what Le told Barber.  Plaintiff provided no

5  declaration from Le confirming that the February 17, 2019 incident did not take place.  And

6  plaintiff provided no declarations from officers or medical staff confirming that the cheeking

7  allegations were false.

8  　　　While plaintiff was previously prescribed narcotics for pain, the February 17, 2019

9  cheeking incident supported Barber's decision to discontinue the morphine, which is also

10  supported by her medical opinion that plaintiff did not require morphine for his medical

11  conditions (UDF 13, 21), as well as Dr. Feinberg's expert opinion.  In addition, defendants

12  adduced evidence that there was a legitimate penological interest in discontinuing plaintiff's

13  prescription to morphine based on current medical best practices, including those in use at CDCR

14  facilities, which disfavor the use of opioids for chronic non-cancer pain.  Such interest is also

15  supported by Dr. Feinberg's expert opinion:  "continuing an opiate prescription for chronic non-

16  cancer pain, in an individual suspected of opiate diversion, would be contraindicated and

17  dangerous as reflected in the referenced CDC recommendations, the referenced CCHCS Pain

18  Management Care Guide, the referenced CCHCS Receiver's Opioid Use Disorder memorandum,

19  as well as the study "Analysis of 2016 Inmate Death Reviews in the California Correctional

20  Healthcare System" (Oct. 8, 2017) (authored by Kent Imai, M.D.)."  (ECF No. 216-1 at 17.)

21  Plaintiff provided no expert opinion to the contrary.

22  　　　Moreover, doctors' decisions to discontinue narcotics or opioids in favor of safer

23  medications have been found medically acceptable in other cases.  See, e.g., Montiel v. Taher-

24  Pour, 1:11-cv-2145 LJO DLB, 2014 WL 2574533 (E.D. Cal. June 9, 2014), findings and

---

25  [21]  Barber declares that her decision to taper plaintiff off the morphine also included a second
26  cheeking incident on February 18, 2019, which plaintiff vociferously objects is false.  However,
    because Dr. Feinberg opines that even one cheeking incident is sufficient to warrant tapering off
27  the morphine, under the legal authorities cited herein, as well as the medical evidence presented,
    no reasonable factfinder would find that the decision to taper plaintiff off morphine was
28  deliberately indifferent, as discussed in further detail herein.

1  recommendations adopted, 2014 WL 3615801 (E.D. Cal. July 22, 2014) (granting defendants

2  summary judgment on Eighth Amendment claim challenging abrupt discontinuation of tramadol

3  and four-day taper of gabapentin, with the use of an alternative prescription for ibuprofen);

4  Solomon v. Negrete, No. 2:10-cv-2103 WBS AC, 2014 WL 546367 (E.D. Cal. Feb. 11, 2014),

5  findings and recommendations adopted, 2014 WL 1024567 (E.D. Cal. Mar. 14, 2014) (granting

6  motion for summary judgment on claim challenging discontinuance of morphine prescription

7  with alternate prescription for ibuprofen).

8        For all of the above reasons, plaintiff failed to demonstrate a genuine dispute of material

9  fact exists that the discontinuation of the morphine prescription violated the Eighth Amendment.

10  Thus, Barber and the remaining defendants are entitled to summary judgment on plaintiff's

11  challenge to the discontinuation of morphine.

12                b. Tapering/Withdrawals

13        Defendants provided Dr. Feinberg's expert opinion that tapering plaintiff off the morphine

14  comported with nationally recognized standards of care for pain management.  (UDF 19.)  Dr.

15  Feinberg further opined that "plaintiff's claim of subsequently suffering withdrawal symptoms is

16  not supported by the medical record."  (ECF No. 216-1 at 17.)  Dr. Feinberg noted that Barber

17  prescribed plaintiff nonnarcotic pain medication and referred plaintiff to the PMC.  (Id.)

18        The burden now shifts to plaintiff to present specific facts to show a genuine issue of

19  material fact as to the tapering and his alleged withdrawals.  See Fed. R. Civ. P. 56(e);

20  Matsushita, 475 U.S. at 586.  While plaintiff was previously prescribed morphine, he fails to

21  provide any opinion from a medical expert or any other admissible testimony from a medical

22  provider in that regard.  Plaintiff contends Barber's tapering violated CCHCS and CDC tapering

23  guidelines to minimize withdrawals.[22]  (ECF No. 242 at 13.)  But plaintiff does not assert that he

24  _____

25  [22]  Moreover, violating prison policy or guidelines does not state a cognizable civil rights
   violation.  Section 1983 provides a cause of action for the deprivation of federally protected

26  rights.  "To the extent that the violation of a state law amounts to the deprivation of a state-
   created interest that reaches beyond that guaranteed by the federal Constitution, [s]ection 1983

27  offers no redress."  Sweaney v. Ada County, Idaho, 119 F.3d 1385, 1391 (9th Cir. 1997) (quoting
   Lovell v. Poway Unified Sch. Dist., 90 F.3d 367, 370 (9th Cir. 1996)); See Davis v. Kissinger,

28  2009 WL 256574, *12 n.4 (E.D. Cal. Feb. 3, 2009).  There is also no liability under § 1983 for

1    is a medical expert.  His self-assessment that his treatment with morphine required a different

2    tapering protocol or that the morphine should have been continued would be inadmissible at trial

3    and a reasonable trier of fact would have no evidence upon which to find such facts.  Fed. R. Civ.

4    P. 56(c)(4); see also Hutchins v. Johal, No. 1:15-cv-1537 DAD HBK, 2021 WL 4690597, at *9

5    (E.D. Cal. Oct. 7, 2021) (prisoner failed to rebut doctor's evidence that "she did not taper and

6    discontinue Hutchins' morphine in conscious disregard to an excessive risk to Hutchins' health"),

7    findings and recommendations adopted, 2021 WL 6051696 (E.D. Cal. Dec. 21, 2021).  Plaintiff

8    provided no expert medical opinion confirming that the tapering of the morphine posed an

9    excessive risk of harm to plaintiff's health, and his citation to prison policies suggesting a

10   different tapering protocol, standing alone, is insufficient to rebut Dr. Feinberg's expert opinion.

11         Plaintiff's claims that other prisoners were tapered off for longer periods, as cited in

12   Miller v. CDCR, 2018 U.S. Dist. Lexis 11716 (N.D. Cal. Jan. 24, 2018) (5 weeks), and Weaver v.

13   Menard, 2021 WL 329558 (D. Idaho Feb. 1, 2021) (7 weeks) (ECF No. 237 at 67), are similarly

14   unavailing.  Such cases fail to demonstrate that Barber was deliberately indifferent to plaintiff's

15   serious medical needs by using the tapering protocol prescribed, and fail to rebut Dr. Feinberg's

16   expert opinion.

17         As to his allegations concerning withdrawals, plaintiff provided multiple requests for

18   health care (7362 forms) during the withdrawal period.  But such evidence shows that plaintiff

19   was seen by various nursing staff who noted plaintiff was "symptomatic," and did not identify

20   any "extreme" withdrawal symptoms.  Such notations are similar to those in Miller, where one

21   nurse took the prisoner's vitals, observed he was not in acute distress, and noted his next

22   appointment; the court found that although the nurse may not have done what the prisoner

23   wanted, that "does not support a reasonable inference that [the nurse] did nothing at all."  Miller,

24   2018 U.S. Dist. Lexis 11716 at *47.  Here, plaintiff was seen by various nonparty nursing

25   professionals who determined he did not require additional medical care.  Moreover, Dr. Feinberg

26   ───────────────

27   violating prison policy.  Cousins v. Lockyer, 568 F.3d 1063, 1070 (9th Cir. 2009) (quoting
     Gardner v. Howard, 109 F.3d 427, 430 (8th Cir. 1997)).  Thus, the violation of any prison

28   regulation, rule or policy does not amount to a cognizable claim under federal law, nor does it
     amount to any independent cause of action under section 1983.

1   opined that "[n]othing in the 7362s or nursing documentation suggests that plaintiff was

2   experiencing withdrawal symptoms."  (ECF No. 216-1 at 6.)  Plaintiff adduced no competent

3   evidence rebutting Dr. Feinberg's expert opinion, and plaintiff did not submit evidence

4   demonstrating he faced an excessive risk to his health where he was provided Tylenol and was

5   seen by nursing professionals during the withdrawal period.

6                           c.  Denial of Effective Pain Medications

7        Plaintiff strenuously argues that he was denied effective pain medication following the

8   discontinuation of the morphine prescription because he was only given over the counter Tylenol.

9   Plaintiff relies on a district court case where the court found a material dispute of fact precluded

10  summary judgment because reliance "upon [a doctor's] preconceived notion that prisoners seek

11  pain medication that they do not need, rather than [the plaintiff's] medical history and the results

12  of his exam" was probative of deliberate indifference.  Pogue v. Igbinosa, 2012 WL 603230, at

13  *13 (E.D. Cal. Feb. 23, 2012).  In Pogue, the defendant doctor had testified that "a lot of people

14  always have back pain and always have straight to their legs [sic]."  Id. at *13.  Although he

15  prescribed pain medication for Pogue, the doctor failed to order an MRI required before Pogue's

16  neurosurgery appointment, which was cancelled for lack of an MRI.  The doctor's view of

17  Pogue's ability to get down during an alarm also suggested deliberate indifference given the

18  doctor's testimony that a prisoner "does not require a mobility vest if he can get down even if it

19  takes the inmate 'one day, two days, I don't know,' to do so."  Id.

20       Here, although Barber documented that she did not believe plaintiff required the amount

21  of morphine he was prescribed for his pain, she discontinued the morphine based in part on the

22  February 17, 2019 cheeking incident, and her decision was supported by other providers notes

23  stating they did not feel plaintiff required narcotics, observations by housing staff that plaintiff

24  did not complain of or appear to have any functional impairments, and Barber's own assessments.

25  (ECF No. 198-5 at 4.)  Moreover, Barber also documented that she saw plaintiff on multiple

26  occasions ambulating quickly and easily with full range of motion, in no apparent distress and

27  pain-free, and he had no inability to function or perform his ADLs.  (UDF 21.)

28  ////

Subsequently, unlike in Pogue, defendants Mansour and Dredar also relied on their medical judgment and observations that plaintiff ambulated without difficulty and was able to perform his ADLs.  Rather than basing their decisions on a belief that plaintiff was simply seeking medications, as found in Pogue, each doctor based his or her treatment decisions on their observations that plaintiff was not objectively demonstrating a need for additional pain medication and that opioids were not medically appropriate.  Such objective determination is supported by Dr. Nikolic's observation on August 12, 2019, well after the discontinuation of the morphine, that plaintiff's calm demeanor did not fit his reported 10/10 pain level, and he had no red flags or issues with ADLs.  (UDF 30.)

Thus, defendants Barber, Dredar and Mansour adduced evidence that they did not act with deliberate indifference with regard to their decisions not to prescribe additional pain medications to plaintiff.  Rather, defendants Barber, Dredar, and Mansour, as well as other doctors, objectively believed that plaintiff was not suffering the level of pain he repeatedly reported.  Defendants Barber, Dredar and Mansour based their decisions on their knowledge of plaintiff's medical conditions, review of his medical records, and observations of plaintiff, including that plaintiff could perform his ADLs, and each doctor took additional steps in an effort to address plaintiff's medical conditions and resulting pain complaints.  Such decisions are supported by the expert opinion of Dr. Feinberg.  See McGuckin, 974 F.2d at 1050 (a defendant "must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established.")  Plaintiff provides no expert opinion to the contrary.

The Ninth Circuit has previously stated that "a deliberately indifferent state of mind may be inferred when the course of treatment the doctors chose was medically unacceptable under the circumstances and they chose this course in conscious disregard of an excessive risk to plaintiff's health." Edmo, 949 F.3d at 495 (internal quotation and citation omitted).  "Yet even most objectively unreasonable medical care is not deliberately indifferent." Id.  Here, plaintiff's preference for a different or stronger medication "represents precisely the type of difference in medical opinion between a lay prisoner and medical personnel that is insufficient to establish a constitutional violation." Parlin v. Sodhi, 2012 WL 5411710 at *4 (C.D. Cal. Aug. 8, 2012);

1   Outten v. Dillen, 2015 WL 9450653, at *8 (E.D. Cal. Oct. 13, 2015) ("[t]he questions of which

2   pain medication to prescribe for symptoms of back pain, as the Supreme Court noted in Estelle,

3   'is a classic example of a matter for medical judgment.'"); Tran v. Haar, 2012 WL 37506 at *3-4

4   (C.D. Cal. Jan. 9, 2012) (plaintiff's allegations that defendants refused to prescribe "effective

5   medicine" such as Vicodin and instead prescribed Ibuprofen and Naproxen reflected a difference

6   of opinion between plaintiff and defendants as to the proper medication necessary to relieve

7   plaintiff's pain and failed to state an Eighth Amendment claim).

8        Plaintiff also contends Barber denied the specialist's recommendation for the non-narcotic

9   pain medication Ultram that would help plaintiff with pain and mobility.  However, as argued by

10  defendant, the specialist only suggested Ultram "if approved by authorities."  (ECF No. 217-1 at

11  58.)  In her progress note, Barber explained that she did not prescribe Ultram (tramadol) because

12  it "does work on the mu receptors just like other narcotics, and this is not an acceptable

13  medication either."  (ECF No. 217-1 at 59.)  Such evidence does not demonstrate deliberate

14  indifference.  Rather, on the evidence presented, it demonstrates a difference of opinion between

15  plaintiff and Barber at that time.  That Barber opted not to prescribe Ultram for plaintiff on one

16  occasion does not demonstrate deliberate indifference, particularly where she continued plaintiff's

17  access to 1300 mg of Tylenol per day, prescribed physical therapy, and also referred plaintiff to

18  the PMC.[23]

19       While plaintiff claims the Tylenol was not effective, the record makes clear that Barber

20  did not believe that plaintiff's pain was as severe as plaintiff claims it was, noting her

21  observations that plaintiff was able to perform his ADLs.  Dredar continued plaintiff's Tylenol,

22  ordered topical capsaicin cream, and also ordered physical therapy and a repeat MRI.  (UDF 26,

23  32.)  Dredar similarly observed that plaintiff did not exhibit any signs of discomfort or distress.

24  (UDF 26.)  Also, Mansour observed plaintiff was clinically doing well and was stable, ambulating

25  ////

26

---

27  [23]  While plaintiff makes much of the delay in obtaining review by the PMC, he fails to
    demonstrate, with competent evidence, that such delay was caused by defendant Barber.  Indeed,
28  plaintiff refused to see Dr. Barber after March 25, 2019.

1  without difficulty, and opined that it was best for plaintiff to try physical therapy before getting an

2  MRI.  (UDF 27, 29, 31.)

3       The record evidence does not establish that defendants Barber, Dredar and Mansour

4  demonstrated a conscious disregard for plaintiff's medical needs.  Simply showing that a course

5  of treatment proves to be ineffective, without demonstrating that the medical professional's

6  conduct was medically unacceptable under the circumstances and chosen in conscious disregard

7  to plaintiff's health, does not establish a claim for deliberate indifference.  Jackson v. McIntosh,

8  90 F.3d at 332; Toguchi, 391 F.3d at 1058.

9       Further, multiple district courts in this circuit have held that a plaintiff's denial of

10  morphine or other pain medication does not amount to deliberate indifference.  See, e.g., Arellano

11  v. Sedighi, 2020 WL 5877832, at *46 (S.D. Cal. Oct. 1, 2020) (failure to provide morphine was

12  "not enough to establish deliberate indifference."); Gonzales v. Ugwueze, No. 1:11-cv-1588 LJO

13  SKO, 2014 WL 223506 at *9 (E.D. Cal. Jan. 21, 2014), aff'd, 594 F. App'x 448 (9th Cir. 2015)

14  (plaintiff's opinion that he should have been provided other types of pain medication does not

15  create a dispute of material fact to preclude summary judgment); Parlin, 2012 WL 5411710, at *5

16  ("[P]laintiff's claim is that he did not receive the type of treatment and pain medication that he

17  wanted when he wanted it . . . . [and] that is insufficient to establish a constitutional violation.");

18  Tran, 2012 WL 37506 at *3-4.

19       In addition, the proper management of plaintiff's pain was complicated by plaintiff's

20  multiple refusals to be seen by defendants Barber and Dredar.

21       Similarly, that other doctors subsequently prescribed different pain medications does not

22  establish that defendants Barber, Dredar and Mansour violated the Eighth Amendment.  A

23  "difference of medical opinion as to the need to pursue one course of treatment over another" is

24  insufficient to establish deliberate indifference unless "the course of treatment the doctors chose

25  was medically unacceptable under the circumstances" and chosen "in conscious disregard of an

26  excessive risk to plaintiff's health."  Jackson v. McIntosh, 90 F.3d at 332.  Here, plaintiff has at

27  most alleged a potential difference in medical opinion between treating defendants Barber, Dredar

28  and Mansour, and physicians who treated plaintiff thereafter.  This is insufficient to show an

1  Eighth Amendment violation.  Indeed, there were doctors who subsequently treated plaintiff who

2  also did not find plaintiff required additional pain medication, such as Dr. Nikolic, Dr. Williams

3  and Dr. Lehil.  (UDF 30, 36, 38.)  In addition, the record reflects that plaintiff's symptoms

4  changed over time, justifying additional changes in plaintiff's prescriptions at that time. (UDF 37,

5  42, 45.)  Plaintiff admitted in his deposition that his pain management changed over time.  (Pl.

6  Dep. at 158.)

7          Therefore, because plaintiff's claim that the prescribed treatments were ineffective in

8  addressing his pain demonstrates only a difference of opinion, not rising to the level of deliberate

9  indifference, the undersigned finds defendants Barber, Mansour and Dredar are entitled to

10  summary judgment on such claim.

11                    d.  Pain Management Committee ("PMC") Review

12          Plaintiff complains that he did not receive PMC review.  However, in his expert

13  declaration, Dr. Feinberg stated that "[p]risons and the healthcare providers they employ are wise

14  to be extra vigilant regarding proper prescribing of pain medications, and having a [PMC] is one

15  way to do so."  (ECF No. 217-1 at 7 (emphasis added).)  Plaintiff provided no expert opinion that

16  plaintiff's circumstances required referral to the PMC for review.

17          In addition, defendant R. Singh declares that plaintiff was provided a review, but such

18  review was done on the papers due to COVID-19.  (ECF No. 199-9 at 5 ¶ 5(i).)  R. Singh next

19  pointed to nonparty Dr. Williams' explanation that patients who undergo surgery and are taking

20  chronic opioids have worse outcomes from both a pain management perspective and a

21  rehabilitative perspective, and it was not recommended that plaintiff start opioids before potential

22  surgery.  (Id.)  Review of Dr. Williams' March 4, 2020 report reflects he provided "a consultative

23  opinion regarding conservative care measures relating to pain and function, in accord with

24  appropriate policy such as the pain management guidelines."  (ECF No. 217-1 at 104.)  Dr.

25  Williams diagnosed plaintiff with whole body pain syndrome, recommended that plaintiff follow

26  up with mental health to address pain coping strategies, and told plaintiff that cervical spine

27  surgery would not take away his whole body pain.  (UDF 36.)

28  ////

1    Although defendant Recarey admitted that no formal PMC meeting in which an

2    interdisciplinary treatment team had met for the specific purpose of discussing plaintiff's current

3    pain management and medication, Recarey denied the request for admission to the extent the

4    request implied that the plan of treatment for addressing plaintiff's pain had not been reviewed by

5    doctors and medical staff on an ongoing basis before and after March 25, 2019.  (ECF No. 239-1

6    at 74.)  Indeed, the record evidence demonstrates that plaintiff was provided multiple doctor

7    appointments with both prison doctors and outside specialists, and various efforts were taken to

8    ameliorate plaintiff's pain, i.e. Tylenol, lidocaine patches, capsaicin cream, and physical therapy.

9    On April 11, 2020, plaintiff's Tylenol was increased from 650 mg twice a day to three times a

10   day.  (ECF No. 217-1 at 111.)  In addition, plaintiff was involved in the chronic care program, the

11   assessment and monitoring of plaintiff's pain was an ongoing process, and it is undisputed that

12   plaintiff was able to perform his ADLs.  Further, as plaintiff's symptoms worsened (UDF 36, 37,

13   42, 45), the record reflects that plaintiff was prescribed Tylenol #3 on August 28, 2020, until

14   plaintiff could receive the facet joint injections.  (ECF No. 217-1 at 119.)  In May of 2021,

15   plaintiff was prescribed Ultram.  (ECF No. 242 at 6.)  The undersigned finds that on this record

16   there is no genuine dispute of material fact as to whether the deprivation of an earlier PMC

17   review constituted deliberate indifference to plaintiff's serious medical needs.

18        3.  Refusals to see Dr. Barber

19        It is undisputed that plaintiff refused to see Barber after March 25, 2019, on at least eight

20   separate occasions.

21        It is clearly established that plaintiff has a constitutional right to refuse medical treatment.

22   See Cruzan by Cruzan v. Dir. Mo. Dept. of Health, 497 U.S. 261, 278 (1990); Washington v.

23   Harper, 494 U.S. 210, 221-22 (1990) (prisoners have a "significant liberty interest" in avoiding

24   administration of unwanted drugs).  "On the other hand, '[w]hile it is clearly within [the

25   prisoner's] rights to refuse medical treatment, he has no right to refuse treatment and then claim

26   deliberate indifference to his medical condition."  Merriman v. Lizarraga, No. 2:17-cv-1701 MCE

27   KJN, 2017 WL 4340041, at *5 (E.D. Cal. Sept. 29, 2017), quoting McNeil v. Singh, 2013 WL

28   1876127, at *19 n.59 (E.D. Cal. May 3, 2013) (where prisoner declined surgery on at least two

1    occasions and refused medication "because he felt that it was improper or medically harmful,"

2    prisoner could not claim deliberate indifference to his medical condition); Zatko v. Rowland, 835

3    F.Supp. 1174, 1178 (N.D. Cal. 1993) (where prisoner refused treatment, deliberate indifference

4    claim could not be sustained).

5         Here, plaintiff's refusal to see Barber complicated her ability to provide medical care as

6    well as plaintiff's ability to receive medical care and to obtain review by the PMC.  While

7    plaintiff retains the right to refuse medical care, he cannot now come to court and claim deliberate

8    indifference based on not receiving such medical care.  Following review of the medical care

9    provided by Barber from January through March 25, 2019, a reasonable factfinder could not find

10   that Barber was deliberately indifferent to plaintiff's serious medical needs.  While plaintiff may

11   not have received the care he wanted, the record reflects that Barber provided care according to

12   her medical judgment, her knowledge of plaintiff's medical conditions, and her observations of

13   plaintiff; Barber's medical care is also supported by Dr. Feinberg's expert declaration.

14   Subsequently, once Barber learned that plaintiff had not received review by the PMC, Barber

15   adduced evidence that she took additional steps to ensure plaintiff received such review, despite

16   plaintiff's refusal to see her.

17        To the extent plaintiff contends Barber was responsible for the delay in receiving the

18   second cortisone shot to his shoulder, such claim also fails because although Dr. Brown

19   recommended the repeat cortisone injection on May 3, 2019, it is undisputed that plaintiff refused

20   to see Barber for the follow-up appointment.

21        While plaintiff disagrees with the care Barber provided, such disagreement, absent

22   competent evidence to the contrary, fails to rise to the level of deliberate indifference.

23        4.  Defendant Dr. Dredar

24        Dredar saw plaintiff on two occasions:  first, he interviewed plaintiff in connection with a

25   grievance; some months later, he treated plaintiff.  The remaining defendants argue that the

26   evidence makes clear that Dredar did not ignore or fail to respond to plaintiff's pain or medical

27   needs based on evidence showing that Dredar reviewed plaintiff's medical history, including

28   recent specialist recommendations and plaintiff's symptoms, made direct observations of

40

1   plaintiff, and rendered decisions based on the doctor's clinical judgment and medical expertise.

2   (ECF No. 199-2 at 18.)

3                    Plaintiff's Opposition

4           When Dredar interviewed plaintiff about his grievance, Dredar "completely disregarded

5   plaintiff's extreme pain and neck condition," and it took another 2 months for plaintiff to get the

6   cortisone shot in his shoulder recommended by the specialist on May 3, 2019.  (ECF No. 237 at

7   35.)  Plaintiff claims that Dredar contradicted himself by stating plaintiff requested the specialist

8   recommended "non-narcotic tramadol," but then asserted plaintiff was fixated on "opiates."

9   (ECF No. 237 at 35.)

10          Despite informing Dredar that plaintiff was "in terrible pain, awake at night in extreme

11  pain, uncontrolled by OTC Tylenol and unable to exercise due to the terrible neck pain," Dredar

12  did "absolutely nothing to help plaintiff's pain" except for renewing the same over the counter

13  Tylenol and capsaicin cream that had not been helping plaintiff "at all for 8 months."  (ECF No.

14  237 at 18-19, 35.)  Plaintiff also noted the pain committee had not yet reviewed plaintiff for

15  appropriate pain review and medication, despite the March referral.  Dredar told plaintiff Dredar

16  would not order the specialist-requested MRI because nothing was wrong with plaintiff's neck;

17  after the appointment, plaintiff submitted a medical slip attaching a copy of his previous MRI,

18  and the next day, plaintiff was called to the clinic and told by a nurse that Dredar ordered the

19  MRI.  (ECF No. 239 at 19.)  Plaintiff argues that Dredar was deliberately indifferent by failing to

20  address plaintiff's "terrible pain in his neck uncontrolled by OTC Tylenol, his lack of sleep and

21  lack of exercise."  (ECF No. 237 at 34.)

22          Finally, plaintiff contends that Dredar's November 12, 2019 note does not match his

23  November 13, 2019 note for MRI in which Dredar stated "pain interferes with ADLs" and

24  "continued severe pain after NSAIDS/Tylenol."  (ECF No. 237 at 37.)  Plaintiff cites exhibits 2-3

25  to his declaration.  (ECF No. 237 at 37.)

26          Defendant's Reply

27          Defendant Dredar argues he is entitled to summary judgment because the medical care he

28  provided was medically acceptable and reasonable medical care for plaintiff.  Despite plaintiff's

                                           41

1    contention that Dredar did nothing to help plaintiff's pain except to renew prescriptions from

2    other medical providers, the evidence shows that Dredar reviewed plaintiff's medical history,

3    observed and evaluated plaintiff's symptoms and behavior, and then rendered treatment decisions

4    based on his clinical judgment and expertise.

5         Specifically, on May 21, 2019, Dredar interviewed plaintiff in connection with his

6    grievance.  Dredar reviewed plaintiff's history, including recent recommendations by specialists,

7    and noted that the syringomyelia was inoperable, there was no indication for surgery, that

8    plaintiff was taking Tylenol and did not show any signs of discomfort or distress, and that there

9    was no medical indication for orthotic shoes because plaintiff had no foot deformities, gait

10   instability or difficulty ambulating.  Dredar's decisions were supported by evaluation,

11   observation, and the doctor's clinical judgment and medical expertise.  (ECF No. 243 at 5.)

12   On November 12, 2019, Dredar saw plaintiff for his complaints of neck and shoulder pain and

13   limited range of motion.  Dredar charted that plaintiff had no muscle atrophy or wasting of his

14   arm.  Based on Dredar's evaluation and recent radiological findings, Dredar found no indication

15   for surgical intervention.  But Dredar ordered physical therapy and a repeat MRI to further

16   evaluate plaintiff's pain.  Such treatment decisions were based on the doctor's evaluation and

17   observation of plaintiff, review of plaintiff's medical history, and the doctor's clinical judgment

18   and medical expertise.  (ECF No. 243 at 5.)

19        Dredar denies his entries re plaintiff's ADLs are contradictory, but rather show that

20   Dredar acknowledged plaintiff's reports of pain and ordered appropriate imaging to aid in

21   diagnosis.  (ECF No. 243 at 6.)  Moreover, despite plaintiff's assertions that Dredar falsely

22   reported observations of plaintiff, Dredar reviewed plaintiff's records, evaluated plaintiff and

23   assessed his symptoms and made medically reasonable and appropriate treatment decisions.

24   Because the challenged observations took place after Dredar's treatment decisions, such

25   challenges are not material to the issue of deliberate indifference.

26        Dredar contends that the record reflects that on these two occasions Dredar reviewed

27   plaintiff's medical records, interviewed and evaluated plaintiff, addressed his concerns, and chose

28   a medically reasonable and appropriate course of treatment.  Plaintiff adduced no evidence that

1   such treatment was unreasonable or inappropriate, but rather constitutes a disagreement with

2   Dredar's decisions, which fails to support a deliberate indifference claim.

3        Dr. Feinberg's Opinion

4        Dr. Feinberg opines that plaintiff's claims concerning Dredar's care on November 12,

5   2019, are not supported by the medical record.  (ECF No. 217-1 at 17.)  Rather, the medical

6   record shows

7   
8        Dr. Dredar took a pertinent history and performed a complete head to toe physical examination.  There is nothing to suggest that plaintiff was not properly evaluated at this appointment.  The medical record

9   also reflects that Dr. Dredar ordered an MRI at this appointment.  Lastly, . . . Dr. Dredar addressed plaintiff's complaints of pain in a

10   medically appropriate manner consistent with the medical standard of care.

11   (Id.)  Dr. Feinberg opined that "Dr. Dredar did not breach the standard of care in his rendition of

12   healthcare and treatment of plaintiff at any time," and "there is no indication in any of the records

13   [Dr. Feinberg] reviewed that would support plaintiff's claim that he suffered any damages arising

14   out of the medical care and treatment by Dr. Dredar."  (Id.)

15        Discussion

16        First, the undersigned finds that plaintiff has provided no expert evidence opposing

17   defendants' expert evidence that Dredar addressed plaintiff's pain complaints in a medically

18   appropriate manner.

19        Second, contrary to plaintiff's claims that Dredar "did nothing" for plaintiff's complaints

20   of pain, the record reflects that Dredar renewed plaintiff's Tylenol and topical capsaicin.  (UDF

21   32.)  Plaintiff's contention that such items were not effective does not demonstrate deliberate

22   indifference, but rather constitutes a difference of opinion regarding the proper medications to

23   treat his chronic pain.  See Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989) (a difference of

24   opinion between medical professionals concerning the appropriate course of treatment generally

25   does not amount to deliberate indifference).  To establish that a difference of opinion amounted to

26   deliberate indifference, the prisoner "must show that the course of treatment the doctors chose

27   was medically unacceptable under the circumstances" and "that they chose this course in

28   conscious disregard of an excessive risk to the prisoner's health."  Jackson v. McIntosh, 90 F.3d

at 332.)  In addition, Dredar ordered physical therapy and a repeat MRI of plaintiff's cervical spine.  (UDF 32.)  Contrary to plaintiff's claim that Dredar's notes concerning ADLs were contradictory, Dredar's note that plaintiff's pain interferes with ADLs acknowledges plaintiff's pain complaints.  (ECF No. 239 at 178.)  Moreover, again, both statements can be true.  Plaintiff has not shown that there is a material dispute of fact as to whether Dredar's decisions regarding plaintiff's pain demonstrated a conscious disregard to an excessive risk to his health.

Third, crediting plaintiff's claim that Dredar did not order the MRI until after plaintiff submitted the health care request (UDF 32), does not present a material dispute of fact.  Even assuming Dredar failed to review a medical record from 2016 prior to the November 12, 2019 appointment, such failure would constitute negligence, not deliberate indifference.  Moreover, Dredar included the MRI order in his November 12, 2019 medical record, so there was no delay in its recording, and Dredar ordered the MRI.  (UDF 32.)  Even if the order was delayed by one day, such delay does not constitute deliberate indifference.

Fourth, as to the grievance interview, plaintiff contends it took another two months to get a cortisone shot in his shoulder.  (ECF No. 237 at 35.)  However, plaintiff did not refute Dredar's declaration that plaintiff declined the steroid injection at that interview.  (UDF 26.)  In addition to his note that plaintiff sought tramadol, Dredar clarified that he "noted that there were reports of [plaintiff] . . . fixating on opiate medication."  (ECF No. 199-5 at 2.)  In any event, the undersigned does not find Dredar's notations are contradictory; indeed both statements could be true, and neither statement evidences deliberate indifference.  Plaintiff's claim that Dredar "completely disregarded plaintiff's extreme pain and neck condition" is belied by Dredar charting that plaintiff was taking Tylenol and did not show any signs of discomfort or distress, as well as Dredar's declaration that Dredar "did not see any medical indication for neurosurgical intervention at that time and recommended conservative treatment."  (ECF No. 199-5 at 3.) Plaintiff adduced no competent medical evidence to the contrary.

Plaintiff refused appointments with Dredar on December 12 and 17, 2019, and thus any failure to subsequently provide medical care could not evidence Dredar's deliberate indifference.
////

1    For all of the above reasons, the undersigned finds that defendant Dr. Dredar is entitled to

2    summary judgment.

3        5.  Defendant Dr. Mansour

4    Dr. Mansour argues he did not ignore or fail to respond to plaintiff's pain or medical

5    needs on the three occasions he treated plaintiff.  Rather, Mansour reviewed plaintiff's medical

6    history, including recent specialist recommendations and plaintiff's symptoms, directly observed

7    plaintiff, and planned for plaintiff's care based on Mansour's clinical judgment and medical

8    expertise.  Moreover, Mansour's decisions were found to be medically reasonable and appropriate

9    by Dr. Feinberg.

10    In opposition, plaintiff asserts that there are triable issues of material facts as to whether

11    Mansour was deliberately indifferent by failing to:  (1) follow the specialist's recommendation;

12    (2) address plaintiff's complaints of uncontrolled pain, lack of sleep and exercise; and (3) provide

13    any care for plaintiff's chief medical condition (his neck).  (ECF No. 237 at 26.)  Plaintiff argues

14    that Mansour wholly failed to address plaintiff's neck issue and allowed plaintiff to endure the

15    wanton and unnecessary infliction of pain.

16    In reply, defendants counter that plaintiff failed to provide evidentiary support for his

17    claims against Mansour.  (ECF No. 243 at 3.)  Further, it was not unreasonable for Mansour to

18    require a course of physical therapy as a conservative approach before ordering an MRI (UDF

19    31); the Constitution does not require that prison doctors give inmates every medical treatment

20    they want.  (ECF No. 243 at 4.)

21    "Typically, a difference of opinion between a physician and the prisoner -- or between

22    medical professionals -- concerning what medical care is appropriate does not amount to

23    deliberate indifference."  Edmo v. Corizon, Inc., 935 F.3d 757, 786 (9th Cir. 2019) (citations,

24    quotations and brackets omitted).  "But that is true only if the dueling opinions are medically

25    acceptable under the circumstances."  Id. (citation omitted).

26    Here, plaintiff again fails to adduce competent medical evidence to rebut Dr. Feinberg's

27    medical opinion that plaintiff's claims that Mansour violated plaintiff's Eighth Amendment rights

28    are not supported by the medical record.

45

1
2
3
4
5
6
7
8
9
10
11
12
13

> Dr. Mansour evaluated Plaintiff via telemedicine, commonly used in prisons and anywhere transportation is made difficult, and which has become quite common throughout medical care due to the COVID-19 pandemic. At their appointment on August 15, 2019, Plaintiff requested an MRI of his neck to assess a disc herniation. Dr. Mansour noted that Plaintiff had just been seen for the same issue three days prior by Dr. Nikolic, at which time a referral to physical therapy was submitted prior to considering a cervical spine MRI. Neither physician noted any red flag signs or symptoms, nor issues with activities of daily living. As Plaintiff was clinically stable, Dr. Mansour felt the best course of action was to first obtain x-rays of the neck, pursue physical therapy as ordered, and then determine if a follow-up MRI was necessary. This is medically appropriate and consistent with the medical standard of care. Likewise, Dr. Mansour addressed Plaintiff's complaints of pain at all of their visits in a medically appropriate manner consistent with the medical standard of care. Plaintiff may disagree, but a disagreement with a treating physician in and of itself does not represent deliberate indifference nor negligence. . . It is my professional opinion that Dr. Mansour did not breach the standard of care in his rendition of healthcare and treatment of Plaintiff at any time. Further, there is no indication in any of the records I reviewed that would support Plaintiff's claim that he suffered any damages arising out of the medical care and treatment by Dr. Mansour.

14    (ECF No. 217-1 at 16.)

15    Plaintiff contends that Dr. Feinberg's position is contradicted by Edmo, 935 F.3d at 757,

16    and Shockner v. Soltanian, 2021 U.S. Dist. LEXIS 163765 (E.D. Cal. July 28, 2021), and that

17    Mansour failed to provide any care for plaintiff's neck, citing Kunkel v. Dill, 2012 U.S. Dist.

18    LEXIS 71993 (E.D. Cal. May 23, 2012), Jett, supra, McGuckin, supra, Estelle, supra.  (ECF No.

19    237 at 26.)  The undersigned finds Edmo distinguishable on its facts.  Id.  In Edmo, the Ninth

20    Circuit recognized that failing to provide medically necessary treatment for gender dysphoria may

21    violate the Eighth Amendment.  Id. at 767.  But in Edmo, the defendant prison wholly denied

22    medically necessary treatment (gender confirmation surgery).  Id. at 773.  While plaintiff broadly

23    claims he was provided no medical treatment for his pain or his neck, the record demonstrates

24    otherwise.  (UDF 17, 23-31, 33, 35-38, 39, 42-45.)

25    The record demonstrates that Mansour met with plaintiff on three occasions, reviewed

26    plaintiff's medical history, chart, and recent neurosurgical and orthopedic surgery evaluations,

27    ordered plaintiff's repeat cortisone shot for his shoulder, reviewed and approved plaintiff's pain

28    medication, ordered an x-ray of plaintiff's foot, and opted to await plaintiff's course of physical

46

1   therapy before ordering an MRI.  (UDF 27, 28, 29, 31.)  As argued by defendants, Mansour's

2   conservative approach does not evidence deliberate indifference.

3            For all of the above reasons, defendant Dr. Mansour is entitled to summary judgment.

4            6.  Denial or Delay of Current Neck MRI

5            Plaintiff argues that on March 25, 2019, Barber denied the specialist's request for a

6   current MRI of plaintiff's neck for surgery that had previously been approved.  However,

7   Barber's medical record rebuts plaintiff's argument.  Barber did not deny but rather deferred the

8   MRI until after plaintiff was seen by the orthopedist, and then referred plaintiff to orthopedic

9   surgery.  Although plaintiff claims he had previously been approved for neck surgery, the medical

10  records demonstrate that such referral had expired, and also indicated plaintiff had previously

11  refused the neck surgery.  (ECF No. 239 at 41.)  Indeed, plaintiff had another opportunity to have

12  the surgery in June of 2021, but asked that it be rescheduled.  Thus, any delay in receiving the

13  neck MRI did not result in an excessive risk of harm to plaintiff, which finding is supported by

14  Dr. Feinberg's expert opinion.

15           Viewing all of the evidence in the light most favorable to plaintiff, plaintiff has not

16  presented evidence creating a triable issue of fact as to whether Barber was deliberately

17  indifferent to plaintiff's serious medical needs when she deferred the neck MRI until after

18  plaintiff was again seen by the orthopedist.  At most, the evidence shows a difference in opinion

19  between plaintiff and Barber.  To the extent the care was different than what plaintiff wanted or

20  less than ideal, such care does not support a finding of deliberate indifference.  See Estelle, 429

21  U.S. at 106 ("[m]edical malpractice does not become a constitutional violation merely because

22  the victim is a prisoner."); see also Wood, 900 F.2d at 1334 (noting that even gross negligence is

23  insufficient to establish deliberate indifference to serious medical needs); and Johnson v. Fortune,

24  No. 1:15-cv-1613 LJO MJS, 2016 WL 1461516, at *2 (E.D. Cal. April 4, 2016) ("a difference of

25  opinion between a prisoner-patient and prison medical authorities regarding treatment does not

26  give rise to a [§] 1983 claim.") (quoting Franklin v. Oregon, 662 F.2d 1337, 1344) (9th Cir.

27  1981).

28  ////

1   Finally, while the record demonstrates a delay in plaintiff receiving the neck MRI with

2   and without contrast, plaintiff fails to demonstrate an excessive risk of harm caused by such

3   delay.  Indeed, plaintiff's ambivalence as to whether or not to have the neck surgery is well-

4   documented.  Plaintiff's reluctance is appropriate; Dr. Ramberg noted that "the probability of

5   relief of cervical pain and stiffness" following such surgery was "in the range of 60%."  (ECF No.

6   216-1 at 134.)  In addition, the surgery posed substantial risks.  (ECF No. 216-1 at 135

7   "permanent disability, death.")  The proposed neck surgery was not like the hip replacement

8   surgery required in Snow, 681 F.3d at 988, which was almost certain to improve the prisoner's

9   pain and function in the activities of daily living.  Nor was it like the gender confirmation surgery

10  denied in Edmo, 949 F.3d at 489, which was proposed to address Edmo's gender dysphoria.

11  Moreover, following the neck MRI with contrast, nonparty Dr. Ramberg did not

12  recommend surgery, but rather recommended pain management injections into plaintiff's facet

13  joints, with a six month follow-up.  (ECF No. 217-1 at 117-18.)  And again, despite initially

14  agreeing to such injections, plaintiff refused the injections on November 25, 2020.  (ECF No.

15  217-1 at 129-30.)  Subsequently, on March 24, 2021, Dr. Ramberg saw plaintiff who complained

16  of "increasing cervical pain and numbness in the arms," and plaintiff agreed to have surgery,

17  which was approved and scheduled.  But on June 27, 2021, plaintiff again declined to have the

18  neck surgery.  (ECF No. 217-1 at 133.)  Thus, the additional delay in receiving the neck MRI

19  with contrast, in addition to the undisputed evidence that plaintiff's symptoms worsened over

20  time, on this record, fails to demonstrate it resulted in an excessive risk of harm to plaintiff.

21  Therefore, all of the defendants are entitled to summary judgment on plaintiff's claim concerning

22  the delay in receiving the neck MRI with contrast.

23      7.  Non-treating Defendants

24  District courts are divided on whether a medically trained supervisor who learns about

25  alleged unconstitutional behavior from a prisoner's grievance and fails to intervene is personally

26  involved in the constitutional violation.  Nicholson v. Finander, 2014 WL 1407828, *7 (C.D. Cal.

27  April 11, 2014).  Some district courts have reasoned that no constitutional claim of any sort may

28  be based upon the administrative appeals process.  Id. (cases cited therein).  Other cases have held

1   that a grievance appeal reviewer who fails to remedy a denial of adequate medical care personally

2   participates in the alleged deprivation.  Id. (cases cited therein).

3       Administrative or supervisory defendants who were involved in reviewing claims in an

4   administrative grievance process may be liable for the constitutional violations complained of in

5   those grievances, depending upon (1) the type and timing of problem complained of, and (2) the

6   role of the defendant in the process.  For example, an appeals coordinator cannot cause or

7   contribute to a completed constitutional violation, which occurred in the past and which is not

8   remediable by any action the reviewer might take.  See, e.g., George v. Smith, 507 F.3d 605, 609-

9   10 (7th Cir. 2007) ("A guard who stands and watches while another guard beats a prisoner

10  violates the Constitution; a guard who rejects an administrative complaint about a completed act

11  of misconduct does not.").  A defendant whose only role in a completed constitutional violation

12  involved the denial of a grievance "cannot be liable under § 1983."  Shehee v. Luttrell, 199 F.3d

13  295, 300 (6th Cir. 1999).

14      If, however, the administrative or supervisory defendant "knew of an ongoing

15  constitutional violation and . . . had the authority and opportunity to prevent the ongoing

16  violation," yet failed to act to remedy the violation, then the defendant may be held liable under

17  § 1983.  Herrera v. Hall, No. 1:08-cv-1882 LJO SKO, 2010 WL 2791586 at *4 (E.D. Cal. July

18  14, 2010) (unpublished) (citing Taylor, 880 F.2d at 1045), report and recommendation adopted,

19  2010 WL 3430412 (E.D. Cal. Aug. 30, 2010).  Where claims are asserted against persons who

20  supervise the provision of prison medical care, the question at summary judgment is not whether

21  the supervisor was "directly involved" in the plaintiff's treatment.  Gonzalez v. Ahmed, 67 F.

22  Supp. 3d 1145, 1156 (N.D. Cal. 2014).  Instead, the question is whether the plaintiff has provided

23  evidence from which a jury could find that the supervisor's "knowing failure to address" the

24  treating provider's deficient care interfered with the plaintiff's medical treatment.  Id.

25      Here, establishing that defendants Singh, Recarey, Adams, and Gates committed a

26  constitutional violation depends on establishing that plaintiff's treating medical providers

27  committed a constitutional violation.  See Starr v. Baca, 652 F.3d 1202, 1207 (9th Cir. 2011)

28  (holding that liability of a supervisor requires a causal connection between the supervisor's

1    misconduct and the constitutional violation committed by the subordinate); see also Patrick v.

2    Rivera, 2013 WL 2945118, at *11 (D. Idaho June 13, 2013) ("Where, as here, there is no

3    constitutional violation by the officers, there can be no municipal liability."); City of Los Angeles

4    v. Heller, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands

5    of the individual police officer, the fact that the departmental regulations might have authorized

6    the use of constitutionally excessive force is quite beside the point.").  Because defendants have

7    shown that plaintiff cannot establish an Eighth Amendment violation based on the tapering and

8    discontinuation of plaintiff's morphine, and the concomitant prescription of Tylenol and other

9    efforts to treat plaintiff's pain, as well as the refusal to prescribe orthopedic shoes, or the delay in

10   receiving the neck MRI or the cortisone shot for plaintiff's shoulder, plaintiff also cannot

11   establish such a violation based on the review of plaintiff's grievances challenging such conduct

12   or their failure to respond to plaintiff's letters or CDCR 22 requests for interview by defendants

13   Adams, Singh, Recarey, and Gates concerning such treatment or alleged lack of treatment.

14          8.  Purported Conspiracy

15          Plaintiff now claims that once litigation began, defendants Adams, Recarey and Singh

16   conspired to alter evidence that Barber violated policy by willfully falsifying her March 6, 2019

17   medical record, by changing the outcome of the administrative review to find policy was not

18   violated.  (ECF No. 237 at 41.)  However, such claim was not included in plaintiff's second

19   amended complaint.  An opposition to a motion for summary judgment is not a proper vehicle for

20   adding new claims to his complaint.  See Wasco Products, Inc. v. Southwall Technologies, Inc.,

21   435 F.3d 989, 992 (9th Cir. 2006) ("[T]he necessary factual averments are required with respect

22   to each material element of the underlying legal theory . . . .  Simply put, summary judgment is

23   not a procedural second chance to flesh out inadequate pleadings."); Brass v. County of Los

24   Angeles, 328 F.3d 1192, 1197-98 (9th Cir. 2003) (upholding the district court's finding plaintiff

25   waived § 1983 arguments raised for first time in summary judgment motion where nothing in

26   amended complaint suggested those arguments, and plaintiff offered no excuse or justification

27   for failure to raise them earlier); see also Williams v. Rodriguez, 2012 WL 1194160 at *9 (N.D.

28   Cal. Apr. 10, 2012) (declining to consider plaintiff's attempt to transform his claim against a

1  defendant doctor from one instance of cancelling a morphine prescription to a claim that the

2  defendant doctor denied him pain medication for years).

3       In any event, as discussed above, the violation of prison policy does not state a cognizable

4  federal civil rights claim.  Cousins, 568 F.3d at 1070.  And, because it is undisputed that on

5  February 18, 2019, Barber was unaware that the February 17, 2019 cheeking incident was false

6  (if it was), plaintiff's allegations concerning defendants' role in the grievance process in

7  addressing his claims of false accusations are not relevant here.

8                 9.  Qualified Immunity:  Eighth Amendment Violations

9       Defendants Singh, Recarey, Gates, and Adams also argue they are entitled to qualified

10  immunity because there is no clearly established consensus of case law that provides officials

11  with fair warning that their alleged conduct violated plaintiff's constitutional rights.  (ECF No.

12  199-2 at 23.)  However, because the undersigned has determined that there was no constitutional

13  violation there is no need to analyze the parties' arguments regarding qualified immunity.  See

14  County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998) ("[T]he better approach to

15  resolving cases in which the defense of qualified immunity is raised to determine first whether the

16  plaintiff has alleged the deprivation of a constitutional right at all.");  see also Saucier v. Katz, 533

17  U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations

18  established, there is no necessity for further inquiries concerning qualified immunity.").

19  VII.  First Amendment - Retaliation

20           a.  The Parties' Positions

21       Plaintiff's Pleading

22       Plaintiff alleges that Barber retaliated against plaintiff because plaintiff sought redress via

23  medical grievances and complaints.  (ECF No. 88 at 12.)  On March 6, 2019, plaintiff was denied

24  care and ordered to leave Barber's office after plaintiff told Barber that plaintiff was reporting

25  Barber to the Medical Board and Barber responded by telling plaintiff to "suffer."  (ECF No. 88

26  at 12.)  Plaintiff claims he was also retaliated against with a "fraudulent note on 3/6/19 that he

27  cheeked his pain medication two days in a row (2/17/19 & 2/18/19)."  (Id.)  Despite plaintiff's

28  two-year prescription for orthopedic shoes, on March 25, 2019, Barber cancelled his shoe order,

1   denied the specialist's March 15, 2019 request for a current MRI of plaintiff's neck for surgery,

2   and denied the specialist's recommendation for "non-narcotic" pain medication Ultram.  (ECF

3   No. 88 at 12.)  Plaintiff was also denied care for his opiate withdrawals and severe daily pain.

4   Such actions and omissions occurred after plaintiff submitted complaints on Barber and plaintiff

5   notified her of his complaint filing on March 6, 2019.  (ECF Nos. 88 at 12; 242 at 14.)

6          Defendant Dr. Barber's Motion

7          Barber moves for summary judgment on this claim, arguing that even assuming,

8   arguendo, that a threat of filing a complaint constitutes protected conduct, plaintiff failed to

9   establish that such threat was the substantial or motivating factor for the alleged retaliatory

10  conduct.  (ECF No. 198-2 at 22.)  Plaintiff provided no documentary or other evidence, other than

11  his own conclusory allegations based on his own beliefs, that demonstrate a causal link between

12  his threat and any of Barber's conduct.  Notably, Barber had already informed plaintiff before the

13  March 6, 2019 medical encounter that Barber believed that orthopedic shoes and morphine might

14  not be medically warranted.  Thus, such decisions could not have been caused by plaintiff's

15  subsequent threat.

16         Moreover, Barber contends that plaintiff fails to demonstrate a triable issue of material

17  fact exists as to whether Barber's actions did not serve legitimate correctional goals.  Barber

18  declares that she ordered plaintiff to leave her office because plaintiff raised his voice at her,

19  which served an important penological interest of protecting order and the doctor's personal

20  safety and was per CDCR policy.  Barber's subsequent conduct involved medical decisions which

21  were supported with an underlying medical basis.  (ECF No. 198-2 at 22.)  Finally, Barber

22  contends plaintiff was not chilled from exercising his rights because he did file complaints of

23  multiple kinds against Barber after the March 6, 2019 encounter.

24         Plaintiff's Opposition

25         In opposition, plaintiff contends that on March 6, 2019, immediately after plaintiff

26  informed Barber that plaintiff was seeking redress against Barber, Barber stood, told plaintiff to

27  "suffer while you do so," and ordered plaintiff to leave her office without providing medical care.

28  (ECF No. 238 at 38.)  After plaintiff left, Barber still did not prescribe or do anything to help

plaintiff with his withdrawals or severe pain.  Rather, Barber then entered an allegedly falsified note that over 2 weeks before an unnamed psych tech brought Barber a cup of plaintiff's morphine residue on February 18, 2019, the day after first falsely reported cheeking report, indicating that plaintiff had cheeked his pain medication two days in a row so this was why she discontinued the medication.  (ECF No. 238 at 39.)  Plaintiff contends the February 18, 2019 allegation concerning morphine residue is virtually impossible because:  (a) the pain medication (extended release morphine) is never crushed per policy, (b) psych tech B. Ashalou, on duty all day February 18, 2019, stated she did not do this or ever see plaintiff cheek his medication.  (ECF No. 238 at 39, citing ECF No. 239-1 at 132 (Pl.'s Ex. LL)); (c) Barber made no mention of this incident in her February 18, 2019 notes, instead mentioning it for the first time in her March 6, 2019 notes, after plaintiff told Barber he was seeking redress against her; (d) Barber first told defendant R. Singh that it was psych tech Le who brought Barber the cup of residue on February 18, 2019 (ECF No. 238 at 40, citing ECF No. 239-1 at 132 (Pl.'s Ex. LL)), but after June 6, 2019, when psych tech Le denied doing this, and the initial grievance response found Barber violated policy and litigation began, Barber changed her story, identifying psych tech N. Thai as the tech who brought Barber the cup of residue (id.); and (e) defendant Adams confirms that N. Thai never gave plaintiff his pain medication.

Plaintiff contends Barber's retaliation was compounded by her actions on March 25, 2019: Barber denied the specialist's request for current cervical MRI to schedule a surgery; denied care for plaintiff's neck disc bulge; disregarded plaintiff's notice of extreme neck pain and lack of sleep/exercise; denied non-narcotic recommended by specialist and continued ineffective over-the-counter Tylenol; discontinued plaintiff's permanent therapeutic shoe order, and denied plaintiff adequate pain medication from February 25, 2019 to June 2020.  (ECF No. 238 at 41.) Such actions and omissions allowed plaintiff's terrible pain and did not advance any penological goals, were taken in an effort to chill his First Amendment rights, and demonstrate he has met all of the elements required for a retaliation claim, arguing that timing is circumstantial evidence of retaliatory intent.  (ECF No. 238 at 42), citing Pratt v. Rowland, 65 F.3d 802 (9th Cir. 1995).
////

1        Barber's Reply

2        Barber contends that plaintiff's listing of his disagreements with Barber's medical

3    treatment is insufficient because it fails to adduce evidence showing a causal link between the

4    alleged retaliation and the alleged protected conduct, a lack of legitimate correctional goals, or

5    that his exercise of his First Amendment rights was chilled.  (ECF No. 244 at 6.)  Rather, as

6    supported by the declarations of Barber and Dr. Feinberg, each of the medical decisions plaintiff

7    challenges had a legitimate medical rationale.  In addition, some of the complained-of conduct

8    took place before March 6, 2019, not immediately after plaintiff advised Barber plaintiff was

9    seeking redress.  For example, Barber declares that she informed plaintiff in January of 2019 that

10   morphine and orthotic shoes might not be warranted.  Indeed, within this claim, plaintiff himself

11   states that Barber denied plaintiff adequate pain medication from February 25, 2019, which was

12   before plaintiff informed Barber that plaintiff would seek redress.  Finally, Barber reiterates that

13   plaintiff failed to show his First Amendment rights were chilled or deterred -- failing to dispute

14   defendant's evidence that plaintiff continued to assert his rights through grievances -- and even

15   stating that Barber's alleged conduct was "an effort to chill," not that his rights were, in fact,

16   chilled.  (ECF No. 244 at 7.)

17                b.  Legal Standards

18       "Prisoners have a First Amendment right to file grievances against prison officials and to

19   be free from retaliation for doing so."  Watison v. Carter, 668 F.3d 1108, 1114 (9th Cir. 2012)

20   (citing Brodheim v. Cry, 584 F.3d 1262, 1269 (9th Cir. 2009)).  A viable retaliation claim in the

21   prison context has five elements:  "(1) An assertion that a state actor took some adverse action

22   against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4)

23   chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably

24   advance a legitimate correctional goal."  Rhodes v. Robinson, 408 F.3d 559, 567-68 (9th Cir.

25   2005).  The provision of adequate medical care to inmates to maintain their health is a legitimate

26   correctional goal.

27       Nevertheless, First Amendment retaliation is not established simply by showing adverse

28   activity by a defendant after protected speech; rather, the plaintiff must show a nexus between the

54

1   two.  See Huskey v. City of San Jose, 204 F.3d 893, 899 (9th Cir. 2000) (retaliation claim cannot

2   rest on the "logical fallacy of post hoc, ergo propter hoc, literally, "after this, therefore because of

3   this.""").  The plaintiff must allege specific facts demonstrating that the plaintiff's protected

4   conduct was "the 'substantial' or 'motivating' factor behind the defendant's conduct."  Brodheim,

5   584 F.3d at 1271 (quoting Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir.

6   1989)).  Thus, plaintiff must "'put forth evidence of retaliatory motive, that, taken in the light

7   most favorable to him, presents a genuine issue of material fact as to [defendant's] intent'" in

8   taking the adverse action.  Brodheim, 584 F.3d at 1271 (quoting Bruce v. Ylst, 351 F.3d 1283,

9   1289 (9th Cir. 2003).)

10                              c.  Discussion

11        Here, it is undisputed that on March 6, 2019, plaintiff verbally informed Barber that

12   plaintiff was seeking redress due to Barber's actions.  The Ninth Circuit has reiterated that the

13   constitutional right to redress of grievances "embraces threats to sue[.]"  Entler v. Gregoire, 872

14   F.3d 1031, 1039 (9th Cir. 2017) (citing Jones v. Williams, 791 F.3d 1023, 1035-36 (9th Cir.

15   2015)).  In Entler, the Ninth Circuit noted that in Jones, the court held that dismissal of a

16   retaliation claim was improper because the inmate's complaints of discrimination to his

17   supervisors and threats that he intended to sue them were constitutionally protected.  Entler, 872

18   F.3d at 1039.  Thus, plaintiff's March 6, 2019 verbal threat was protected conduct.

19        However, plaintiff fails to demonstrate that Barber's adverse actions were taken because

20   of plaintiff's March 6, 2019 verbal threat to seek redress against her.  Rather, the evidence shows

21   that Barber informed plaintiff as early as January 23, 2019, the first time she saw plaintiff, that

22   she did not believe plaintiff's medical conditions warranted the amount of morphine he was

23   getting.  (UDF 21.)  Importantly, Barber began tapering off plaintiff's morphine based in part on a

24   cheeking report Barber received from psych tech Le on February 17, 2019.  While plaintiff

25   vociferously argues that Barber's March 6, 2019 report was false, he adduces no competent

26   evidence that Barber knew the February 17, 2019 cheeking report by psych tech Le was false (if it

27   was) on February 18, 2019, when the tapering began.  And even assuming the March 6, 2019

28   report was false, there is no causal connection through timing, because the tapering of the

1   morphine began on February 18, 2019, <u>before</u> plaintiff told Barber on March 6, 2019 that plaintiff

2   would be taking action against her.  Also, plaintiff was prescribed Tylenol before March 6, 2019,

3   and on February 26, 2019, the triage nurse confirmed that plaintiff's PCP would not prescribe an

4   opiate or anything stronger.  (ECF No. 217-1 at 47; 239 at 60.)  Thus, there is no causal

5   connection between the alternative medication prescribed prior to Barber's actions on March 6,

6   2019.  Moreover, it is undisputed that the morphine was tapered until February 25, 2019, and

7   although plaintiff was reporting withdrawal symptoms thereafter, various nursing professionals

8   found plaintiff required no additional medical care, and on March 7, 2019, the day after Barber

9   ordered plaintiff out of her office, in a grievance concerning his neck pain, plaintiff reported that

10  "[m]ost withdrawal symptoms bearable now but still have blurry vision at times."  (ECF No. 239

11  at 64.)

12          Plaintiff is required to adduce evidence demonstrating that the plaintiff's protected

13  conduct was "the 'substantial' or 'motivating' factor behind the defendant's conduct."  <u>Brodheim</u>,

14  584 F.3d at 1271 (quoting <u>Soranno's Gasco, Inc.</u>, 874 F.2d at 1314).  Plaintiff fails to do so.

15          Importantly, the evidence shows that the taper advanced a legitimate medical goal of

16  ending morphine for plaintiff whose pain was not of the sort that warranted the use of morphine.

17  Taking a prisoner off opiates that are not appropriate for his medical condition also advances the

18  legitimate penological goal of reducing prescription drug abuse and drug addiction among the

19  prison population.  <u>See</u>, <u>e.g.</u>, <u>Hicks v. Dotson</u>, 73 F. Supp. 3d 1296, 1305 (E.D. Wash. 2014)

20  ("The DOC has a legitimate penological goal in regulating prescription pain medication to avoid

21  drug abuse."); <u>Joseph v. Clayton</u>, 2020 WL 804863, at *7 (S.D. Cal. Feb. 18, 2020) (noting that

22  "reducing prescription drug abuse and drug addiction among the prison population" is a

23  legitimate penological interest) (internal quotation marks and citations omitted); <u>Miller v.</u>

24  <u>California Dep't of Corr. & Rehab.</u>, 2018 WL 534306, at *18 (N.D. Cal. Jan. 24, 2018) (taking

25  inmate off medication "not appropriate for his medical condition also advances the legitimate

26  penological goal of reducing prescription drug abuse and drug addiction among the prison

27  population"); <u>Juarez v. Butts</u>, 2020 WL 2306850, at *11 (E.D. Cal. May 8, 2020) (noting that,

28  "even if staff was incorrect to conclude that [plaintiff] intended to abuse his medication, their

1   assessment reflects a legitimate penological interest in preventing drug abuse") (internal quotation

2   marks and citation omitted);[24] Townsen v. Hebert, 2015 WL 5782036, at *4 (D. Nev. Oct. 2,

3   2015) ("Courts have repeatedly recognized inmates' health and safety as legitimate penological

4   interests.") (citations omitted).

5          Given that the morphine taper and discontinuation reasonably advanced a legitimate

6   medical goal that was also a "legitimate correctional goal," plaintiff cannot establish one of the

7   essential elements of a retaliation claim.  See Rhodes, 408 F.3d at 567-68.  Viewing the evidence

8   and the reasonable inferences therefrom in the light most favorable to plaintiff, no reasonable jury

9   could find that Barber was not motivated by a legitimate penological interest in tapering and

10  discontinuing plaintiff's morphine prescription, particularly where she was not informed of

11  plaintiff's protected conduct until after such medical decisions were made.

12         Plaintiff also contends that on March 6, 2019, Barber retaliated against plaintiff by telling

13  plaintiff to "suffer," and ordered plaintiff to leave Barber's office without providing medical care.

14  Plaintiff declares he was in Barber's office "approximately 60 seconds."  (ECF No. 239 at 6.)

15  On the other hand, Barber declares that because plaintiff raised his voice at her, Barber ordered

16  plaintiff to leave her office, which served important penological interests in protecting order and

17  Barber's personal safety, and was consistent with CDCR policies.  (ECF No. '198-5 at ¶ 15.)

18  Plaintiff adduced no evidence to rebut Barber's declaration that ordering plaintiff out of her office

19  comported with CDCR policies and protected order and Barber's personal safety.  Moreover,

20  while plaintiff may not have obtained medical care from Barber on March 6, 2019, he was

21  subsequently seen by nursing staff for his complaints concerning withdrawal symptoms, who

22  determined no additional medical care was required.  Indeed, by his own account, his withdrawal

23  symptoms had largely abated by March 7, 2019.  On March 15, 2019, plaintiff was seen by

24  neurological surgeon Dr. Rahimifar, and on March 25, 2019, Barber provided plaintiff further

25  medical treatment, including a referral for physical therapy and the PMC, although it was not the

26

27  [24]  Initially, the findings and recommendation were adopted, 2020 WL 3542193 (E.D. Cal. June 30, 2020), but the order was rescinded on July 1, 2020, to address Juarez' request for extension of time to file objections; subsequently, the findings and recommendation were adopted, 2020 WL 6871062 (E.D. Cal. Nov. 23, 2020).

28

1   treatment plaintiff wanted.  As argued by Barber, the record shows that the subsequent medical

2   care provided by Barber reasonably advanced a legitimate medical goal, also a "legitimate

3   correctional goal," as opined by Dr. Feinberg.

4        Therefore, for all the above reasons, defendant Dr. Barber is entitled to judgment as a

5   matter of law on plaintiff's retaliation claim.

6   VIII.  State Law Claims

7        Based on the above recommendations, this court declines to exercise supplemental

8   jurisdiction over plaintiff's state law claims and orders that his state law claims be dismissed

9   without prejudice.  See 28 U.S.C. § 1367(c)(3); Ove v. Gwinn, 264 F.3d 817, 826 (9th Cir. 2001).

10  IX.  Remaining Motions

11       A.  Motions to Strike

12       In his oppositions, plaintiff moved to strike Dr. Feinberg's "perjured" declarations "for

13  clear evidence of falsity."  (ECF Nos. 237 at 4, 238 at 4) (citing In re Phenylpropanolamine

14  Products, 460 F.3d 1217 (9th Cir. 2006).  There are two declarations by Dr. Feinberg on file, one

15  17 pages, the other 19 pages.  Plaintiff fails to support his conclusory claim with specific facts or

16  evidence.  Plaintiff also fails to explain how the cited Ninth Circuit case supports his position.

17  Plaintiff's unsupported motions to strike are denied.

18       B.  Motion to File Sur-Reply

19       Plaintiff sought leave to file a sur-reply to correct defendant Dr. Mansour's reply claiming

20  that the July 10, 2019 medical record indicated plaintiff was not a candidate for surgery.  (ECF

21  No. 247 at 1, citing reply at 3-4.)  Plaintiff clarifies that it was the syringomyelia that was non-

22  surgical, citing Dr. Rahimifar's March 15, 2019 report.  However, plaintiff also had a disc

23  herniation at C5-C6, which is the serious painful medical condition that caused the surgeon to

24  request a current MRI with and without contrast.  (Id.)  Plaintiff argues that it was this serious

25  painful medical condition (disc bulge/herniation) that defendants disregarded and failed to

26  provide medical care for until after extensive substantial delay.  (ECF No. 247 at 1.)

27       Plaintiff's motion to file sur-reply (ECF No. 246) is granted, and the undersigned has

28  considered plaintiff's sur-reply (ECF No. 247).

1

### C. April 29, 2022 Motion to Strike

2
Plaintiff contends that defendants failed to specifically address plaintiff's claim that

3
Barber rapidly reduced his morphine in one week, in violation of policy and CDCR guidelines,

4
"which subjected him to extreme withdrawals he was allowed to endure without help/care."

5
(ECF No. 248 at 2.)  Plaintiff claims he moved for summary judgment on this claim, and that

6
defendants failed to address such argument until defendants (except Barber) addressed the

7
argument for the first time in their reply.  He contends the argument must be stricken inasmuch as

8
the Ninth Circuit states that "new arguments and evidence presented for the first time in a reply

9
are generally waived or ignored."  (ECF No. 248 at 3) (quoting Bridgham-Morrison v. Nat'l Gen.

10
Assur. Co., 2015 U.S. Dist. LEXIS 183214 (W.D. Wash. Nov. 16, 2015), and citing United States

11
v. Puerta, 482 F.2d 1297 (9th Cir. 1992).

12
The remaining defendants oppose plaintiff's motion, pointing out that defendants' motion

13
included evidence and argument addressing plaintiff's disagreement with Barber concerning

14
plaintiff's need for morphine.  (ECF No. 249 at 1, citing ECF No. 199-2.)  In addition, the expert

15
declaration of Dr. Feinberg analyzed plaintiff's medical care, opining that "Dr. Barber exercised

16
good medical judgment, comporting with nationally recognized standards for care for pain

17
management, when she acted in plaintiff's best interests by tapering him off opioid pain

18
medication."  (ECF No. 217-1 at ¶ 58.)  Remaining defendants contend that plaintiff's motion to

19
strike failed to address defendants' evidence and argument addressing the course of treatment

20
regarding pain medication, and thus fails to provide a basis to strike any argument from

21
defendants' reply.

22
In reply, plaintiff reiterates his view that defendants failed to specifically address

23
plaintiff's claim that he was subjected to cruel and unusual punishment by being tapered off

24
morphine over a period of just seven days with no help for withdrawals, despite receiving 30 mg

25
of morphine twice a day for five years.  (ECF No. 250 at 2.)

26
Defendants adduced evidence and arguments concerning Barber's medical care in

27
connection with the tapering of morphine and the alleged lack of care for plaintiff's withdrawals,

28
as discussed in the tapering/withdrawal section set forth above.  On this record, the undersigned

1    agrees that plaintiff's motion to strike is not well-taken.  Plaintiff's motion to strike defendants'

2    argument (ECF No. 248) is denied.

3    X.  Objections

4          The issues in this action have been extensively briefed by both parties.  For that reason,

5    objections to these findings and recommendations shall be no longer than fifteen pages.

6    XI.  Conclusion

7          Accordingly, IT IS HEREBY ORDERED that:

8          1.  Plaintiff's motions to strike Dr. Feinberg's declarations (ECF Nos. 237 at 4, 238 at 4)

9    are denied;

10          2.  Plaintiff's motion to file sur-reply (ECF No. 246) is granted; and the undersigned

11    considered plaintiff's sur-reply (ECF No. 247); and

12          3.  Plaintiff's motion to strike defendants' argument (ECF No. 248) is denied.

13          Further, IT IS RECOMMENDED that:

14          1.  Defendant Barber's motion for summary judgment (ECF No. 198) be granted;

15          2.  The remaining defendants' motion for summary judgment (ECF No. 199) be granted;

16    and

17          3.  The court decline to exercise supplemental jurisdiction over plaintiff's state law claims,

18    and dismiss such state law claims without prejudice.

19          These findings and recommendations are submitted to the United States District Judge

20    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

21    after being served with these findings and recommendations, any party may file written

22    objections with the court and serve a copy on all parties.  Such a document should be captioned

23    "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

24    objections shall be filed and served within fourteen days after service of the objections.  The

25    parties are advised that failure to file objections within the specified time may waive the right to

26    appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

27    Dated:  January 27, 2023

       /wilk1338.dfts.msjs

28

                                                    KENDALL J. NEWMAN
                                                    UNITED STATES MAGISTRATE JUDGE